## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————

|  |  |  |
|---|---|---|
| **SULTAN M. CHOWDHURY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 1:05CV02368 - RMU |
| | ) | |
| **MARTIN J. GRUENBERG, ACTING** | ) | |
| **CHAIRMAN, FEDERAL DEPOSIT** | ) | |
| **INSURANCE CORPORATION,** | ) | |
| | ) | |
| Defendant. | ) | |

———————————————————

## DEFENDANT'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiff, Sultan M. Chowdhury ("Chowdhury" or "Plaintiff"), a former Grade CG-15 Senior Information Systems Specialist with the Federal Deposit Insurance Corporation ("FDIC" or "Agency"), alleges that the Defendant discriminated and retaliated against him and subjected him to non-sexual harassment that created a hostile work environment because of his race (Asian), color (Brown), national origin (Bangladesh), religion (Muslim) and gender (Male) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, *et seq*. ("Title VII").  After ample discovery, however, the Plaintiff has put forth no evidence that he suffered prohibited discrimination or retaliation in any form.

As set forth below, and as demonstrated in the Rule 56.1 Statement of Undisputed Material Facts accompanying Defendant's Motion for Summary Judgment, there is no genuine issue as to any material fact as to any of Plaintiff's claims.  Defendant therefore

respectfully requests that judgment be entered for Defendant as a matter of law, and that
Plaintiff's claims be dismissed with prejudice.

## II. FACTUAL BACKGROUND[1]

Plaintiff began his employment with the FDIC in June 1991.  At the time of the
alleged discrimination, he worked as a Grade CG-15 Senior Information Specialist on the
Central Data Repository ("CDR") Implementation Team in the FDIC's Division of
Insurance and Research ("DIR") until his disability retirement in July 2005.  Chowdhury
had obtained this position in December 2002 as part of a settlement of a prior EEO civil
action that was filed in January 2000.

Plaintiff's claims in this case derive from three formal complaints of
discrimination filed with the EEOC in 2004 based primarily on three discrete acts: 1)
Chowdhury's non-selection for a Corporate Success Award ("CSA") by his supervisor,
Martin Henning ("Henning"), the CDR Project Manager, in February 2004; 2)
Chowdhury's receipt of a mid-term performance assessment in March 2004 from
Henning that his written communication skills did not meet expectations for his position
and grade level and later his placement on a 90-day performance improvement plan
("PIP") to improve his writing deficiencies; and 3) Chowdhury's non-selection for one of
three temporary positions as Supervisory Information Technology Specialist ("IT
Specialist"), by Mark Brenneman ("Brenneman"), Associate Director, Division of
Information Resources Management ("DIRM") in March 2004.

---

[1]  The facts set forth in this section are for information only.  For evidentiary references
in support of Defendant's motion, please refer to Defendant's Statement of Undisputed
Facts accompanying Defendant's Motion for Summary Judgment.

Plaintiff also alleges that Defendant retaliated against him because of his prior EEO activity with respect to his non-selection for the IT Specialist positions and his receipt of the mid-term review and PIP.  In addition to Plaintiff's claims of discrimination and retaliation, he also argues that these incidents, along with several others, constitute a hostile work environment.

**1.  CSA Nomination.**

In January 2004, all FDIC employees were considered for a CSA, which was a discretionary award that provided for a 3% increase in basic pay in addition to the annual pay raise, for those employees who were recognized as the top contributors with the Agency during calendar year 2003.  The purpose of this award was to recognize individual initiative, exceptional effort and achievements that reflected important contributions to the Agency.  Employees were evaluated and nominated based on one or more of four criteria: business results, competency, working relationships, and learning and development.  Since Henning did not become the Project Manager of the CDR team until October 2003, he consulted with Jim Crum, former Assistant Director, IDM Project Team, who had previously supervised the CDR team for the majority of the review period, regarding which team employees should be nominated for a CSA.  Crum recommended three employees who he felt met the CSA criteria – a Caucasian male, Jon Wisnieski, a Hispanic male, Mark Montoya, and a Caucasian female.  Crum did not suggest Chowdhury because he did not believe that Plaintiff's contributions rose to the level of the three recommended employees under CSA guidelines.  Henning nominated two employees for the 2003 CSA – Mark Montoya, and Jon Wisnieski.  Of the employees nominated by Henning, only Mr. Montoya received a CSA.

**2. Mid-Term Performance Review and PIP.**

Agency policy required Henning give all employees under his supervision a mid-year performance review.  In March 2004, Henning met with Plaintiff to discuss his mid-term performance rating.  Henning rated Plaintiff's overall performance as "meets expectations" with the exception of his written communication, which he found did not meet expectations for Chowdhury's position and grade level.  Henning summarized their meeting in a memorandum dated April 9, 2004.  The memorandum outlined specific actions Plaintiff would take over the next 90 days to improve his writing and further stated that Plaintiff's written work product would be reevaluated at the end of the 90-day period.

In May 2004, shortly after the mid-term review, Plaintiff sought psychological treatment for anxiety and depression.[2]  Henning met frequently with Plaintiff to evaluate his progress and provide feedback during the 90-day assessment period.  In June 2004, Henning told Plaintiff that his written communications were still not meeting expectations and therefore, he should not be surprised by his year-end performance review.  Chowdhury interpreted this statement as a threat.  Henning explained that his intent was to give Plaintiff honest, constructive feedback concerning his progress in advance of the year-end performance review to enable him to improve his written work product.  On August 18, 2004, Henning placed Plaintiff on a 90-day PIP when he concluded that Chowdhury's written work product had not improved to an acceptable level after months of counseling and related assistance.  The PIP cited specific examples of Plaintiff's written work that were deficient since Henning's initial assessment in

---

[2] Plaintiff had previously been treated for anxiety and depression beginning in April 1997.

March 2004 and provided detailed information on how Plaintiff could improve his performance, and how Henning would assist him in bringing his performance to an acceptable level.

Plaintiff disagreed with Henning's assessment. He maintained that he had good written communication skills and that Henning had singled him out and placed him on a PIP because of his race, color, national origin, religion and retaliation.

Plaintiff never completed the PIP. On November 9, 2004, nine days before the expiration of the PIP, Plaintiff was advised by his doctors that he should take a medical leave of absence. Plaintiff went out on extended medical leave and never returned to the workplace. While on leave, he applied for disability retirement which was approved effective July 23, 2005.

**3. Non-Selection for IT Specialist Positions.**

Plaintiff applied for one of three temporary IT Specialist, CG-15, positions posted in 2003. Eighteen individuals applied for these positions. A merit promotion panel rated and ranked qualified applicants occupying positions at the CG-14 level and twelve were referred for consideration. Because Plaintiff already occupied a CG-15 position he was referred non-competitively on a reassignment roster. Brenneman, the selecting official, convened a selection panel comprised of himself, Ralph Elosser ("Elosser"), Assistant Director, Division of Finance, and James Barker ("Barker"), Senior Counsel, Legal Division. Brenneman selected Elosser and Barker to interview the candidates with him because they were the senior IT liaisons for two divisions that DIRM supported and two of the selectees were expected to support their respective programs. The panel reviewed each candidate's application package and interviewed the candidates

asking them the same questions.  The panel considered the results of the interviews and each candidate's background and work experience.  Brenneman selected three applicants: Marcia Boardley ("Boardley"), an African American female, with no prior EEO activity, Melanie Chiaschi ("Chiaschi"), a Caucasian female, with no prior EEO activity and Noreen C. Padilla ("Padilla"), a Hispanic female with no prior EEO activity.  Plaintiff claimed that his background, education and experience far exceeded that of the selectees, and maintained that Brenneman did not select him for the position because of his race, color, national origin, gender and prior EEO activity.

**4.  Hostile Work Environment.**

Plaintiff has cited several interactions with Henning, in addition to the non-recommendation for a CSA and the unfavorable mid-term review and PIP discussed above, which he claims is evidence of harassment creating a hostile work environment. First, Chowdhury claims that upon his initial meeting with Henning, Henning told Plaintiff that he "fired people" and that he knew "Plaintiff's background."  Plaintiff construed this to mean that Henning knew that he had engaged in prior protected activity. Second, in November 2003, Plaintiff contends that Henning changed Plaintiff's job title from "Project Manager" to "Senior Information Systems Analyst" and thereafter Henning changed Plaintiff's work assignments.  Third, in February 2004, while Plaintiff was on leave, Henning told his staff during a meeting that Chowdhury would be transferring to another position after he was selected for the Internal Job Rotation Program ("IJRP"). Finally, Chowdhury claims that in March 2004, Henning "openly taunted" Plaintiff in front of two colleagues, Laura Lapin and Susan Koepp, that Chowdhury would not receive a raise for taking on additional duties.

