### Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - x
SULTAN M. CHOWDHURY,           :
            Plaintiff,          :  Civil Action Number:
  v.                            :  05-2368 (RMU)
SHELIA C. BAIR,                 :
            Defendant.          :
- - - - - - - - - - - - - x

Washington, D.C.

Tuesday, April 15, 2008

Deposition of
           MAUREEN E. SWEENEY
a witness of lawful age, taken on behalf of the
Plaintiff in the above-entitled action, before Leanne
M. Krivonak, a Notary Public in and for the District of
Columbia, at the offices of Swick & Shapiro, 1225 Eye
Street, N.W., Suite 1290, commencing at approximately
2:16 p.m.

Diversified Reporting Services, Inc.
(202) 467-9200

### Page 2

APPEARANCES:

On Behalf of the Plaintiff:
   DAVID H. SHAPIRO, ESQ.
   JAMES E. SIMPSON, ESQ.
   Swick & Shapiro
   1225 Eye Street, N.W.
   Suite 1290
   Washington, D.C. 20005
   (202) 842-0300

On Behalf of the Federal Deposit
Insurance Corporation:

   TINA A. LAMOREAUX, ESQ.
   Federal Deposit Insurance Corporation
   Legal Division
   Room D-6138
   3501 Fairfax Drive
   Arlington, Virginia 22226
   (703) 562-2304

Also Present:

   Sultan M. Chowdhury

### Page 3

CONTENTS

                                                  PAGE

EXAMINATION ON BEHALF OF THE PLAINTIFF:    4, 10

   By Mr. Shapiro

EXAMINATION ON BEHALF OF THE DEFENDANT:    100

   By Ms. Lamoreaux

EXHIBITS

                                                  PAGE

Number 1 — Memo: Your Notice of              38
   Unsatisfactory Performance/PIP
   To: Martin Henning
   From: Sultan Chowdhury
   August 30, 2004

### Page 4

1            PROCEEDINGS
2  Whereupon,
3            MAUREEN E. SWEENEY
4  was called for examination by counsel for the Office of
5  the United States Trustee, and having been first duly
6  sworn, was examined and testified as follows:
7        EXAMINATION ON BEHALF OF THE PLAINTIFF
8        BY MR. SHAPIRO:
9    Q  Would you state your full name, please, ma'am.
10   A  Maureen Evelyn Sweeney.
11   Q  And can you give us your current residential
12 address?
13   A  8807 Skokie Lane, Vienna, Virginia 22182.
14   Q  Skokie?
15   A  S-K-O-K-I-E.
16   Q  In Vienna?
17   A  Yes.
18   Q  And the ZIP?
19   A  22182.
20   Q  Any plans to move?
21   A  No.
22   Q  Good.

MSJ - EXHIBIT 14

Page 57

1  says to him is I know of your background. Do you
2  recall that?
3    A  From reading the document?
4    Q  Yes.
5    A  Yes.
6    Q  Did you ever ask Mr. Henning about
7  that -- what he was referring to when he said that to
8  Mr. Chowdhury?
9    A  I don't recall specifically asking him about
10 that.
11   Q  Did you ask him about his keeping a Bible on
12 his desk -- prominently displayed on his desk?
13      MS. LAMOREAUX:  Object to form.
14      BY MR. SHAPIRO:
15   Q  Did you ask Mr. Henning about that?
16   A  Did I ask Mr. Henning about -- I'm sorry. Can
17 you say that again, please?
18   Q  Yes.
19      Did you ask Mr. Henning about him keeping a
20 Bible prominently displayed on his desk?
21   A  No.
22   Q  Why not?

Page 58

1    A  Because I did not know it was a Bible until I
2  read in the complaint because Martin keeps a book on
3  his desk, but there are no markings on it.
4    Q  I understand, but once you read it in the
5  complaint and saw that Mr. Chowdhury said it was a
6  Bible, did you then as Mr. Henning about it before you
7  made the decision to promote him to executive level?
8    A  No.
9    Q  This case -- this complaint, the EEO complaint
10 filed by Mr. Chowdhury, that had been pending -- that
11 was pending at the time you promoted Mr.
12 Henning -- correct -- to the executive level?
13   A  Yes.
14   Q  Did anyone else complain about Mr. Chowdhury's
15 writing -- writing skills, communication skills -- that
16 you're aware of other than Mr. Henning?
17   A  Yes.
18   Q  Who?
19   A  I know that there were other Steering
20 Committee members who in their review of documents --
21   Q  Which documents?
22   A  The documents that are samples for the --

