EXHIBIT F1

# AFFIDAVIT OF SULTAN CHOWDHURY

DISTRICT OF COLUMBIA

DATE TAKEN: December 17, 2004

I, Sultan M. Chowdhury, Senior Information Specialist, Grade CG-15, Division of Insurance and Research (DIR), Banking and Statistics Branch, Federal Deposit Insurance Corporation (FDIC), make the following statement freely and voluntarily to Turna R. Lewis, who has identified herself to me as an EEO Contract Investigator for the FDIC, investigating my complaint of discrimination filed on August 25, 2004, knowing that this statement is not confidential and may be shown to an interested party (those with a legal right to know). I hereby solemnly swear or affirm:

1.      I have been employed by FDIC for 13 ½ years, beginning in June 1991. My race is Asian. My color is Brown, I am a Muslim, and I am 49 years old (DOB: 10/24/55). My current first level supervisor is Martin Henning, Project Manager, Central Data Repository (CDR). He has been my supervisor since October 2003. My second-level supervisor is Maureen Sweeney, Deputy Director, DIR, and my third level supervisor is Dr. Arthur Murton, Director, DIR. They were my supervisors when the actions cited in my EEO complaint occurred.

2.      I received a memorandum titled, "Mid-Year Performance Deficiency," on April 13, 2004, from my supervisor Martin Henning (Attachment "A"). The memo is dated April 9, 2004, and I found it open on my chair (face up, with no envelope) upon my arrival on 4/13/04. His memo was surprising to me since I received "superior" and "outstanding" ratings on my performance throughout my 29 years of professional experience of which 13 ½ years have been in the FDIC. I sought a meeting with Mr. Henning, and expressed my disappointment and appall with his assessment. He alleged that my "written communication" was deficient and cited three documents. He

Initials 

MSJ - EXHIBIT 15

mentioned that we agreed that certain steps would be taken in a meeting we had on March 31, 2004. Since Mr. Henning became my supervisor in October 2003, he has shown a pattern of discrimination, harassment, and insult to me and my professional achievements.

3.     When he first came on board in October 2003, I sought a meeting to apprise Mr. Henning of the CDR project activities, my role, and to offer him my assistance in the successful implementation of the project. In the middle of our meeting, he said that he "fired" people before. Although I was surprised at this unrelated and uncalled for comment, I went on and talked about the work of the project. Towards the end of the meeting, Mr. Henning said that he knew my background. When I asked how he knew my background, he said that he could not tell me the source. I thought about these comments, but put it out of my mind thinking that hard work is the thing to do.

4.     A few weeks after he became my supervisor, Mr. Henning reassigned me to different tasks that included assisting the CDR oversight manager (OM). I sought a meeting with him on 11/5/03 (Attachment "B") and told him that I would prefer to continue my role in implementing the taxonomy for the CDR in addition to the other concurrent tasks. In this role, I was leading a team of about 15 interagency (FDIC, Federal Reserve Board, and the Office of the Comptroller Currency) professionals. I organized the team, and was commended for my initiatives and progress made in the task. However, Mr. Henning told me that nobody wanted to do the tasks he assigned me, especially assisting in the contract OM related tasks. I asked him to reconsider my assignments whereby the project could benefit from my experience of approximately three decades in technology and complex project management for which I received awards that included a medal from the U.S. President's Council for the Y2K for my efforts at the FDIC. However, he advised me to report to him through Laura Lapin, the CDR Contract OM.

5.     At the beginning of November 2003, Mr. Henning indicated that he would change my job title from "Project Manager" to "Senior Information Systems Specialist."

I told him that I came to the DIR's CDR project from the Division of Information Resources Management (DIRM) of FDIC as a Project Manager (Attachment "C"), and I would like to continue with that position title and will support the project effort to the best of my abilities. He told me very pointedly that he would be the "only project manager" in the team. In December 2003, I received a personnel action form, SF 50-B, that changed my job title to "Senior Information Systems Specialist." He did not provide me with any reasons for the change in my job title.    I did not do anything in response to the position title change since I felt it was uncalled for and a discussion would be of no value.

6.    In November 2003, Mr. Henning distributed an organization chart (Attachment "D") that required me to report to him through Laura Lapin, another CG-15 employee. She has been on detail to the CDR project. I am the only non-Caucasian CG-15 employee in the CDR team. All of the other CG-15 Caucasian employees reported to Mr. Henning directly. No explanation was provided to me for the change.

7.    I was scheduled to go on vacation at the end of January 2004. I mentioned my vacation plans to Mr. Henning, gave him a leave application which he approved. When I returned to work on February 17, 2004, several people came up to me and exclaimed, "you are still here?" They told me that Mr. Henning announced in a CDR interagency Steering Committee meeting that he had a replacement for me and that I had gone to another job. Among other participants, A. Jon Wisnieski and Susan Keopp of the FDIC, and Geary Cunningham of the FRB were present in the meeting.

8.    In the next several days I came to know that my  replacement was Alan Deaton, who was brought to the CDR team with a promotion to CG-15. He is White, and my observation is that he has much less experience than me. There had been no prior discussion with me, nor had I taken another job within or outside FDIC. I was surprised, but continued with my duties. Upon my return, I observed Mr. Henning introducing Alan Deaton to my colleague in the office next to mine, but Mr. Henning did not introduce Mr. Deaton to me. I did not meet or know Mr. Deaton before.

Initials _Se_____

9.    Since January 2004, Mr. Henning excluded me from the project management and CDR Steering Committee meetings. All CG-15 employees in the CDR team, except me, were invited to these meetings. The project management meetings are weekly, and the steering committee meetings are biweekly. Since August 2004, I have been invited to the project management meetings, but not to the Steering Committee meetings.

10.    I was the Risk Manager for the CDR project, but I was excluded from attending the Steering Committee meetings where the agency executives were briefed on the project risks and significant issues that have impact on the project tasks were discussed. As a result, I would only get second-hand and delayed information on the project status and directions given by the executives.