## III. ARGUMENT

**A.  LEGAL STANDARD.**

**1. Summary Judgment.**

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Plaintiff, in response, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324. (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987). "If the evidence is

merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

## 2. Title VII Claims.

Title VII makes it unlawful for an employer to "fail to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). This statutory text establishes two elements for an employment discrimination case: (i) the employee suffered an adverse employment action (ii) because of the employee's race, color, religion, sex or national origin.

To prove a Title VII violation, Plaintiff must demonstrate by a preponderance of the evidence that the actions taken by the FDIC were "more likely than not based on the consideration of impermissible factors". *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Under the familiar three-step burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973), Plaintiff has the initial burden of making a *prima facie* showing of discrimination or retaliation.  If the Plaintiff succeeds, the burden shifts to the Defendant to produce credible evidence that its actions were taken for a legitimate, nondiscriminatory reason. *Id.*  Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve

no credibility assessment."). If the Defendant meets this burden of production, Plaintiff must prove that the employer's stated reason was pretext for discrimination or retaliation. *Burdine*, 450 U.S. at 256. To do so, the Plaintiff must show "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515. The burden of persuasion that discrimination motivated the Agency's actions remains at all times with the Plaintiff. *Id.* at 507; *Burdine*, 450 U.S. 253; *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (*en banc*).

**3. Plaintiff's *Prima Facie* Case of Discrimination and Retaliation.**

To establish a *prima facie* case of discrimination, Plaintiff must show that he: 1) belonged to a statutorily-protected group; and 2) he suffered an "adverse employment action"; 3) under circumstances giving rise to an inference of discrimination. *See Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (citing *Brown v. Brody*, 199 F.3d at 452; *Harding v. Gray*, 9 F.3d at 152). In the discrimination context, "an employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find *objectively tangible harm*." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (citing *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999) (emphasis added). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (internal quotation marks omitted). Accordingly, the D.C. Circuit has defined an adverse employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision

causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (internal citations omitted).

To establish a *prima facie* case of retaliation, Plaintiff must demonstrate that: 1) he engaged in statutorily protected activity; 2) a reasonable employee would have found the challenged action materially adverse; and 3) there is a causal relationship between the two. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415-16, 165 L.Ed.2d 345 (2006).[3]

With regard to the first prong of the *prima facie* case, the alleged activity must be statutorily protected. *Forkkio v. Powell*, 306 F.3d at 1131-32. As to the second prong, its purpose is to prohibit employer actions that cause harm, i.e. that are likely "to deter victims of discrimination from complaining to the EEOC, the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Burlington*, 126 S.Ct. at 2415. "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id*. With regard to the third prong, the plaintiff may establish a causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the [retaliatory] personnel action took place shortly after that activity." *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (quoting *Mitchell v. Baldridge*, 759 F.2d 80, 85 (D.C. Cir. 1985). However, the temporal activity must be very close. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (three or four-month period is insufficient to show causal connection, and 20-month period suggests "no causality at all").

---

[3] In *Burlington*, the Supreme Court held that the Title VII anti-retaliation provision extends beyond work-place related or employment-related acts and harms, but, at the same time, covers only those retaliatory actions that would have been materially adverse to a reasonable employee. *Id.* at 2416.

If Plaintiff is able to establish a *prima facie* case of retaliation, the analysis then follows that for a discrimination claim, Defendant must articulate legitimate non-discriminatory reasons for its actions and Plaintiff then has the burden of proving that Defendant's actions were taken for reasons other than those offered, but instead, for a retaliatory purpose. *Moses v. Howard Univ. Hosp.*, 474 F.Supp.2d 117 (D.D.C. 2007).

It is undisputed that Plaintiff is a member of five protected groups at issue: he is male, brown-complected, Asian, Bangladesh and Muslim. It is also undisputed that his filing of EEO complaints constitutes protected activity, for which Title VII protects against reprisal. *See* 42 U.S.C. § 2000e-3(a). However, the Plaintiff has failed to establish that he suffered an adverse action, the second element of the *prima facie* case of discrimination or retaliation, with respect to two of the acts complained of by Plaintiff – his non-nomination for a CSA and his mid-term review and placement on a PIP.[4] Additionally, Plaintiff has also failed to establish the third element of his retaliation claim based upon the unfavorable mid-term review and PIP or his non-selection for one of the IT Specialist positions.

**a. CSA Nomination.**

Plaintiff claims that Henning did not nominate him for a CSA because of his race, color and national origin. Plaintiff's Affidavit, Ex. 1, pp.1-2. The failure of a supervisor to nominate an employee for a performance award is not an adverse employment action where the receipt of the award is discretionary rather than automatic. *Douglas v.*

---

[4] There is also some question whether Plaintiff can establish an adverse employment action as to the third action, his non-selection for the IT Specialist position, a temporary lateral position. *See Maramark v. Spellings*, 2007 WL 2935411 (D.C. Cir. 2007)(denial of a five month temporary lateral position is not an adverse employment action).

*Jackson*, 2007 WL 891349, at *3 (D.D.C. 2007)(the failure to be nominated for an award is analogous to a negative performance rating, as such, it can only constitute an adverse employment action if the employee's receipt of the award, and the monetary bonus, would have been automatic); *see also Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996) (lowered performance evaluation of "fully successful" which prevented plaintiff from obtaining discretionary bonus did not constitute adverse employment action under Title VII). Both Henning, and Chowdhury's former supervisor, Crum explained that they would not recommend Chowdhury for a CSA because, in their judgment, Chowdhury's performance did not reflect the exceptional initiative, effort and/or achievement as defined by FDIC's criteria for receiving the CSA.[5] Fact # 30; Ex. C, ¶ 5 of Fact # 29; Ex. E, ¶ 6. Even if Chowdhury had been nominated for the CSA, the award was not automatic.[6] Because a discretionary bonus system leads only to a subjective expectation or hope that an employee might receive a bonus, it cannot give rise to an adverse employment action. *See Ball v. Tanoue*, 133 F. Supp.2d 84, 91 (D.D.C. 2001) (citing *Russ v. Van Scoyoc Assocs., Inc.*, 122 F.Supp.2d 29, 33 (D.D.C. 2000). Plaintiff was

---

[5] As the CSA Circular explains, meeting one or more of the four CSA criteria does not entitle an employee to be nominated to receive a CSA. Exhibit L; Fact # 27.

[6] The DIR procedures for reviewing and approving a CSA nomination were as follows: The first-line supervisor prioritized and assigned a numerical ranking for all nominated employees within his or her supervision. The CSA nomination forms were forwarded to the appropriate Associate Director, who was next in line to review the nominations and ranking. The Associate Director met with all Section Chiefs to discuss the rankings and determine a collective Branch ranking. The five Associate Directors and the Chief of Planning & Resource Management met with the DIR Executive Review Board (ERB) -- the Division Director and the Deputy Directors -- to discuss ranking and recommend a Division ranking. The Division Director made the final CSA determinations. 12/31/03 Memorandum re DIR Procedures for Processing Corporate Success Awards. Under this process, one of the two people nominated by Henning did not receive a CSA. Ex. 2.

materially unaffected by his failure to be nominated for a CSA.  He still enjoyed the same title, benefits, salary and grade level.

**b. Mid-Term Review and PIP.**

Plaintiff contends that Henning gave him an unfavorable mid-term review and later placed him on a PIP because of his race, color, national origin, religion and reprisal. Plaintiff's EEO Complaint # FDICEO-040043,  Ex. V.