Page 59

1    Q  Meaning --
2       MS. LAMOREAUX:  Can she finish her answer
3  before you ask another question? She was in the midst
4  of answering your first question when you're asking her
5  which documents.
6       BY MR. SHAPIRO:
7    Q  -- you mean, in f -- in Part f?
8    A  In Part b and e.
9    Q  In b and e, the Business Contingency Plan?
10   A  Uh-huh, yes.
11   Q  It was a draft that was circulated for
12 comments; correct? That's the purpose of a draft is t[o]
13 circulate it for comments; correct?
14   A  You asked -- yes.
15   Q  And other people had comments; correct?
16   A  Yes.
17   Q  Who else -- who had criticism of Mr.
18 Chowdhury's written -- writing skills besides Mr.
19 Henning?
20   A  On the Business -- on any document?
21   Q  Sure, let's take the Business
22 Continuity -- Contingency Plan first. Who had

Page 60

1  criticism of Mr. Chowdhury's writing?
2    A  On the -- I believe there were Steering
3  Committee members who had --
4    Q  Who?
5    A  -- concerns about the document not being
6  understandable at first draft.
7    Q  Who?
8    A  I believe it was someone from the Office of
9  Comptroller of the Currency.
10   Q  Who?
11   A  Gary Cunningham -- I'm sorry, Gary
12 Christianson. There's another Gary on that project.
13   Q  Where is Mr. Christianson now? Still at the
14 Comptroller of the Currency?
15   A  Yes.
16   Q  I think he made comments that he didn't think
17 it was well written?
18   A  I recall that -- that he had concerns about
19 the quality of that document at draft, yes.
20   Q  The writing?
21   A  Yes.
22   Q  The quality of the writing?

Page 61

1    And who did he express those to? To you — or
2 comment — written comments? Were they written
3 comments or oral statements?
4    A  I believe he made those to Martin Henning
5 and —
6    Q  Orally or in writing?
7    A  I do not know.
8    Q  Well, how would you know about them if he made
9 them to Martin Henning?
10   A  I heard about them.
11   Q  From Martin Henning?
12   A  Yes.
13   Q  I see. Did he make — did Mr. Christian (sic)
14 make any comments to you — or written comments that
15 you observed yourself about the quality of the writing
16 of that document — the Business Contingency Plan?
17   A  Not that I recall.
18   Q  So whatever comments that were critical of the
19 draft done by Mr. Christian came to you orally from Mr.
20 Henning?
21   A  Yes.
22   Q  Anyone else who said — others who had

Page 62

1 criticism — let's just take their d, the Business
2 Contingency Plan spoken of in Subpart b. Anybody else
3 have — that you understood have criticism of the
4 writing on that document?
5    A  Not that I can recall.
6    Q  Okay. Any other document that you understand
7 other people besides Martin Henning had criticism of
8 it?
9    A  Well, on the CDR test and evaluation
10 recommendations Mary West had comments on those.
11   Q  Yes, Mary West had comments.
12      You recall that I received substantial
13 comments from Mary West — do you understand that those
14 comments were critical of the writing?
15   A  I recall Mr. Henning telling me that Ms. West
16 had criticisms of that.
17   Q  Of the writing?
18   A  Yes.
19   Q  And, again, that's nothing that you saw
20 directly? That came to you via Mr. Henning?
21   A  Yes.
22   Q  Any other people had criticism of Sultan

Page 63

1 Chowdhury's writing?
2    A  Not that I'm aware of specifically.
3    Q  And in both cases Ms. West and Mr.
4 Christianson who allegedly had criticisms, those claims
5 that they were critical of Mr. Chowdhury's writing came
6 to you orally from Mr. Henning? That was the source to
7 you?
8    A  Yes.
9    Q  And there weren't any others that you recall?
10   A  Not that I recall.
11   Q  You had no such criticisms of Mr. Chowdhury's
12 writing, correct?
13   A  Not that I recall.
14   Q  Now, I just want to understand. You were, at
15 the time, the Deputy Director. The Director was Dr.
16 Arthur Murten?
17   A  Yes.
18   Q  All right. And who was Andrea Woolson at that
19 point in time?
20   A  Andrea Woolford?
21   Q  Woolford. I'm sorry. Woolford.
22   A  She's the Chief -- at that time she was the

Page 64

1 Chief of our Administrative area in the division.
2    Q  Well, he notes her as the Assistant Director
3 of Planning and Research Management Staff, DIR?
4    A  Yes, that's her title.
5    Q  So, she was not in direct — this direct
6 supervisory chain of Mr. Henning, correct?
7    A  No.
8    Q  Now, did you know how Sultan Chowdhury got to
9 DIR?
10   A  Yes.
11   Q  How?
12   A  Mr. Crum informed me that he would be joining
13 the CDR team as a result of a settlement.
14   Q  Settlement of what?
15   A  Of an EEO complaint.
16   Q  So you knew at the time before Mr. Henning had
17 gotten there that Mr. Chowdhury had had a previous EEO
18 case that had been settled?
19   A  Yes.
20   Q  That resulted in his joining the DIR staff?
21   A  Yes.
22   Q  What else did you know about the settlement of