11.    Despite my seniority in the organization, larger offices were given to both Alan Deaton and Andrew Sterling.

12.    Between March 1 through March 31, FDIC employees are required to receive mid-year performance reviews. Mr. Henning met with other staff of the CDR team, but in my case he rescheduled my performance review meeting at least 10 times (Attachment "V"). He also did not show up for several of our scheduled meetings.

13.    On March 31, 2004 (the last day the mid-year review had to be completed), our scheduled meeting at 10:30 a.m. did not take place. Mr. Henning and I met at about 4:30 p.m. on 3/31/04 in his office. In this meeting, as in my prior mid-year and annual reviews, I expected the usual positive comments that I typically received. However, Mr. Henning surprised me when he told me that my written communication skills did not meet his expectations. I informed him that I received "superior" and "outstanding" ratings throughout my 29 year professional career, and that this was first time that I had been told that I have a performance deficiency in written communication or any other criteria of performance.

At FDIC, I developed several types of documents that included project initiation documents, information technology (IT) plans, cost benefit analyses, operations guides, procedures guides, disaster recovery plans, business contingency plans, statement of work (SOW), request for proposals (RFP), etc. I initiated and successfully conducted interagency and interdivisional meetings. I participated in a number of FDIC and FFIEC steering committee meetings with senior executives where I presented position papers and reports. At no time, had I been criticized for deficient writing skills.

I told Mr. Henning that because we have had a relatively new working relationship and individuals have varying preferences in styles, I was willing to adapt to his style and approach to satisfy him. I brought to his attention that the documents he was citing for deficiency were approved work, and I had provided these to him for his review but did not receive any negative comments from him. He told me that our conversation was very "informal," and assured me that it was not "going anywhere." I told him I would continue to work as best as possible to satisfy him.

14.     At the risk management plan meeting in Mr. Henning's office on April 8, 2004, the participants discussed the new Certification and Accreditation (C&A) responsibilities being added for Federal IT system security as a result of the evolving requirements of the Federal Information Security Management Act (FISMA). Mr. Henning assigned me the C&A role or "certification agent" for the CDR, and then asked me what should my salary raise for the year be. I said that I didn't know, but expect it to be high given the additional responsibilities for the C&A. In a taunting manner, he then said that I would get a "0% raise" in the presence of Laura Lapin and Susan Koepp of FDIC. In FDIC, a 0% increase means that an employee "does not meet" at least any one of the performance review criteria. Such rating also jeopardizes an employee's career progression, and makes the employee a candidate for RIF in a down-sizing environment.

15.     Upon receipt of the 4/9/04 "mid-year performance deficiency" memorandum, I met with Mr. Henning on 4/15/04. I requested follow-up meetings on 4/20/04 (Attachment "E"). I expressed my disappointment over the contents of his 4/9/04 memo which were contrary to his assertion to me on 3/31/04 that his comments were informal

and between us. I told Mr. Henning that, in our meeting on 3/31/04, we did not agree to any of the points he wrote in the 4/9/04 memo. However, as a committed employee, I assured him that I would do my best to satisfy him. We began to meet on a weekly, and sometimes bi-weekly, basis. In several of the meetings, he chagrined that I am a CG-15 employee like him.

16.    All of the documents that Mr. Henning cited for deficiency were reviewed and approved by the interagency stakeholders. For example, the CDR Risk Management Plan (Attachment "F"), had been approved by his predecessor and my former supervisor. This document was cited to be of "excellent quality" (Attachment "G1") in my performance review for 2003. I prepared the CDR financial summaries for January 2004. These were the first batch of reports with planned monthly updates. I coordinated with DIR financial analyst, DIRM, and the Division of Finance (DOF) staff to assemble the required data, and sent the first draft to Mr. Henning and Laura Lapin for their review. On January 23, Mr. Henning inquired regarding a few data elements, and commented, "This looks great, thanks Sultan." (Attachment "H"). Similarly, the Security Assessment Questionnaire (SAQ) and the cover letter were circulated to all stakeholders, including Mr. Henning, in FDIC, FRB, and OCC, and were updated with the comments received. Senior executives of the three agencies approved the SAQ and signed the cover letter on April 8, 13, and 15 (Attachment "W"); Mr. Henning, I, and other agency staff also signed the SAQ (Attachment I2).

17.    Mr. Henning's pattern of treatment towards me -- telling me that he "fired" people in the past, that he knew my background without disclosing the source of such knowledge, non-recommendation for the Corporate Success Award (CSA) despite substantial contributions and savings for the FDIC, change of my position title without any reason, my non-inclusion in project meetings, unwillingness to meet with me, and his unsubstantiated verbal criticism of my previously approved work in a March 31 meeting, and the April 9 memo on alleged "deficiency" in the Mid-year Performance Review -- indicated a pattern of discrimination.

18.    I completed a course, How to Sharpen Your Business Writing Skills, at the American Management Association (AMA) in May 2004 in the spirit of continued professional development, and to meet Mr. Henning's requirements. On June 15, 2004, we met, and I showed Mr. Henning my certificate of completion of the course at the AMA. I asked if he could clear me of his assessment on my mid-year performance review since I completed the course and took other steps recommended by him. He told me that he would tell me at the end of 90 days, prescribed in his memo of 4/9/04. He then paused and told me "don't be surprised at your annual performance review!" I took it as a threat. It sounded like he had made up his mind regarding giving me a failing assessment in my performance review.

19.    Upon my enquiry on how I could satisfy him, he asked me to provide him with more examples of my writing. I sent him examples of previously approved or reviewed documents (Attachments I1 and I2). He criticized each of these documents to be deficient. His criticisms centered around sequence of certain paragraphs within the document, use of more "crisp" words, etc. Incidentally, these documents were sent to him for his review and comments prior to final distribution. For example, my recommendation on the level of efforts for the Security Test and Evaluation (ST&E) for the CDR was approved by the CDR Steering Committee on May 20, 2004 (Attachment "J"); whereas Mr. Henning criticized this document to be deficient.