The evaluation process that led to the PIP was not an adverse employment action.[7]  Plaintiff has failed to establish a materially adverse consequence giving rise to a claim for either discrimination or retaliation based upon the March 2004 mid-term review or the August 2004 PIP.  He does not establish, much less identify, any objectively tangible harm or injury produced by the mid-term review and PIP.[8]  The mid-term review and PIP did not result in any economic loss to Chowdhury or any change in his pay, grade, benefits or duty status.  He was not demoted, his pay did not change, and his responsibilities were not significantly modified.  Instead, he was presented with clear goals to assist him in improving his written communication.  Exs. O and U.  Moreover, the mid-term review memo and the PIP presented identifiable grounds for finding that

---

[7] A PIP is a non-disciplinary tool used to improve an employee's performance, not for misconduct. Ex. 3; Ex. 4.

[8] The Courts in this Circuit have consistently held that a plaintiff's subjective feelings of harm cannot form the basis of an adverse action. *See Forkkio*, 306 F.3d at 1130-31("[p]urely subjective injuries, such as … public humiliation or loss of reputation are not adverse actions") (internal citations omitted). *Dickerson v. SecTek, Inc.* 238 F.Supp.2d 66, 75 (D.D.C. 2002) (no adverse action in gender discrimination case where plaintiff's only harm "was physiological—the stress that she endured when faced with the prospect of losing her position"); *Dage v. Johnson*, 537 F.Supp.2d 43, 62 (D.D.C. 2008)("[Plaintiff] was never actually removed from the [ ]program.  His anxiety, while perhaps understandable given his delicate health condition, was speculative, subjective, and ultimately unfounded.  Purely subjective harm of this nature does not represent an actionable adverse action").

Plaintiff's written work did not meet expectations for his grade and position. *Id.*   Plaintiff faced no ultimate consequences from these actions as he never completed the PIP.  Fact #'s 48 – 51. Consequently, Plaintiff can point to no action on the part of the Agency which would dissuade a reasonable person from making or supporting charges of discrimination – indeed Plaintiff filed a formal discrimination complaint concerning these events.  "[T]he filing of a complaint after an alleged instance of retaliation militates against a conclusion that retaliation occurred, as it demonstrates that the filer was not deterred from protecting his rights." *Baloch v. Norton,* 517 F. Supp.2d 345, 361 (D.D.C. 2007) citing *DeHart v. Baker Hughes Oilfield Ops., Inc.,* 214 Fed. Appx. 437, 442 (5th Cir. 2007).  Plaintiff filed his formal EEOC complaint regarding the mid-term review and PIP on August 25, 2004. Ex. V.

As to the third element of a *prima facie* case of retaliation, Chowdhury has not demonstrated any nexus between his engaging in protected activity and Henning's mid-term review of Chowdhury and his placement on a PIP.  Henning first became aware that Chowdhury had entered into a settlement agreement with the FDIC involving a prior EEO lawsuit either at the end of 2003 or early 2004 while reviewing the position classifications and discussing those with Andrea Woolford ("Woolford"), Assistant Director Planning and Resource Management, DIR.  Woolford wanted to insure that FDIC complied with the terms of the settlement agreement. Ex. M, p. 1, ¶ 4.  In late April 2004, Henning learned that Plaintiff filed an informal complaint about the CSA when he was interviewed by an EEO counselor.  Ex. 5.  Thereafter, Plaintiff was placed on a PIP on August 18, 2004, almost four and one-half months after he made his informal complaint about the CSA and approximately eight months after Henning learned of

Plaintiff's prior EEO settlement.  Ex. U.  The timing of these incidents is not sufficiently close to be "unduly suggestive" and there is no other evidence suggesting a causal connection.   Given the length of time that passed between the protected activity and the alleged adverse action, Plaintiff cannot demonstrate the necessary causal relationship.

**c. IT Specialist Position**

Chowdhury presses his retaliation claim by observing that Brenneman was the approving official for the settlement of his earlier EEOC complaints that he filed in January 2000.   Plaintiff's Depo., Ex. 9.   To establish a *prima facie* case of retaliation under Title VII, the Plaintiff must demonstrate a causal link between the alleged adverse employment action and his protected activity.  *Mitchell v. Baldrige*, 759 F.2d at 86 (D.C. Cir. 1985).  To prove a causal connection, the Plaintiff must establish that the "employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."  *Id.* at 86 & n. 6 (citations omitted).  Here, Plaintiff has failed to show a causal link between his earlier employment discrimination complaint filed in January 2000, and later settled in December 2002, and Brenneman's decision in December 2003 not to select Plaintiff for one of the three temporary IT Specialist positions.  Plaintiff's retaliation claim as to Brenneman must fail because the protected activity and the adverse personnel action are not close enough together in time to establish the requisite causal connection.  The temporal proximity between the statutorily protected activity and the adverse action must be "very close" to establish a causal connection. *Vance v. Chao*, 496 F. Supp.2d 182, 186 (D.D.C. 2007) (relying on *Mitchell v. Baldridge,* 792 F.2d 80, 86 (D.C. Cir. 1985).  Courts in this jurisdiction "typically require that no more than three months have elapsed from the time

of the protected activity to the occurrence of the adverse action." *See Rattigan v. Gonzales*, 503 F. Supp.2d 56, 77 (D.D.C. 2007). Here, the length of time between the settlement of the Plaintiff's complaint and the Plaintiff's non-selection for the IT Specialist positions was 12 months.[9] This length of time is far too great to demonstrate a causal link. Accordingly, the Plaintiff has failed to establish a *prima facie* case of retaliation against Brenneman as to his non-selection for the IT Specialist position. Similarly, Plaintiff does not proffer sufficient evidence of retaliation with regard to the other panel members, Elosser and Barker. Plaintiff's only evidence of retaliation on behalf of the panel members is his statement that "managers talk among themselves". Ex. 1, p 4, ¶ 9. Elosser testified that was not aware of Plaintiff's prior EEO activity and Plaintiff can not point to any evidence to suggest otherwise. Ex. 6, p.3, ¶ 8. As such, Plaintiff cannot make out a *prima facie* case of retaliation against Elosser.

Barker testified that prior to serving on the panel he was aware that Plaintiff had filed a prior EEO complaint or had participated in EEO activity in the past. Ex. 7, p. 3, ¶ 7. Barker's knowledge of Plaintiff's prior EEO activity in 1997-1999 is simply too far attenuated from when he sat on the panel in November 2003 to establish a nexus sufficient to draw an inference of retaliatory conduct. *See also Sullivan-Obst v. Powell*, 300 F.Supp.2d 85, 92-93 (D.D.C. 2004) (lapses of over three months and over fifteen

---

[9] The underlying actions giving rise to the settlement occurred years before the settlement in 2002. Fact #s 2 and 3; Ex. A. Brenneman testified that he became aware of Chowdhury's earlier EEO complaint in 2002. Ex. 8. Brenneman recalled that he was the selecting official for a position that Chowdhury applied for in 1998 and that he did not select Chowdhury. *Id.* This vacancy was one of several positions Chowdhury applied for from 1996-1999 and was not selected by several different managers, which lead to his filing an EEOC action and later a civil suit that was ultimately settled with the FDIC in December 2002. Fact # 2, Ex. A. Chowdhury testified that he did not allege that Brenneman was not a discriminating official in his prior EEO complaints. Ex. 9.

months were insufficient to support an inference of causation).  As such, Plaintiff cannot make out a *prima facie* case of retaliation against Barker.

Even if this Court were to conclude that the non-nomination for CSA and mid-term review and PIP placement were materially adverse actions, summary judgment is appropriate because, as detailed in section III. B. 1 and 2 below, there is no genuine dispute as to whether these actions, and the non-selection, were the result of anything other than legitimate nondiscriminatory reasons and the Plaintiff has failed to introduce any evidence, other than his own speculation, that suggests that the reasons were pretextual.  *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).[10]

## 4.  Hostile Work Environment.

"A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice."  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (internal quotation marks omitted). The workplace becomes hostile for purposes of a Title VII claim only when it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

---

[10] In *Brady*, the Court stated the rule clearly: "In  a Title VII  disparate-treatment suit *where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision*…the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and the employer intentionally discriminated against the employee on a the basis of race, color, religion, sex, or national origin?" *Id.* (emphasis added).