20.    As required by Mr. Henning, we met weekly, and sometimes biweekly. However, I did not receive the 90-day review from him, due on July 11, 2004, per his April 9 memorandum. Also, the annual performance review period for employees in FDIC ends on August 31. I, therefore, sent him an e-mail on 7/28/04 (Attachment "K") stating that although I did not agree with his assessment of my performance, and complied with his instructions, and hoped that he would clear me of his perceived deficiency in my performance. Upon receipt of this email, Mr. Henning called me to a meeting in his office on 7/30/04. He was visibly agitated and flashing my email in his hand said, "I will give you a 'PIP.'" He did this because I had written that email to him. At the time, I was not sure what a "PIP" was and asked him. He explained to me that

there is possibility of getting terminated from the FDIC if the requirements of the performance improvement plan (PIP) are not satisfied. I questioned him about the purpose and intent of issuing me a PIP with such dire consequences despite my efforts to do everything to satisfy him, and my "superior" and "outstanding" record in performance throughout my career in FDIC. I also assured him of my best efforts to work him for the success of the project, and meeting the FDIC goals and objectives. I stated that we could achieve success in our project efforts by conducting the business through open communication rather than resorting to the PIP.

21.     In one of our meetings in regard to the written communication, I inquired of Mr. Henning why he had been so rigid with me, to which he stated that I filed an EEO complaint against him for non-award of the Corporate Success Award (CSA).

22.     Mr. Henning and I continued to meet weekly after July 30, 2004. In these meetings, we discussed CDR project tasks, but his comments about my writing were generic, such as, that certain part of the document was "not crisp," or certain section could "be tighter." In order for me to establish a baseline on Mr. Henning's expectations, I asked him whether the documents I prepared met their purpose or could be assigned review grades such as "A" through "D." He told me not to ask such questions.

23.     Mr. Henning did not provide me with any example of FDIC documents that he thought were ideal; he provided me with work papers of a writing course he took in the past and reference to a text book.

24.     On August 18, 2004, Mr. Henning left the PIP (Attachment "L ") on my chair, faced up without an envelope.

25.     Later in the day on 8/18/04, I went to the copy room and found a copy of the PIP on the copy machine. This facility is shared by all employees. I felt violated and humiliated – as the PIP is a confidential personnel matter – and it was not treated as

Initials  SC

such. I left a note in an envelope (Attachment "M") on Mr. Henning's chair, exclaiming that I had found the PIP memorandum on the copier; he said that he was "sorry."

26.    We met on August 18, 2004, and as directed by Mr. Henning, I signed the PIP memorandum acknowledging its receipt. He went over the contents of the memo with me.

27.    I responded to the PIP, point by point, on August 30, 2004 (Attachment "N"). As in his April 9 memorandum, the documents cited deficient in the PIP were previously approved, and used on several occasions. These documents were available for Mr. Henning's comments prior to final distribution. In my response, I cited performance ratings on my written communication criterion during the past five years (Attachments G1 through G5): "Meets Expectation" in three reviews, and "exceeds expectations" in two reviews. I sent copies of my response to the PIP to Dr. Aurthur Murton, Director, DIR; Ms. Maureen Sweeney, Deputy Director, DIR; and Ms. Andrea Woolford, Assistant Director, Planning and Resource Management Staff. The next day, Mr. Henning came to my office and told me that he would rebut my response. To date, I have not received a response from him nor did I hear from the DIR management.

28.    I continued to do my best at work. However, I started getting recurring headaches, heightened blood pressure, migraines, and felt disillusioned because of the alleged deficiency. The weekly meetings and other treatment were torturous for me. The assessment was not objective, and I did not see a light at the end of the tunnel despite my efforts to meet Mr. Henning's preferences. My goal was to be an executive in FDIC or at another government agency through commitment and hard work; however, it became apparent that Mr. Henning was taking steps to ruin my career. One day in May 2004, I felt so bad that I contacted the Employee Assistance Program (EAP) for anxiety. The EAP counselor advised me to seek professional counseling and treatment. I visited the FDIC nurse's office several times due to stress related symptoms. I was unable to sleep, wondering what I would face when I came to work.

29.    I was the designed coordinator for the OIG and GAO audits, however, I was excluded from the OIG audit entrance meeting; I only knew from third party sources that an audit engagement meeting was taking place. Mr. Henning advised the OIG officials not to contact me for any questions regarding the CDR project.

30.    Mr. Henning gave me a 30-day review of the PIP on September 22, 2004 (Attachment "O"). Again he left it on my chair, face-up, uncovered, and without an envelope. It appeared to be on a positive tone, especially in regard to the Eagan Service Center (ESC), MN, site visit report.

31.    Mr. Henning continued to nit pick my work, and demean my professional judgments. I called a meeting of the CDR contractor, Unisys, Mr. Henning, and Ms. Lapin, to discuss and resolve the contractor's failure to deliver products that were late by over three months. I asked the contractor for a specific estimated date of delivery for the product instead of generic "as soon as possible." The next day, Mr. Henning scolded me to be lacking "professionalism" for pressing the contractor for a specific date in our meeting. I found such criticism to be unfair and unjust, given my experience as a contract oversight manager, technical monitor, and project manager.

32.    Mr. Henning blocked my potential career opportunities within the FDIC through the Expression of Interest (EOI) for details and the Internal Job Rotation Program (IJRP). In our weekly meeting of October 12, 2004, in the face of undue and unfair criticism of my work, I proposed to Mr. Henning that it might be best for me to get a re-assignment elsewhere within the Corporation. He responded that he has been denying my detail and IJRP opportunities since the beginning of 2004.