Although Plaintiff is not required to plead a *prima facie* case of hostile work environment, the alleged facts must be able to support such a claim. *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000). In determining whether an environment is sufficiently hostile or abusive to support a claim, courts must look at "'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1990) (quoting *Harris*, 510 U.S. at 23). "[N]ot all abusive behavior, even when it is motivated by discriminatory animus, is actionable." *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002) (quoting *Barbour v. Browner*, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999). The "conduct must be extreme to amount to a change in terms and conditions of employment." *Faragher*, 524 U.S. at 788. This standard is intentionally "demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher,* 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Servs*., 523 U.S. 75, 80 (1998)).

**B. PLAINTIFF'S DISCRIMINATION AND RETALIATION CLAIMS.**

**1.  Plaintiff's Non-Nomination for a CSA Does Not Evidence Unlawful Discrimination or Reprisal.**

Plaintiff's allegations that the Agency discriminated against him based on his race, color or national origin when he was not nominated for a CSA, are unsubstantiated. The Agency articulated legitimate, nondiscriminatory reasons for its actions which Plaintiff has failed to show were a pretext for unlawful discrimination.

In October 2003, Henning was appointed Project Manager of the CDR team. Fact # 7; Ex. E. Three months later, CSA nominations for 2003 were due. The awards were

discretionary and were based on work done from January 1, 2003 through December 31, 2003. Ex. L; Plaintiff's Depo., Ex. UU.  In late December, Henning asked employees under his direct supervision to list the contributions they wanted considered for the CSA. Fact # 28.

Crum served as project manager for the CDR team and was Plaintiff's supervisor until October 2003, which constituted the majority of the 2003 CSA period.  Fact # 4. Therefore, Henning asked Crum to recommend to him the employees whose contributions merited a CSA.  Fact # 29.  In making his recommendations, Crum considered the values the CSA program rewards, i.e. individual initiative, exceptional effort, and/or achievements that reflect important contributions to the FDIC and/or its organizational components.   He also considered whether the employee's contributions reflected initiative, effort, and achievement beyond that normally expected for the employee's position and grade.  Ex. C. p. 3, ¶ 6.   He recommended three employees to Henning.  Ex. C, p. 3, ¶¶ 5-7.  Henning nominated two of the employees recommended by Crum, Montoya and Wisnieski based on Crum's recommendations and his own judgment of their performance while under his supervision.  Ex. 11.

Henning explained the reasons for his nominations.  He stated that the nominees were "both pioneers on the CDR project and made more significant contributions than [Plaintiff] in the areas of 'business results' and 'competency'."  He further explained that the nominees were "key drivers in the initiation of the CDR Project and [were] responsible for major innovations and the successful application of an industry standard to a specific FDIC business process.  Their innovation and creativity far surpassed [Plaintiff's] and they developed unique ideas regarding the execution of the CDR Project

whose goal is to improve the way banks report financial information to the FDIC, Office of Comptroller of the Currency and to the Federal Reserve System." Ex. M, p. 2. Henning pointed out that one of the nominees, Montoya, had a very strong technical background and is the subject matter expert who provides key technical support to the three agencies referenced above; the other nominee, Wisnieski, was strong in the business arena, and he developed strategies and designed systems to process and disseminate information to the business community. Ex. M, pp.2-3.

Plaintiff contends that his work was deserving of a nomination for a CSA because he saved the Agency $100,000 by preventing a vendor from charging for services that should have been included in an original task order. Ex. N. Henning explained that Plaintiff's actions, while good work, were commensurate with performing his regular duties and did not rise to the standard required for a CSA. Henning further explained that an employee had to develop and implement an innovative, money saving idea to warrant a CSA for the money saving effort. Ex. M, p. 3. Plaintiff acknowledged in his deposition that his effort in saving the Agency money was part of his normal job responsibilities. Ex. 19. Plaintiff also claims that he "took initiative beyond the call of normal duties that enhanced the interests of the FDIC." Ex. 1, p. 6, ¶ 12. However, Plaintiff never identified what that initiative was that enhanced the Agency's interests other than stating that he has been a high performer who previously received "awards and accolades" for superior performance throughout his career at the Agency. Ex. 1, p. 6, ¶ 13. Plaintiff's own assessment of his performance is insufficient to establish pretext. *See Waterhouse v. Dist. of Columbia,* 124 F.Supp.2d 1, 5 (D.D.C. 2000), *aff'd*, 298 F.3d

989 (D.C. Cir. 2002).  Accordingly, Plaintiff has failed to rebut Henning's reasons for not

nominating him for a CSA.

**2. Plaintiff's Unsatisfactory Mid-term Review and PIP Do Not Evidence Unlawful Discrimination or Reprisal.**

Plaintiff's allegations that he was discriminated and harassed based on his race,

color, national origin, gender, and retaliation, when he was given an unfavorable mid-

term review and subsequently placed on a PIP when he failed to improve his written

work product are not supported by the evidence. The Agency has articulated legitimate,

nondiscriminatory reasons for its actions, and Plaintiff has failed to show that the

Agency's reasons were pretext for discrimination.

In March 2004, Henning found that Plaintiff's technical competence met

expectations, but his written communication skills did not meet performance expectations

for his position and CG-15 grade level.  Ex. E, p. 5; Ex. O.  FDIC Circular 2430.1

"Performance Management Plan" ("PMP") defines performance expectations as "the

results expected or requirements established for performance criteria at a particular rating

level."  Ex. 3.  Acceptable performance at the CG-15 level for written communication

skills includes quality written products that are effective, clear, concise, well organized,

thoroughly researched, and effectively presented; in addition, the written products should

be neat, properly formatted, grammatically correct, and require only minimal editing. Ex.

U.  After supervising Plaintiff for five months, Henning observed that the Plaintiff's

written communications were not clear and concise; he did not effectively communicate

with his audience; his audience frequently did not understand what he was trying to

communicate; his writing did not progress sequentially, and his writing required frequent

revisions.  Ex. E, p. 3; Ex. U.  Henning met with Plaintiff in March 2004 to discuss his

mid-term performance rating and to counsel Plaintiff regarding the deficiencies and weaknesses in his written work. This discussion was memorialized in a written notice that Plaintiff received on April 9, 2004. Ex. O. While the memorandum acknowledged Plaintiff's contributions to the CDR project in several areas, it also noted that Plaintiff's written communication skills were unacceptable and listed specific actions he should take to improve his writing skills. *Id.* One action was to write a paper evaluating the security alternatives available to the CDR project and assessing current CDR security design adequacy. To assist Plaintiff with this project, it was agreed that he would take writing courses offered by the FDIC or externally, receive feedback on his drafts, and meet regularly with Henning to discuss his progress. *Id.* Henning conducted several meetings with Plaintiff during the 90 day period to provide constructive feedback regarding his progress. Ex. 12.

On June 15, 2004, during a counseling session, Henning told Plaintiff not to be surprised by his performance appraisal. Henning explained that his comment was not a threat as alleged by Plaintiff. Rather, it was intended to let Plaintiff know that his writing still needed improvement before the end of the appraisal year; that Henning gives constructive criticism to all his employees; and that FDIC policy requires supervisors to provide regular feedback to employees so they will know what is expected of them. Ex. E, p. 3.

Henning was not the only member of the CDR project team who noticed deficiencies in Plaintiff's writing. Other members of the CDR project team both within and outside the Agency shared Henning's concerns. For example, Mary West, a senior

official at the Federal Reserve Board,[11] expressed dissatisfaction with Plaintiff's written

work to Henning and Laura Lapin, Plaintiff's team leader ("Lapin"). Fact # 40; Ex. E, p.

3; Ex. 13, pp.79- 80. Additionally, Lapin, Gary Christensen, a national examiner with the

OCC, and Tom Selle, from the FDIC, noted problems with Plaintiff's written work

product. Ex. E, p. 3; Ex. 14, pp. 58-63; Ex. 13. pp. 73-75.

  Plaintiff was placed on a 90-day PIP on August 18, 2004 when Henning

concluded that Chowdhury's written work product had not improved to an acceptable

level after over four months of counseling and related assistance. Fact # 42; Ex. U.

Henning's actions were in accordance with FDIC policy set forth in the PMP, which

requires a rating official to place an employee on a PIP when the employee fails to meet

expectations after counseling. Ex. 3.