33.    I was selected in the pool of candidates for the FDIC IJRP Level II: Leadership Development Program, in January 2004 (Attachment "X"). Once a match is found between a candidate's expertise and a position through the IJRP, the selection is made; I was waiting for such a match. I expressed interest for one such position and had an interview with Fred Carns, Deputy Director, DIR, and Dean of School of Insurance of the

FDIC Corporate University. Upon my follow-up on the status of the selection in April 2004, Mr. Carns told me that based on his discussion with Mr. Henning and Ms. Sweeney, I could not go on a new assignment at that time. However, he advised me to look for other opportunities in the future.

34.     Prior to applying for any detail opportunities within the FDIC, supervisory approval is required. In June 2004, I intended to apply for a detail in the Cost Management Program in the DOF, and requested Mr. Henning's approval through an email on 6/7/04 (Attachment "P"). I have extensive experience in the requirements for this position and could make significant contributions to the FDIC. Mr. Henning did not respond to my request, but told me after the application closing date that he spoke with Betty Rudolph (the selecting official) about my interest in the position, and that he did not approve me to apply.

35.     Mr. Henning confirmed to me that he blocked an IJRP detail opportunity to the FDIC Office of Diversity and Economic Opportunity (ODEO) in September or October, 2004. He also blocked my expressed desire to serve as a mentor in the FDIC Corporate Mentoring Program. I served the ODEO with distinction on a previous detail as the Chair of Communications Working Group of the Diversity Steering Committee. I also served two terms as mentor in the past. He may have blocked other opportunities that I had applied for.

36.     Mr. Henning denied my request for training in a security Certification and Accreditation (C&A) workshop in June 2004 (Attachment "Q"). Stewardship of the C&A for the CDR is my responsibility. This is a new functional area for me, and the C&A is a critical element to comply with the evolving requirements of the FISMA.

37.     Mr. Henning compromised my right to privacy, and embarrassed me by disclosing the personnel action that he initiated against me. He disclosed to Ms. Lapin that I attended the business writing workshop at the AMA in May 2004, and she asked me about it upon my return from the workshop. He displayed a similar pattern by leaving

a copy of the PIP on the copier in a public place, and leaving the PIP and other related correspondence without an envelope on my chair.

38.    I received the 60-day review on the PIP (Attachment "R") on November 4, 2004 (that was due on 10/16/04), left on my chair, face up, without an envelope although I had previously complained about the lack of confidentiality for these documents. This review appeared to be a reversal of Mr. Henning's 30-day review of September 22. He made unfair and inaccurate assertions in the memo.

39.    Mr. Henning alleged that the ESC site visit report was not of my original authorship; whereas, he had previously praised this document. He engaged in back channel communication with my team member and created the impression that I misinformed him on the development process of the report. This report is a product of the ESC site visit team consisting of four FDIC professionals, and I was the team lead. Tom Tuzinski, an FDIC IT examiner at the Minneapolis, MN office, and I are the primary authors of this report. Comments from other team members and that of Mr. Henning's were included in the final version of the report (Attachment "S"). I offered Mr. Henning the first draft of the report prepared by Mr. Tuzinski, for comparing with the final version, but Mr. Henning refused stating that he obtained a copy from Mr. Tuzinski (without informing me), even though I am the team lead for the effort and my office is two doors away from Mr. Henning's. I felt his actions were unprofessional and insulting to me.

40.    After leaving the 60-day review on my chair, Mr. Henning came by my office and stood in the doorway, and asked me if I had received the 60-day review. This is another example of how Mr. Henning harassed me, since such reviews are widely known to federal employees as adverse personnel action. I suffered severely from such harassment and continuing discrimination, and my doctor placed me on medical leave starting on November 10, 2004, that continues to date.

41.    On November 16, 2004, I responded to Mr. Henning's 60-day review of November 4, 2004 (Attachment "T").

42.    Antoinette (Toni) Pavone of the FDIC Ombudsman Office had applied for an announcement for a single vacancy in the CDR Implementation Team of the DIR in or about January 2004. After she became aware that two people (Alan Deaton and Andrew Sterling) were selected for the vacancy announcement even though it was for a single position, she called Mr. Henning and enquired on how two selections were made against one vacancy. He told Ms. Pavone that he made the second selection since someone from his team vacated a position (it is now obvious that he meant me since he announced in the CDR Steering Committee meeting in February 2004 that I had gone to another job and he hired my replacement!). Ms. Pavone told me of her conversation with Mr. Henning.

43.    In 2001, I successfully served as the Chair, Communications Working Group of the FDIC Diversity Steering Committee. In that role, I edited and published corporate-wide communications of over 100 pages (Attachment G3) and several other written products. In addition, throughout my career in the FDIC, I developed and led the development of several dozens of IT plans, system development life cycle (SDLC) documents, contingency plans, disaster recovery plans, budgetary reports, statement of work (SOW), request for proposal (RFP), employee performance reviews, status reports, etc. These documents were reviewed and approved, and were beneficially used in the Corporation. My written products were rated to be of high quality in the last five consecutive annual performance reviews (Attachments G1 – G5). I served as an effective mentor. I spoke at Corporate-wide events, and was commended for my performance.

44.    I believe that there was no basis for Mr. Henning's alleged assessment of deficiency in my written communication, except the intent to harm my career. His pattern of treatment and actions made it clear to me that he wants to terminate me from my position in FDIC thereby deny me the potential of further progression in my career. There was no basis for giving me a PIP. Rather, my 29-year career, including 13 ½ year

in the FDIC, with consistent "superior" and "outstanding" performance ratings show that I am a high performer in all criteria including written communication.

I am the only non-white in the CDR Implementation Team at the CG-15 level. I believe that my race, color, and national origin are the only reasons for Mr. Henning's actions to harm my career. I did not know him and had not worked with him before. He, apparently, could not tolerate me at the CG-15 level; in several of our meetings, he chagrined that I was at the same grade as him.

I believe that my religion was a factor because I noticed that Mr. Henning keeps a Bible on his desk. I feel that he is taking discriminatory actions based on what I am, and not how I perform.