  The PIP outlined deficiencies in three key writing assignments that Plaintiff had

prepared subsequent to his mid-year review: an initial draft of the CDR Business

Continuity Plan, a CDR Security Test & Evaluation Recommendation document and a

July 30, 2004 email relaying information regarding contractor audit reports. Henning

explained his reasons for the PIP as follows:

> The initial draft of the Business Contingency Plan (BCP) you
> provided on June 10 was a good first draft, but as we discussed
> needed substantial work before it could be completed or adequately
> demonstrate your writing improvement. You provided another draft
> to me and team members for review on August 10 and received
> substantial feedback on August 11 regarding that document. The
> feedback from other readers was similar to the feedback I had provided
> earlier. Specific examples of the modifications needed are that the
> document requires a more streamlined disaster recovery organizational
> structure, requires a completed acronym reference table, and requires

---

[11] The CDR Project was an interagency project that included employees from the Federal
Reserve Board and the Office of the Comptroller of the Currency ("OCC"). Ex. 20,
p.137, lines 22-23; p. 138, lines 1-5 and errata sheet.

improved organizational clarity with regard to the process for analyzing systems outages and determining the need for invocation of the BCP.

The CDR Security Test & Evaluation Recommendation document was deficient in that the purpose statement was not entirely consistent with the document's contents, it lacked clarity in the background section, and it lacked a concise sequence that allowed the reader to understand well the process used to arrive at the recommendation. I reviewed these deficiencies with you on August 10.

The July 30 E-mail relaying information regarding requested contractor audit reports was deficient in that it did not answer the two specific questions that were asked at the end of the E-mail string. A more concise and direct approach would have been to answer the two questions posed directly, and at the beginning of your response, followed by supporting comments. I reviewed the deficiencies with you on August 10.

Ex. U, pp. 1-2.

On September 22, 2004, Plaintiff received a 30-day written progress review from Henning. Fact # 44. Henning noted that the Plaintiff showed significant improvement on two assignments provided in the PIP: the CDR Security Test & Evaluation Recommendation and the Eagan Site Visit Report. Ex. W.

On November 4, 2004, Plaintiff received a 60-day written progress review from Henning. Fact 3 46; Ex. X. Henning identified three major writing assignments that did not meet the written communication performance standards established in the PIP: the CDR Business Contingency Plan, the Eagan Site Visit Report and the Security Plan. *Id.* Of particular note was the Eagan Site Visit Report. Under the terms of the PIP, it was agreed that the Plaintiff would be the primary author of the report. After the 30-day progress review, Henning learned that the Plaintiff was not the primary author of the report and that his only involvement with the document was to edit the first draft of the report that was originally written by another FDIC employee, Tom Tuzinski. *Id.*; Fact #47; Ex. X, p.1, ¶ 3; Ex. E, pp. 6-7. As a result, Henning did not see substantial

improvement in the quality of Plaintiff's written work.  It was clear that Plaintiff still had difficulties with his writing.  In sum, Henning extensively detailed the unsatisfactory quality of Plaintiff's work and the performance-related incidents that led to the unfavorable review and the subsequent PIP.   In order to avoid summary judgment based on the aforesaid legitimate nondiscriminatory reasons, Plaintiff must rebut these reasons with sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against him on the basis of his race, national origin, color or religion.  *See Short v. Chertoff*, 2008 WL 2174856*6 (citing *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (*en banc*)).  Defendant submits that the Plaintiff is unable to do so.

The Plaintiff asserts essentially two arguments in support of his position that Henning's legitimate non-discriminatory reasons for not selecting him were actually a pretext for discrimination.  First, the Plaintiff argues that his prior performance ratings at the FDIC established that he was a "high performer in all criteria including written communication." Ex. 15, pp.13-14, ¶ 44.  Second, the Plaintiff contends that he should not have been put on a PIP because he did everything that Henning asked him to do to bring his writing up to an acceptable level, and because the documents he drafted were ultimately approved. Ex. 15, pp.6, ¶ 16, 9, ¶ 27.  Neither position, however, is sufficient to establish pretext.

First, Plaintiff asks this court to infer discriminatory motive on the part of Henning based on a history of satisfactory performance appraisals with the FDIC.  The

fact that Plaintiff received performance ratings of meets expectations, including his

written communication skills, for the period 1999-2003, does not establish that Henning's

articulated reasons for placing Plaintiff on a PIP was a pretext for discrimination.

Moreover, Plaintiff's earlier performance evaluations do not by themselves, demonstrate

the adequacy of his writing skills particularly when he was subsequently promoted.  *See*

*Simmons v. Cox*, 495 F. Supp.2d 57, 64-65 (D.D.C. 2007) (Plaintiff's reliance on positive

feedback regarding her work performance before being placed on a PIP does not

demonstrate that the quality of her work during PIP period was satisfactory).   Indeed,

after Plaintiff was promoted to a CG-15 in 2002, his former supervisor, Crum questioned

his writing skills for the appraisal period 2002-2003.   Even though Crum found Plaintiff's

written communication skills met expectations, he noted that Plaintiff needed to improve

the organization and clarity of his writing:

> Oral and written communication skills are acceptable.  Sultan
> is responding to feedback on ways to adapt the "voice" and
> complexity of his formal and informal written communications
> to the intended audience….He is working to improve the organization
> of his formal documentation to help others grasp the results of issues he
> wishes to convey and preserve.

Ex. D.

Henning's assessment of Plaintiff's written work product was consistent with the

comments Chowdhury had received from Crum concerning his written work in his 2003

performance review.  Whereas Crum gave Plaintiff, a new CG-15, the benefit of the

doubt; several months later Henning expected Plaintiff to demonstrate the written

proficiency required of an employee at the CG-15 level.  Significantly, Crum, Lapin,

Henning each worked with Plaintiff when he was a CG-15 and each found his writing

deficient with respect to organization and clarity.  Even CDR team members outside of

the Agency shared those concerns.  Plaintiff's reliance on favorable ratings in his prior

performance reviews is undercut by his own testimony that prior to joining the CDR

project team he had not done a significant amount of business writing.  Ex. 16.

The Plaintiff's second argument – that he did everything Henning asked, and

documents he drafted were ultimately approved by his supervisors and utilized by others,

is also without merit.  As detailed above, Plaintiff did not fully comply with the terms of

the PIP.  One of the major writing assignments, the Eagan Site Report, was not originally

written by Plaintiff.  Moreover, even though the Plaintiff had complied with other

requests from Henning relative to the PIP, his writing still did not meet the performance

standards for his position and grade.

Likewise, the ultimate approval of documents that Plaintiff was responsible for

producing does not establish that Plaintiff's writing skills were acceptable for an

employee of his position and grade level.  Moreover, as Henning testified, several of the

writing assignments Plaintiff drafted were completed by others.  Ex. 17.

Lastly, Plaintiff challenges the validity of Henning's criticism of his written work

performance.  However, Plaintiff's self-assessment of his written work is conclusory and

cannot establish pretext of discrimination. *See Waterhouse v. Dist. of Columbia*, 124 F.

Supp.2d 1, 5 (D.D.C. 2000), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002); *Smith v. Chamber of

Commerce of U.S.*, 645 F. Supp. 604, 608 (D.D.C. 1986) (noting that "plaintiff's

perception of himself, and of his work performance, is not relevant").

Accordingly, Plaintiff has failed to show that the reasons given by Henning for his

mid-term performance review and subsequent PIP were a pretext for discrimination.  He

has not shown that the PIP requirements were anything but reasonable.  He offered

nothing other than his own speculations and allegations to refute Henning's legitimate nondiscriminatory reasons for his decisions. In short, there is no evidence that discrimination or retaliation, rather than Chowdhury's written performance problems, prompted the unfavorable review and PIP.

**3. Plaintiff's Physical and Mental Health.**

Plaintiff has placed his physical and mental health at issue in this case, alleging that Defendant's treatment of him caused physical and emotional harm. *See* Complaint, at ¶¶ 18-19. In point of fact, Plaintiff experienced significant health issues many years prior to the allegations in this action. Further, as more fully set forth below, Plaintiff's physical and mental health appears to have deteriorated over a period of years, including the time period involved in this action.

Although Plaintiff complains of depression and anxiety which he attributes solely to Henning, Plaintiff was treated for these conditions as far back as April 1997. Fact # 35. In a report dated October 14, 2004, Phillip Appel, Ph.D., Plaintiff's psychologist in April, 1997, states "[b]ecause of [Plaintiff's] condition, he is more sensitized to react to supervisory criticism and dislike." Fact # 62.