In FDIC, I was commended several times for effectively serving as a project manager, unit chief, contract oversight manager, and technical monitor. I saved substantial amounts of money for the Corporation by introducing innovative processes in business and technology, and increased employee morale through fair treatment and proactive management practices. I am sanguine that I did not lose these traits after Mr. Henning became my supervisor in October 2003.

45.    Sensing his intentions, in April 2004, I respectfully requested Mr. Henning to facilitate my transfer from his unit to another organization within the FDIC; instead, as noted above, he blocked my opportunities and proceeded with issuing me a PIP in August 2004.

46.    In addition to discriminating against me, Mr. Henning is retaliating against me on account of my prior EEO complaint against him regarding non-recommendation for the FDIC Corporate Success Award (CSA). I had provided him with my reasons for deserving the award since I saved the Corporation over $100,000 in 2003 in addition to other achievements (Attachment "U"). I sought EEO counseling regarding this complaint at the end of March 2004. I am aware that the EEO counselor talked with Mr. Henning at the end of March or early April 2004. The complaint is currently pending.

Initials SC

47.     In 2000, I had filed an EEO complaint that was settled in my favor in December 2002. I believe, Mr. Henning is aware of the complaint because he mentioned in our first meeting in October 2004 that he was aware of my background. He may have applied for the position that I currently hold in the DIR. I came to my current position as part of the December 2002 settlement agreement. I believe that there are others in our team who write worse than me, but they were not issued any PIP. Mr. Henning said, in a vindictive manner, that I had filed an EEO complaint against him; he seemed to be antagonistic against me.

48.     As remedies to the above actions, I seek the following:

- Prohibit Mr. Henning from discriminatory practices designed to destroy my successful career in the Federal government
- Attorney fees
- Compensatory damages
- Remove negative references, including PIP and related documents, from official and unofficial personnel files
- Transfer or reassign me to another position within the FDIC
- Permanent prohibition that Martin Henning will not supervise me
- Prohibition against retaliatory action as a result of this and any other EEO actions

I have read the above statement consisting of 15 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties (those with a legal right to know).

SANDRA D. DAVIS
Notary Public
Montgomery County
Maryland
My Commission Expires Oct 8, 2008

_____
Signature

_____
Date

Subscribed and sworn to before
at ~~Washington, DC~~ *Rockville, Maryland.*
on the __6__ day of January 2005

_____
Signature of Witness

Initials_____

## Rebuttal to Martin Henning Affidavit

I noted that Mr. Henning had his affidavit witnessed by Jon Wisnieski, a CDR team member, who works under his supervision. Mr. Henning also had his affidavit regarding the CSA complaint witnessed by Geary Cunningham of the FRB. Mr. Cunningham is a member of the CDR Steering Committee and leads various CDR work groups. It appears to be inappropriate that project team members were witnesses to Mr. Henning's affidavit, especially since they know the aggrieved party, and both of them are potential witnesses in this complaint.

The paragraph numbers below correspond to the paragraph numbers of Martin Henning's affidavit of January 25 and 26, 2005.

**Para 4.** Mr. Henning's contention that he was unaware of my EEO complaint against him regarding the Corporate Success Award is untrue. The FDIC EEO counselor issued the Notice of Right to File (NTRF) formal complaint on April 22, 2004. I am aware that she talked with Mr. Henning re this matter at the end of March 2004 or beginning of April 2004, prior to issuing the NTRF. Indeed, Mr. Henning's continuous discrimination and harassment towards me starting in October 2003 has led me to major depression.

It is appalling that within a month of taking over the duties of the CDR project manager, he set his priority to change my position classification whereas a significant work remained to be done to make the CDR a successful project. I was making substantive contributions to the success of the CDR and xBAT projects, and I was not aware that my position classification then was of any detriment to the project activities. Mr. Henning's action shows his pre-meditated intent to discriminate against me and harm my career.

**Para 5.** Mr. Henning's contention that he was unaware of my March 2004 EEO complaint against him re the CSA until July/August 2004 is untrue. Per the facts in Para 4 above, he was aware of my complaint in March/April of 2004. In addition, he was

aware of my prior EEO activities, and the settlement agreement of December 2002 (per para.4 of his affidavit).

Mr. Henning's action to delay my mid-year review at least 10 times, and conducting the mid-year performance discussion at the eleventh hour (approx. 4:30 p.m.) of the last due date of the mid-year review (3/31/04) shows his malicious intent to bring unsubstantiated allegations against me. Upon my protest to his remarks on 3/31/04, he told me that it was an "informal" conversation and that that the conversation was "not going anywhere" beyond he and I. Despite such assurances, he issued a written memorandum on 4/13/04 and falsely claimed that I had agreed to the actions he prescribed in the memo.

Indeed, I inquired about the thick file Mr. Henning brought with him in our one-on-one meetings sometime in May/June 2004 since I found it unusual for a supervisor to bring a thick file with him when talking with an employee in an "informal" session. To my inquiry, he replied that it was I who had filed an EEO complaint against him.

**Para 6.** Alan Deaton joined the CDR team sometime in February 2004, i.e., after Mr. Henning's announcement in the interagency steering committee meeting that he hired someone to replace me (see Para 7 and 42 of my affidavit of January 2005). Andrew Stirling joined the CDR team sometime in the summer of 2004. My title prior to Mr. Henning's change was IDM Project Specialist/Project Manager, and not Sr. Computer Specialist that Mr. Henning stated.

**Para 8.** Mr. Henning issued the alleged deficiency and the PIP, ostensibly because of my status as a minority at Grade 15. Otherwise, it is incomprehensible to a reasonable person that someone with consistent record of "superior" and "outstanding" overall and in written communications ratings over two decades will suddenly fall to the "failing" grade with the arrival of Mr. Henning.

SC

**Para 9.** It is convenient to give failing grades to anyone on a subjective category without any guidelines. Indeed, the CDR project team members discussed the inadequacies of the "use cases" document that contributed to reduced functionality in the CDR; contrarily, Mr. Henning appeared to have cited this document to be a good example.