In late 2000 or early 2001, Plaintiff suffered a "minor stroke" which caused him to be hospitalized and remain out of work for two months. Fact # 38. Following the stroke, Plaintiff was treated for additional health issues, including hypertension. Fact # 58.

Beginning in May 2004, less than one month after receiving his mid-term review, which criticized his writing, Plaintiff sought counseling for depression and anxiety with a psychologist, Dr. Sandra Hoffman, Ed. D. Fact # 36. Plaintiff was simultaneously

treating with a psychiatrist, Dr. Taiwo Okusami, who wrote letters excusing Plaintiff

from work from November 2004 through January 2005. Fact #s 48 and 49.

In March 2005, while out of work on extended medical leave pending approval of

his disability retirement,[12] Plaintiff began treating with psychiatrist, Dr. Martin Book,

D.O. In a report prepared to support Plaintiff's disability retirement application, Dr.

Book stated:

> ….during the past *several years*, [Plaintiff] has experienced the onset and
> intensification of a debilitating set of symptoms, including unremitting pain,
> fatigue, cognitive difficulties, anxiety and depression, which have driven him
> to the point where he is unable to perform the critical elements of his job.

Fact # 60. (emphasis added).

Dr. Book goes on in the report to opine:

> [Plaintiff's] failure to respond to repeated medical and psychiatric treatment
> intervention suggests that his *condition is progressive* and that further
> worsening may well be expected.

Fact # 61 (emphasis added).

Plaintiff's physical and mental health did not improve, as predicted. In March

2006, Plaintiff's primary care physician, Dr. Vintu Ganti, M.D., referred him to a

neurologist, Dr. David Satinsky, M.D., for a neurological evaluation. Fact # 63. Dr.

Satinsky ultimately referred Plaintiff to psychologist, Syd Brown, Ph.D., for a

neuropsychological evaluation. Fact # 64. Following two days of examination, Dr.

Brown issued a report of his findings regarding Plaintiff. Fact # 65. In the report, Dr.

Brown recited certain background information taken from Plaintiff. In discussing his

---

[12]   Plaintiff was approved for multiple disability benefits, among them, "Long-Term
Disability" from The Hartford under the "Mental Limitation" provision. Fact # 56.

stroke in 2000, Plaintiff is quoted as saying "that was the beginning of my downfall," and "I was having a rotten life."  Fact # 66.

Dr. Brown's report went on to explain that Plaintiff had difficulties with "working memory," "processing visual material without making errors," and "processing speed." Fact # 67.   Dr. Brown also concluded that Plaintiff's "attentional functioning is severely compromised." Fact # 68.  In the area of "Executive Functions", such as "ability to control impulsive responding", "ability to respond flexibly under pressure", "ability to utilize feedback", "verbal fluency", were found to be "extremely weak" and "severely compromised".  Fact # 69.  Plaintiff was also evaluated as "weak" in "Organizational Functions", Fact # 70; "Learning", Fact # 71; and "Emotional Functioning", Fact # 72. The "Emotional Functioning" section of Dr. Brown's report states:

> Mr. Chowdhury may have a hysteroid adjustment to life and may experience periods of exacerbated symptom development under stress; His thinking is likely to be characterized by obsessiveness and indecision.

Fact # 72.

Dr. Brown listed several areas where Plaintiff was "impaired", Fact # 73, resulting in a "Differential Diagnosis" of "vascular dementia" or "dementia of the Alzheimer's type." Fact # 74.

Upon reviewing Dr. Brown's report and Plaintiff's previous medical tests, Dr. David Satinsky ruled out "vascular dementia", Fact # 75, and believes that Plaintiff's cognitive impairments may be due to Alzheimer's Disease.  Fact # 76.  Most notably, Dr. Satinsky, a practicing neurologist for over 40 years, is of the medical opinion that Plaintiff's "cognitive impairments" identified by Dr. Brown, occurred over a period of years.  Fact # 78.

Defendant submits that there is ample evidence from Plaintiff's own health care providers, that Plaintiff experienced significant medical issues years before the allegations in this action arose. There is additional compelling evidence of Plaintiff's physical and mental conditions deteriorating for months and years after he left Defendant's employ. (Reports of Martin Book, Syd Brown and testimony of David Satinsky, *supra*).

Finally, Dr. Satinsky's expert testimony, which has not been rebutted or discredited, that Plaintiff's significant cognitive impairments developed over a "period of years" is wholly contrary to Plaintiff's assertions. Plaintiff maintains that his mental and physical health issues are directly attributed to his alleged treatment by Henning. While it is unfortunate that Plaintiff apparently suffers from significant cognitive impairment and other medical issues, Drs. Satinsky, Book and Brown attribute these problems to issues developing over years, which continue to decline.

Significantly, a reasonable inference can be drawn that Plaintiff's cognitive impairments were "developing" during the time that he was supervised by Henning (October 2003 through November 2004) and may have contributed to his performance issues and his inability to correct them.

**4. Plaintiff's Non-Selection for the IT Specialist Position Does Not Evidence Unlawful Discrimination or Reprisal.**

As set forth herein, Brenneman articulated legitimate, non-discriminatory reasons for his selections and the Plaintiff has not offered any facts, other than his own subjective view, to suggest that Brenneman's reasons for selecting Boardley, Ciaschi and Padilla were due to his race, color, sex, national origin or prior EEO activity.

Brenneman based his selection decisions on the candidates' applications and interviews. Fact # 18; Ex. H. Brenneman chose Elosser and Barker to serve on the interview panel with him because two of the temporary IT Specialist positions supported their program areas. Fact # 15.

The interview questions were prepared by Brenneman and were directly related to the Knowledge, Skills and Abilities ("KSA'S") required for the position.[13] Fact # 13; Ex. F. Each candidate was asked the same questions in the same order and given the same amount of interview time pursuant to the Agency's structured interview process. Fact #'s 10, 16; Ex. H, p. 2, ¶ 6. At the conclusion of the interviews, Elosser and Barker gave Brenneman their interview notes and a list of their top five candidates based solely on the candidates' interviews. Fact # 17; Ex. H, pp. 2-3; Ex. 7 pp. 2-3, ¶¶ 4-5. Brenneman, Elosser and Barker were in general agreement about the top five rated candidates. Fact # 21; Ex. H; Ex. 6, p. 3, ¶ 6. Boardley, Ciaschi and Padilla were on each of their lists, but Plaintiff was not among the top five candidates of any panel member. *Id.*; Ex. 21.

Brenneman noted that all candidates were qualified for the position based on their experience but in selecting the most qualified candidates he found that the selectees' applications provided greater detail regarding their advanced skills and abilities vis-à-vis the KSA's, and they each gave strong interviews, which substantiated and reinforced their application materials. Ex. H, pp. 2-7; Ex. 18. Brenneman observed that while

---

[13] The KSAs for the temporary IT specialist positions were: (1) ability to manage large projects and applications within established timeframes and budget constraints; (2) knowledge of the functions and capabilities of ADP hardware, software and telecommunications systems; (3) knowledge of budget, cost analysis, and resources management; (4) ability to identify client organization's information needs and develop technical alternatives for meeting the needs; and (5) ability to manage technical staff that report directly or through subordinate managers and to manage multiple large technical projects.

Plaintiff had many years of experience, was a licensed CPA and held a Masters degree in IT, his application, in particular the KSA's, lacked specificity and focus, some of the statements in his application lacked credibility, and his overall interview was unexceptional. Fact # 20; Ex. H, pp. 3-7; Ex. 18. By example, Plaintiff's application stated he had managed 50 large complex projects, but it lacked details to support the extent of that claim, and it provided little more than superficial reference to any of the projects. Brenneman noted that during the course of a year, the FDIC generally runs no more than three or four such projects, and they are all managed by different people. Ex. H, p.3, ¶ 8. Brenneman also questioned Plaintiff's claim that he managed systems with over 200 million real time records in use around the clock and worldwide. Brenneman had doubts about the claim because United Airlines was the only place Plaintiff had worked where he could have gained such experience, yet Plaintiff had only worked at the airline six months, and during that time he was responsible for training the technical staff. *Id.* Moreover, during the interview, Plaintiff did not provide details on the breadth of his experience in these areas.