**Para 10.** The statements in this paragraph are unfounded. My written products were lauded for quality and effectiveness throughout my professional career, specifically in the FDIC. Jim Crum, project manager prior to Mr. Henning's ascension, conveyed to me the CDR Steering Committee members' appreciation of my presentation on complex CDR/xBAT related matters. I developed dozens of IT plans for approval by the FDIC executives, concept papers, system requirements documents, cost-benefit analyses, feasibility studies, user manuals, and other technical documents in the FDIC. Others used many of my documents as templates.

The CDR risk management plan was developed and accepted for use by the CDR project management in October 2003. The plan was cited to be of "self directed and of excellent quality" in my 2003 performance evaluation. As with any evolving project document, I updated the document with new sections and incorporated comments by team members. At no time, I was told that the document was not understood.

I developed the business contingency plan (BCP) and distributed this to my interagency (FDIC, FRB, and OCC) team members for their comments. I did not receive any written comments from the team members; however, their verbal comments were positive. I set up the August 2004 meeting with the interagency team and Mr. Henning for comments on the BCP that was in draft form. In fact, this was the first meeting where FFIEC agency representatives participated in the review of the draft BCP. In that meeting no one commented that the BCP "was not adequate." The following is my recollection of the participants' comments:

a. Tom Selle, FDIC: he suggested that I remove the CDR implementation date (since the project team failed the planned 2004 implementation date). He also volunteered to

contribute a workflow chart of CALL processing; however, I did not get it from him as of November 2004.

b. Jack Talbert, FDIC: he suggested that we should incorporate another option for seeking alternative BCP site selection at one of the participating government agencies in addition to the commercial business contingency providers proposed in the draft plan.

c. Gary Christensen, OCC: he suggested to change the organizational structure of the proposed business contingency execution/operational teams. He also volunteered to share a copy of a similar plan with me. However, I did not get any sample despite my verbal and email follow-ups with him.

d. Martin Henning, FDIC, CDR Project Manager: he asked a number of clarifying questions. He also instructed me to remove my name with his as the business contingency coordinator. He wanted me to change the organization of the business contingency management efforts. He questioned as to the non-presence of any footnote of the publications I cited in the bibliography of the BCP.

It should be noted here that professional business contingency and disaster recovery journals suggest that the development of an effective BCP take 12-18 months, and that all organizations within an enterprise participate in the execution of a BCP. However, Mr. Henning instructed me to remove the proposed participation of various functional/ operational areas of the FDIC, FRB, and OCC. I prepared the first draft of the BCP in June 2004, in addition to other parallel responsibilities. Despite receiving no negative comments from other BCP team members (except for the comments noted above), Mr. Henning concluded in August 2004 that the BCP was "not adequate."

Indeed, I had the BCP reviewed by the writers and editors of the FDIC DIR. They made a few suggestions in the format of the document (such as paragraph numbering scheme), however, did not suggest that the document did not convey its meaning. It should also be noted that the BCP was in draft format in August 2004, and

the purpose of the August 2004 meeting was to review the document, get comments from the participants, and update the document. The draft BCP was available at the CDR intranet site for anyone to review and comment on the document. It became clear that Mr. Henning would term any of my documents that receive comments/suggestions in the review process as deficient.

**Para 10a.** Mr. Henning's tone, demeanor, pattern of treatment starting in October 2003, and the allegation of deficiency on my performance, were clearly threatening to me. His allegation was contrary to the "superior" and "outstanding" ratings I received throughout the past 28 years including 13 annual ratings in the FDIC. I am positive that I have not lost my quality in written communications since Mr. Henning became my supervisor in October 2003.

**Para 11.** Obviously, Mr. Henning did not find reason to fault documents prepared by others except me. It is apparent that, for Mr. Henning, I possessed too distinct minority features to be a CG-15 employee.

**Para 12.** Mr. Henning's statements in this paragraph speak for themselves that he disregarded my right to privacy and self-esteem, and his own obligations to protect the rights under the law.

**Para 13.** My recollection is very clear regarding Mr. Henning's statement in the middle of our first one-on-one meeting that he "fired" people before and that he "knew" my background. I would not find such comments "just conversational" as Mr. Henning attempts to portray. I found such remarks surprising, especially in our first meeting, and shared the conversation with some of my colleagues.

**Para 14.** I am curious as to how Mr. Henning decided to redistribute the assignments and draw organizational chart for the CDR, thereby making Ms. Lapin my team leader within a few weeks of his ascension to the CDR project manager position. In his organizational chart, I am the only non-white grade 15 employee that reports to him

through another "detailed" grade 15 employee to the CDR. Clearly, I possess far superior experience than Ms. Lapin in complex project management, contract oversight, technical monitoring, record of accomplishments in successful project implementation, and supervisory performance in FDIC. His decision clearly portrays his bias against a non-White employee at grade 15.

**Para 15.** Mr. Henning's decision to require all "white" CG-15 employees to report to him, except me, the only non-white CG-15 employee, displays his blatant bias against me. It is not accurate that the task for CALL taxonomy generation was complete in October 2004. I had marshaled project team from the three agencies, established procedures for the task, and the Steering Committee commended the progress I made in the task. Leading the risk management and Section 508 compliance tasks were my pre-existing responsibilities.

I had raised my concerns regarding the redistribution of assignments and the organizational chart at least twice with Mr. Henning in person. Each time he told me that he would take them into consideration, but to no result. I did not find it business-like to write to Mr. Henning about my concerns that he and I discussed multiple times. I had raised the importance of security management, a key requirement in the implementation of an IT project, to Mr. Henning since it was not included in his functional/organization chart. I took over the security responsibility with the impression that I would be relieved of the financial reporting responsibility of the contract oversight management.