Brenneman stated that the selectees distinguished themselves from Plaintiff and other applicants by providing better and more specific responses to the six interview questions. Ex. H, pp. 3-4, ¶ 9. He explained that the selectees gave specific examples of their work experiences and how they solved problems. *Id.* The examples they provided gave him confidence in their ability to solve problems and reinforced the statements in their applications addressing the KSAs. In contrast, he stated that Plaintiff spoke in more general terms and at times gave answers that were not responsive to the questions. Fact # 20.

Barker shared Brenneman's observations and conclusions regarding the candidates' performance during the interview. Ex. 7, p. 3, ¶ 5. Barker recalled that Boardley, Ciaschi and Padilla performed better in their interviews than Plaintiff "in terms of appearing confident and poised, providing clear, logical, direct and relevant responses to the questions…and demonstrating interest and enthusiasm for the position." Ex. 7, Barker Second Supplemental Affidavit, p. 2.

### a. Selection of Marcia Boardley

Brenneman stated that he selected Ms. Boardley based upon her outstanding application which provided specific examples of her advanced skills and abilities in managing and implementing large-scale corporate applications such as CERTS (Corporate Enhanced Recruitment Tracking System), FWP (Federal Work Program), CTAW (Corporate Time and Attendance Worksheet) and ETVPS (Electronic Payment Voucher Processing System) while effectively managing each project's scope, time and budget. Ex. 18, Marcia Boardley Candidate Selection Recommendation. Her application and interview further emphasized a very strong background and considerable experience in both technical aspects of systems development and the Systems Development Life Cycle ("SDLC") as a result of her work on major projects. *Id*. She described techniques and gave examples of prioritization, negotiation, and baselining as useful for controlling scope. Ex. H, pp. 3-4, ¶ 9. Ms. Boardley was articulate in her interview responses and her responses, like Ms. Padilla, surpassed those of the Plaintiff in four of the six interview questions. For example, when asked about her experience and approach in supervising staff (interview question 5) Brenneman notes that she responded "she dealt with mis-matches of staff and skills by providing cross-training. She noted she had been able to

manage workloads despite recent staff reductions and used project plans as a primary tool
to gauge work progress. She also noted that continuity and consistency were key
components of managing people and that she focused her staff's attention on project
scope, plans and budgets." Ex. H, pp. 5-6; ¶ 11.

By contrast, Brenneman noted that the Plaintiff "gave an adequate response and
stated that he was very experienced, had an open-door policy, and was fair with his staff.
In general, the responses of [Boardley and Padilla] showed a more hands-on approach,
particularly dealing with less than perfect staffing situations."[14] *Id.*

**b. Selection of Melanie Ciaschi**

Brenneman selected Ms. Ciaschi based upon her excellent qualifications. More
particularly Brenneman noted her application and interview provided detailed examples
of her substantial involvement in the development and maintenance of key corporate-
wide systems such as CHRIS (Corporate Human Resources Information System) and
NFE (New Financial Environment) while effectively managing the project's scope, time
and budget. Ex. 18, Melanie Ciaschi Candidate Selection Recommendation.
Additionally, her application evidenced a very strong understanding of, as well as
significant experience employing, the technical aspects of systems development, use of
project management tools, and knowledge of SDLC deliverables. She related her
knowledge of application development languages and tools such as Visual Basic, network
administration, SQL Server and Peoplesoft. She has an advanced Microsoft certification.
*Id.*; Ex. 23.

---

[14] The response of Ciaschi was not considered superior to Plaintiff on this question. *Id.*

Brenneman observed that Ms. Ciaschi's interview "substantiated and strengthened

her application materials. Ex. 18. She was able to very clearly and convincingly

communicate and expand her strong project management experience, extensive systems

development background and general management and leadership experience. *Id.* For

example, when asked to describe the breadth and depth of her experience managing large

application development projects, Brenneman notes that Ms. Ciaschi "provided a very

convincing response regarding her on time and on budget management of the CHRIS

project and use of the SDLC managing projects and requirements to control scope." Ex.

H, p.4, ¶ 9. In contrast, although Plaintiff worked on large projects, including ISM,

LMIS ("Legal Management Information System"), FIMS ("Financial Information

Management Systems") and Y2K, he did not elaborate on what key management

techniques he used in successfully completing these efforts. In effect, his explanations

were generalized and less specific than the three selectees. *Id.*

### c. Selection of Noreen Padilla

Brenneman selected Ms. Padilla based upon her application and interview which

highlighted her advanced skills and ability to manage and implement large-scale

corporate applications such as ViSION ("Virtual Supervisory Information on the Net")

while effectively managing the project's scope, time and budget.[15] Ex. 18, Noreen

Padilla Candidate Selection Recommendation. As ViSION project lead, she was

instrumental in implementing a multi-tier application architecture. Her application

showed substantial experience in formulating and managing annual and multi-year

application development budgets, developing business cases and cost benefit analyses,

---

[15] The ViSION project was larger than any of the IT projects the Plaintiff had worked on. Ex. 25, pp. 58-59.

and in working with clients to provide technical alternatives to their business needs. Her work with the multi-tier ViSION architecture resulted in providing DSC with a system that would consolidate the work processes performed by DSC managers. Her application also demonstrated her considerable experience in managing technical staff and multiple project teams while in charge of the ViSION project. *Id.*

Brenneman observed that Ms. Padilla's interview substantiated and reinforced her application materials. "She was able to very clearly and convincingly communicate and expand on her strong project management experience, extensive systems development background, and well established supervisory and leadership experience. Her ability to work under pressure for extended periods of time was further evidenced during the interview." *Id.* For example, when asked to describe a time when she had to work under pressure and recount how she got her work done (interview question six), Brenneman notes Ms. Padilla gave "examples from her work on the ViSION project, where the team was under pressure for 2 years. Her approach involved bringing alternatives and recommendations to management when dealing with problems and issues, rather that just informing them of the problem. She also noted the importance of good communication and in controlling one's own personal stress so it does not transfer to team members." Ex. H, p.6, ¶12.

The Plaintiff's response to the same interview question "cited being under pressure most of his career and noted the long hours he worked on the Y2K project. He noted the importance of setting an example and to recognize the needs of other project team members in stressful situations." Brenneman noted that Plaintiff's "response was okay but the selectees gave more tangible examples. Each selectee referenced specific

examples where they solved stress-related problems, where Mr. Chowdhury talked in
more general terms.  Their specific examples provided greater confidence in their ability
to deal with stress and to lead teams that were under stress." Ex. H, pp.7-8, ¶12.

In an effort to establish pretext, the Plaintiff argues that his experience, education
and background far exceeded that of the selectees.  Ex. J, p. 220; Ex. 26, p.232.  He
pointed out that he had strong managerial and technical skills and that he managed large
IT projects that serviced the Division of Finance and the Legal Division.  He also stated
that he was the project manager for the Y2K initiative[16], and that he has 29 years of IT
experience.  Ex. 1, pp. 3-4, ¶7.   Plaintiff's arguments are not persuasive.  They are based
on his own assessment of his qualifications, which is subjective judgment that does not
prove its point.  *See Waterhouse v. Dist. of Columbia*, 124 F. Supp.2d 1, 7 (D.D.C. 2000)
(stating that pretext is not shown "simply based on [plaintiff's] own subjective
assessment of [his] own performance"), *aff'd* 298 F.3d 989 (D.C. Cir. 2002).

To survive a motion for summary judgment in a non-selection case when the
employer has articulated a legitimate non-discriminatory reason for the non-selection, a
plaintiff must prove that he was "significantly" or "markedly" better qualified than the
successful candidate. *See Lathram v. Snow*, 336 F.3d 1085, 1091-92 (D.C. Cir. 2003).