It is pretentious on Mr. Henning's part that he assigned me the financial reporting task of the CDR project because of my background as a CPA. Financial reporting of a project is the responsibility of the contract oversight manager (OM). To my knowledge, it is not a practice in the FDIC to engage professional accountants to assist the OM for project financial reporting. Based on his chagrin expressions on several occasions that I am a grade 15 employee "just like" him, I believe, Mr. Henning's sole purpose of making me a team member under Ms. Lapin demonstrates his bias against me as a minority at grade 15 level.

Ms. Lapin treated me unprofessionally on a number of occasions. I wanted Mr. Henning to deal with this matter, but he never did. Therefore, I talked with Ms. Lapin directly. When I brought this to her attention, she apologized and acknowledged that other people have told her of her "abrasive" attitude in the past.

**Para 16.** As pointed out above, my performance ratings over the years speak of my skill in producing effective and high quality written products. It is not comprehensible that my superior and outstanding ratings in written communication skills over two decades could diminish to a failure level with the change of a supervisor. To further his biased motive, Mr. Henning chose a "subjective" criterion to tarnish my successful professional achievements, and to destroy my career in the Federal government.

**Para 17.** The statements are inaccurate. After my return from annual leave in February 2004, I heard from interagency participants of the Steering Committee of Mr. Henning's announcement in mid-February (when I was away) that he got a "replacement" for me. I did not express overload of work to Mr. Henning until about June 2004. At that time, I was constrained by dealing with Mr. Henning's allegation on deficiency in performance, increased work in CDR security certification and accreditation (C&A), CDR site visits, 508 compliance, and risk management tasks. Ms. Lapin's affidavit (para.9) states that Mr. Henning made the statement that "Sultan would be leaving" in the "CDR interagency Steering Committee meeting, an internal FDIC project meeting, or the FFIEC Project Management meeting."

**Para 17a.** Yes, I was not invited to the project management meetings starting January 2004 through August 2004, except on a case-by-case basis. However, all white CG-15 employees were invited to the meeting regularly except me until August 2004. Although CDR meetings were posted in the CDR intranet, we were reminded several times in the staff meetings that only the invitees should attend the meetings. Once again, all white CG-15 employees were invited the CDR Steering Committee meetings except me. I was not a "member" of the CDR Steering Committee. However, I am not aware that Messrs.

Deaton, Stirling, and Ms. Lapin are "members" of the CDR Steering Committee, but they were invited attendees to the meeting.

**Para 18.** My understanding is that the performance evaluation must be independent, and it is likely to be a violation of regulations to review previous performance evaluations of an employee while preparing a new evaluation. However, in the current FDIC performance plan and evaluation, the ratings are "Meets" or "Does Not Meet" expectation. Therefore, my previous rating of "meets expectations" in all criteria of evaluation, including the "written communication skills," is as good as it could be.

**Para 19.** It is incorrect that the CDR Steering Committee (SC) members did not "understand" my presentation on the Security Test and Evaluation (ST&E). The ST&E is a relatively new requirement under the Federal Information Security Management Act (FISMA). The SC members had asked probing questions on the purpose and necessity of the ST&E, and the Certification and Accreditation (C&A) process in the first meeting. Approval of a new process in two presentations that required a significant amount of task and resources commitment from the agencies, in my view, should be hailed as a huge achievement rather than the belittling it gets from Mr. Henning. I wonder how many other tasks, requiring additional resource commitments, were approved by the SC in one presentation only!

**Para 20.** I stand by the fact that Mr. Henning scolded me in our one-on-one meeting for asking the CDR contractor, Unisys, the previous day to provide us with a specific estimated date for completion of the task that Unisys delayed by several months.

In fact, in a staff meeting after the contractor failed to deliver the project, Mr. Henning gave the contractor performance a "B" rating after the key project team members assigned the contractor performance "D-" through "F" ratings and abruptly stopped the discussion. He even proposed to declare the project a "success" by implementing the non-functioning CDR system in the production environment without

giving any access to the users of the system. He would then take steps to correct the deficiencies of the system.

**Para 21.** It is obvious from the statements in this paragraph that Mr. Henning had a vindictive agenda to demean me and damage my career. He told Fred Carns, Deputy Director, DIR, in March 2004 or before that I was on a PIP, whereas he issued me the PIP on August 18, 2004. Mr. Henning similarly obstructed my other career opportunities within the FDIC by providing incorrect information on my performance to advance his discriminatory intent.

Mr. Henning did not ask me my career aspirations in the next 3-5 years, as he said he asked other employees. In my affidavit, I provided my email request for training in system Certification and Accreditation (C&A) which he verbally denied, and did not respond to me in writing. I did take the business writing course at the American Management Association, per his instructions, in the spirit of cooperation and continued professional education. My second course was a two-hour orientation on writing given to the FDIC DIR researchers and economists by the FDIC DIR writers and editors. Mr. Henning instructed me to shorten my participation in the pre-scheduled pre-retirement seminar in order to attend this orientation. He also patronized me by sending my name to the instructors prior to informing me of the seminar.

**Para 23.** The Eagan Service Center (ESC) site visit report is one of the examples of how Mr. Henning criticized my products after they were reviewed, approved, or received positive feedback. Like the ESC report, he criticized the following documents to be deficient:

- risk management plan after it was adopted for use in October 2003;
- the financial summaries which he commented in January 2004 that it "looked great;"
- security assessment questionnaire (SAQ) after it was approved by the interagency Steering Committee and the security team; and

Mar 09 05 11:59a      Raso Schowdhury        301-738-2255

- My recommendation on the security test and evaluation (ST&E) after it was approved by the CDR interagency Steering Committee.

I find it abhorrent that after the ESC site visit report was accepted by the security team and presented to the CDR project management, Mr. Henning would indulge in a "sting" operation, apparently to harm my career and to serve his ulterior motive. He ventured into back channel communications with Tom Tuzinski, my team member. He asked Mr. Tuzinski about my work, and then sent me an email with questions as if to verify whether my information will match with that of Mr. Tuzinski's.