Longer experience does not establish that Plaintiff's qualifications are superior.
*Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (internal quotation marks and
citation omitted); *see Barnette v. Chertoff,* 453 F.3d 513, 516-17 (D.D.C. Cir. 2006)
(finding that the plaintiff had not demonstrated a "significant qualifications differential"

---

[16] Brenneman testified that Larry Proctor was the Project Manager for the Y2K initiative.
Plaintiff was the IT manager for the Financial Information Management System within
the Y2K initiative.  Ex. 25, pp. 57-58.

when she had three more years of supervisory experience than the selectee, as well as a markedly longer tenure of employment at the agency). Plaintiff argues that he was the better qualified candidate given his 29 years of IT experience and longer managerial and supervisory experience compared to the selectees.[17]

Plaintiff has not put forth any evidence that would permit a reasonable fact finder to conclude that Chowdhury's credentials were "starkly superior" to the three selectees, or that he was "significantly more qualified" for the IT Specialist position. The differences between Plaintiff and the three selectees do not support an inference of either discrimination or retaliation. Each of the selectees had significant experience managing large projects at the FDIC, each had considerable technical knowledge, and supervisory/ leadership experience managing a team or staff under stressful conditions. "[T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based on unlawful criteria. The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination. *Burdine*, 450 U.S. at 259; *see Aka* 156 F.3d at 1294.

Plaintiff's only evidence that Brenneman's selection of Boardley, Ciaschi and Padilla was discriminatory is his own subjective view that his experience, education and background far exceeded that of the selectees. Ex. J; Ex. 26, pp. 230-232. He points to no actions on the part of the selecting official or the panel of interviewers that would substantiate any discriminatory motive for his non-selection. Chowdhury testified that he

---

[17] Comparatively, Ms. Boardley had 19 years of IT experience at the FDIC. Ms. Padilla had 23 years of government IT experience, 17 of which was at the FDIC. Ms Ciaschi had 10 years IT experience, 6 of which was at the FDIC. Exs. 22, 23, 24.

had worked with Elosser and Barker when he was in DIRM; both Elosser and Barker

were his clients. Ex. 27, pp. 217-219. Chowdhury stated that he knew Brenneman

because they had worked in the same division, Brenneman was the Assistant Director in

DIRM, and that he thought Brenneman was a signatory to the settlement of Chowdhury's

prior EEO case in December 2002. Ex. 27, pp. 215-216. Chowdhury affirmed that he

had no prior problems with Brenneman, Elosser and Barker and that during the course of

his interview, the panel members made no statements concerning Plaintiff's race, color,

gender, national origin or his protected activity.[18]  Ex. 27, pp. 215-219. A disagreement

with the judgment of the selecting official is not enough to support a finding of pretext.

Plaintiff has not addressed in any meaningful way Brenneman's reasons for not selecting

him. The Agency was entitled to exercise its discretion in choosing among qualified

candidates so long as its decision was not based on discriminatory criteria, and there is no

evidence that the decision was based on a discriminatory motive.

Based on the forgoing, Plaintiff's discrimination and retaliation claims fail as a

matter of law with respect to his non-selection for the Supervisory IT position.

## C.  PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM.

**The Plaintiff Fails to Establish an Objectively Hostile Work Environment.**

Plaintiff focuses on several interactions with Henning, in addition to the non-

recommendation for a CSA and the unfavorable mid-term review and PIP discussed

above, which he claims is evidence of harassment creating a hostile work environment.

First, Plaintiff claims that when he initially met with Henning, Henning told Plaintiff that

he "fired people" and that he knew "Plaintiff's background". Plaintiff construed this to

---

[18] Plaintiff's EEO complaint, FDICEO-040025, did not allege that he was discriminated
on the basis of his religion.

mean that Henning knew that Chowdhury had engaged in prior protected activity.
Second, in November 2003, Chowdhury contends that Henning changed his job title from
"Project Manager" to "Senior Information Systems Analyst" and thereafter Henning
changed Plaintiff's work assignments.  Third, in February 2004, while Chowdhury was
on leave, Henning told his staff during a meeting that Chowdhury would be transferring
to another position after he was selected for the Internal Job Rotation Program ("IJRP").
Finally, Chowdhury claims that in March 2004, Henning "openly taunted" Plaintiff in
front of two colleagues, Laura Lapin and Susan Koepp, that Chowdhury would not
receive a raise for taking on additional duties.

Nothing offered by Plaintiff shows that his race, color, national origin, religion or
any other protected category was the reason for his unfavorable mid-term review and PIP
and his treatment by Henning.  Moreover, none of the acts alleged by Plaintiff, whether
considered alone or cumulatively, meets the demanding standards for a hostile work
environment claim under Title VII.  Plaintiff presents absolutely no evidence tying any of
the conduct of which he complains to his sex, race, color, national origin, religion or his
participation in protected activity.  Nor has Plaintiff established that any of the conduct
complained of interfered with his work performance.

These incidents merely involve the daily interactions between Plaintiff and his
supervisor.  The written personnel measures, i.e. the mid-term review and PIP contain no
words of intimidation, ridicule, or insult.  Nothing identified by Plaintiff in his complaint
or elsewhere demonstrates conduct severe or abusive enough to create a hostile work
environment.  When Plaintiff was asked whether Henning ever made any remarks about
Plaintiff's national origin, religion, or color he replied "no."  Ex. RR.   Plaintiff's

remaining hostile work environment claims of alleged finger-pointing, Henning's

statements that "he fired people" and that he knew "Plaintiff's background", Henning's

unmarked leather-bound bible placed on his desk, Henning's non-recommendation for a

CSA, Henning announcing Chowdhury's selection for the IDJP program at a team

meeting, and the change in his position description from IDM Project Specialist to Senior

Information Systems Specialist[19] are not the type of "extreme" conduct necessary to

support a hostile work environment claim and they surely do not demonstrate a work

environment that was pervaded by discrimination.[20]  *See Faragher*, 524 U.S. at 788,

*Singh v. U.S. House of Reps., Comm. On Ways & Means*, 300 F.Supp.2d 48, 56 (D.D.C.

2004).

      None of the comments or conduct attributed to Henning was based on Plaintiff's

religion, sex, race or national origin nor are they so egregious as to rise to the level of a

hostile work environment. Chowdhury's own concessions at deposition conclusively

establish that he cannot meet the standard of proof required for a hostile work

environment claim.  When Plaintiff was asked whether Henning made "any overt

comments to [him] about his race, or [his] color, or [his] religion, or [his] place of origin

---

[19] Plaintiff testified that he was not the CDR Project Manager, rather, he had "managed" discrete sections of the CDR project.  Ex. 28.

[20] Three of the acts Plaintiff relies upon to establish his hostile work environment claim are the same discrete acts that make up his discrimination and retaliation claims: non-recommendation for CSA, unfavorable mid-term review and PIP. As this court noted in *Baloch v. Norton*, "[a]s a general matter, this jurisdiction frowns on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim." 517 F.Supp.2d 345, 364 (D.D.C. 2007). (citations omitted). "Discrete acts constituting discrimination or retaliation claims…are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult."  *Lester v. Natsios*, 290 F. Supp.2d 11, 33 (D.D.C. 2003).

Chowdhury responded "[n]ot to my recollection."  Ex. 30; Fact # 81; Ex. RR.  When

asked about the Bible on Henning's desk, Plaintiff testified that it did not bother him, he

did not find it offensive, and Henning never referred to it when speaking with the

Plaintiff.   Fact # 82, Ex. SS, p. 120.  When asked whether Henning ever made any

comments to Plaintiff about his religion or Muslims in general, Plaintiff responded "no".

Fact # 85; Ex. SS, p. 122.   Plaintiff has pointed to no facts that he was forced to suffer

any "discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or

pervasive to alter the conditions of his employment and create an abusive working

environment."  *Oncale*, 523 U.S. at 81.  Accordingly, Plaintiff's hostile work

environment claim should be dismissed.

## IV. CONCLUSION

For the reasons set forth herein, the Defendant respectfully requests this Court

enter summary judgment in Defendant's behalf.  A proposed order is attached.

July 21, 2008                              Respectfully Submitted,


                                          /s/_____
                                          Tina A. Lamoreaux, Counsel
                                          District of Columbia Bar No: 375762
                                          Federal Deposit Insurance Corporation
                                          Legal Division
                                          3501 Fairfax Drive, Room VS – D6138
                                          Arlington, VA 22226
                                          P: (703) 562-2304 F: (703) 562-2468

                                          /s/_____
                                          Victor E. George, Counsel
                                          California Bar No: 89595
                                          Federal Deposit Insurance Corporation
                                          Legal Division
                                          3501 Fairfax Drive, Room VS – E6004
                                          Arlington, VA 22226
                                          P: (703) 562-2395 F: (703) 562-2468

Attorneys for Defendant