I was the lead for CDR site visit task. I formed the CDR site visit team, and obtained Mr. Tuzinski's supervisory approval for his participation in the effort. I provided regular weekly updates to Mr. Henning on the ESC site visit report, Mr. Tuzinski's role, and other CDR tasks. If he had any questions or comments on the development of the report, he could have asked me.

Mr. Henning first introduced the term, "original authorship" in his 60-day PIP review given to me on 11/4/04 to reverse his positive tone in the 30-day review. Prior to 11/4/04, Mr. Henning did not tell me, and I did not commit to any original authorship of any document. Practically, all business documents are products of contributions and reviews by interested parties. For example, my suggestions and comments added fundamental values to documents developed by others and Mr. Henning--my contribution should not reduce any credit of the original developers of the documents.

Para 24. Mr. Henning's treatment of me has been nothing short of discrimination and continuing harassment. I have worked in many organizations and with many supervisors, and provided them with outstanding service that earned me a medal from the U.S. President's Council on the Y2K, accolades, awards, and promotions throughout my career. However, 28 years later, Mr. Henning took it as a passion to discredit my career achievements in the FDIC. Instead of letting me take a break from his malicious

Mar 09 05 12:00p    Raso Schowdhury                301-738-2299              P.12

persecution of me, by pursuing my career objectives in another organization of the FDIC,
he bent on to keep me in his organization and ultimately issued the PIP.

Yes, Mr. Henning said that he provided "constructive criticism" to "other" CG-15
level employees (all Caucasian except me), and did not place anyone on a PIP except me.

3/9/05

Mar 09 05 12:00p    Raso Schowdhury

**Rebuttal to Laura Lapin Affidavit**

I received Ms. Lapin's affidavit of January 26, 2005, as a soft-copy and was not signed or sworn. The paragraph numbers below correspond to the paragraph numbers of her affidavit of January 25, 2005.

**Para 5.** As far as I knew, I was the team lead for the CDR security, 508 compliance, and risk management teams, and was responsible for the tasks in these areas. I organized the interagency teams, obtained necessary approval from the CDR Steering Committee, and sought participation of the members from the three agencies. Sometime in mid-2004, the risk management responsibility was moved to Andrew Stirling due to my workload.

**Para 6.** The CDR contractor, Unisys, developed a risk management plan (RMP) from the contractor's point of view. However, we had extensive discussion with the CDR project management and concluded that an RMP from the FFIEC purview is required as part of sound project management practices. The initial plan was finalized in October 2003 with the understanding that the RMP will be updated as the project development work progressed, and Mr. Henning's predecessor (an FDIC executive) commended this plan.

**Para. 7.** This affirms that I had distributed the draft document for feedback from the team members, and I welcome all comments and suggestions.

**Para 9.** I believe that the purported assumption of my leaving the CDR team soon is unfounded. Ms. Erica Bovenzi, Dean of School of Leadership Development and Deputy General Counsel of the FDIC, sent the email of my selection in the pool of candidates for the Internal Job Rotation Program (IJRP) Level II: Leadership Development Program on 12/23/04. Ms. Lapin was present, sometime in early January of 2004, in one of our conversations when Mr. Henning and I discussed the IJRP selection process. It was not a job offer. The email was clear that it was the first step in the IRJP selection process, and the appropriate selection officials will match candidates with their areas of interest. I had expressed my interest to work with Fred Carns, Deputy Director of the DIR, and in March

2004 or earlier, Mr. Henning stopped my selection in this position in the IJRP through his incorrect input to Dr. Carns regarding my performance. However, Ms. Lapin confirms that Mr. Henning announced in a meeting "Sultan would be leaving."

**Para 10.** To my recollection, Mr. Stirling was given the risk management responsibilities several months after Mr. Henning made the allegation on my performance that caused increased stress on me to respond to the allegation, and commitment to the security and 508 compliance tasks.

**Para 11.** Since I was told that I would get a "0% raise," I remember the conversation very clearly. Ms. Lapin may not remember the conversation; but it was soon after she and Mr. Henning participated in a security briefing by the FDIC DIRM security staff.

It is not true that I told Ms. Lapin that I would go to the business-writing workshop at the AMA. Mr. Henning confirmed in his affidavit of January 25 and 26 of 2005 that he had told Ms. Lapin re my attendance in the workshop.

**Para 12.** Ms. Lapin's comment regarding my writing is in line with what Mr. Henning alleged; they have strong coordination between them and work very closely. Her comment is incoherent with over a dozen performance evaluations by executives and senior staff of four divisions of the FDIC, and many more since the beginning of my professional career in 1975. I worked in FDIC DIRM, as did Ms. Lapin, and my writings were cited to be of high quality and used as templates by others. I received "outstanding" and "superior" ratings on my written communication skills in FDIC. Additionally, I gained significant command in written communication skills from my work in the graduate program and my qualification as a CPA. My graduate work included a thesis of approximately 200 pages that, as I recall, received high commendation from the Dean of the school for its quality and contents.

I started to get invitation to the project management meetings starting sometime in August 2004, i.e., much after I filed my EEO complaint re the PIP. Prior to August 2004,

Mar 09 05 12:01p    Rase Schowdhury    301-738-2233

I was not an invitee to this meeting, whereas all of my white grade 15 colleagues were in the invitee list. Although all CDR team members could view the CDR calendar, we received repeated reminders in the CDR staff meetings that only people invited to specific meeting should attend the meeting. I do not recall of Ms. Lapin's "encouragement" of my participation in the project management meeting. I do not "forget" about meetings since I use my electronic "Outlook" calendar as well as a hard-copy calendar. On one occasion, I had a conflict with the meeting time with my pre-scheduled doctor's appointment, and I informed this to Ms. Lapin in advance. My peers and superiors commended me for conducting business meetings in an excellent manner with advance agenda, publication of discussion papers, open exchange of ideas, and maintaining meeting schedules.

**Para 13.** I do not understand Ms.Lapin's reference to the "another" plan.

3/9/05