UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| Sultan M. Chowdhury, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Martin J. Gruenberg, )<br>Acting Chairman, )<br>Federal Deposit Insurance Corp. )<br>)<br>Defendant. )<br>) | Case Number: 1:05CV02368 (RMU) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7.1(h), Defendant hereby submits the following statement of material facts as to which there is no genuine dispute.

1. Plaintiff, Sultan M. Chowdhury, (hereinafter "Plaintiff") began employment with the Federal Deposit Insurance Corporation, (hereinafter "Defendant"), in June, 1991, Complaint at ¶ 6.
.
2. On February 10, 2000, Plaintiff filed a civil action in the District of Columbia, alleging violation of Title VII by Defendant herein (hereinafter "Plaintiff's first lawsuit"). The case is styled, <u>Chowdhury v. Tanoue</u>, Civil Action No. 00-CV-239 (RWR). Copy of Plaintiff's first lawsuit, Exhibit "A" hereto.

3. On or about December 27, 2002, the parties settled Plaintiff's first lawsuit, resulting, *inter alia*, in Plaintiff being promoted to a Grade CG-15 position in the Division of Insurance and Research ("DIR"). Copy of Plaintiff's SF-50, dated December 15, 2003, Exhibit "B" hereto.

4. From approximately December 30, 2002 through approximately October 1, 2003, Plaintiff's first-level supervisor was James Crum. Affidavit of James Crum at page 2, paragraph 5, Exhibit "C" hereto.

5. On or about October 30, 2003, Plaintiff received an Annual Performance Evaluation from James Crum, covering the period September 1, 2002 through August 31, 2003. Copy of Plaintiff Performance Evaluation, Exhibit "D" herein, Complaint at ¶ 7.

6. Plaintiff's Annual Performance Evaluation, Exhibit "D" herein, rated his performance as "Meets Expectations" in all categories, but contained the following comments about his writing: "Oral and written communications are acceptable. Sultan is responding to feedback on ways to adapt the "voice" and complexity of his formal and informal written communications to the intended audience."

    "Sultan's work is logical and thoughtful. He is working to improve the organization of his formal documentation to help others grasp the results and issues he wishes to convey and preserve." Exhibit "D" herein at page 2 under "Comments" section.

7. On or about October 1, 2003, James Crum was replaced by Martin Henning as Plaintiff's immediate supervisor. Affidavit of Martin Henning at page 1, paragraph 1, Exhibit "E" herein.

8. On or about September 26, 2003, Defendant advertised Vacancy Announcement No. 2003-HQ-2360, for three Supervisory IT Specialists, Grade 15, for a "term" not-to-exceed one year. Copy of Vacancy Announcement 2003-HQ-2360. Exhibit "F" hereto.

9. Plaintiff applied for the position announcement in Exhibit "F" herein and was among those candidates referred to the "Selecting Official", Mark Brenneman, for consideration. Affidavit of JoRita Campbell at page 2, paragraph 4, Exhibit "G" herein.

10. Defendant utilizes a "Structured Interview" process for competitive vacancies and did so in the instant case. Affidavit of Mark Brenneman at ¶ 6, Exhibit "H", herein.

11. Defendant's written "Guidance" regarding "Structured Interviews" contains four "main concepts": (1) Job-related interview questions based on job requirements in the position description, vacancy announcement and job analysis; (2) Benchmarks for each interview questions; (3) All candidates asked the same questions; (4) All candidates measured against the same benchmarks. Copy of "Guidance" document regarding "Structured Interviews", Exhibit "I" herein.

12. The "Guidance" document described in No. 13 above provides that "Benchmarks" are developed for each interview question by the Selecting Official. Exhibit "H", herein, at page 1, "Benchmarks."

13. In accordance with Exhibit "I" herein, the "Selecting Official" for the position described in No. 8 above, Mark Brenneman prepared six interview questions with benchmarks for the subject interview process. Affidavit of Mark Brenneman, Exhibit "H" herein at ¶ 5.

14. In accordance with "conducting a Panel Interview", page 3 of Exhibit "I" herein, Mark Brenneman elected to create an interview panel for the subject interviews, although he was not required to do so under FDIC policy. Affidavit of Mark Brenneman, Exhibit "H" herein at page 2, ¶ 4.

15. The persons selected by Mark Brenneman for the interview panel referenced in No. 14 above were Assistant Director, Division of Finance, Ralph Elosser and Senior Counsel, Legal Division, James Barker. Both Elosser & Barker were selected for the interview panel because two of the selectees were expected to support their respective program areas. *Id.*

16. In accordance with "Interview Requirements", page 3 of Exhibit "I" herein, all interview candidates, including Plaintiff, were asked the same "structured interviews" questions. Affidavit of Mark Brenneman, Exhibit "H" herein, at page 2, ¶ 6.

17. At the conclusion of the interview process, "Selecting Official" Mark Brenneman requested and obtained the "top five" interviewees of Mr. Barker and Mr. Elosser. Affidavit of Mark Brenneman, Exhibit "H" herein, at page 2, ¶ 7.

18. In accordance with "Next Steps", page 3 of Exhibit "I" herein, "Selecting Official" Mark Brenneman evaluated the top-rated candidates, as determined by all panel members, based upon their respective application materials, their responses to the interview questions, individually and as compared to the other candidates. Affidavit Mark Brenneman, Exhibit "H" herein at page 3, ¶ 8.

19. "Selecting Official" Mark Brenneman selected Marcia Boardley, Melanie Ciaschi and Noreen Padilla for the subject positions. Affidavit of JoRita Campbell, Exhibit "G" herein, at page 3 ¶ 5.

20. "Selecting Official" Mark Brenneman believed that Plaintiff overstated or exaggerated his qualifications and background in his application and did not provide specific examples of his experience to the extent of the selectees and was not considered as better-qualified than any of the selectees. Affidavit of Mark Brenneman, Exhibit "H" herein, at pages 3 through 7, paragraphs 8 through 12.

21. Plaintiff was not among the top five candidates of any of the three interview panel members. Affidavit of Mark Brenneman. Exhibit "H" herein, at pages 2-3 at ¶ 7.

22. Plaintiff never worked directly with any of the three selectees, Fact No. 19, above, nor does he have any personal knowledge of their respective skills or qualifications. Deposition of Plaintiff at page 220, lines 11 through 22, page 221, lines 1 through 22, page 222, lines 1 through 19, Exhibit "J" herein.

23. On or about April 9, 2004, Plaintiff filed a formal EEO complaint with Defendant's Office of Diversity and Equal Opportunity ("ODEO") alleging

    discrimination related to his non-selection for the subject positions. Copy of Formal EEO Complaint, Agency Docket No.FDICEO-040025, Exhibit "K" herein.

24. The "Corporate Success Award" ("CSA") program was a product of the Compensation Agreement negotiated between Defendant and the National Treasury Employees Union ("NTEU") for the years 2003-2005. FDIC Circular 2420.1, dated July 21, 2003, Exhibit "L" herein.

25. Under the Compensation Agreement, if a bargaining unit employee received a performance rating of "meets expectations" during the prior year's rating period, that employee is to receive an annual increase in basic pay of 3.2 percent for each year covered by the Agreement. Accordingly, 33 1/3 percent (one-third) of bargaining unit employees received a total increase in basic pay for 2004 [or 2005] of 6.2 percent (3.2 percent annual increase plus 3.0 CSA increase). Circular 2420.1 § 11-1, Exhibit "L" herein.

26.     The Circular identifies four criteria upon which nominations for the Award will be evaluated:

    A. Business Results: Consistently displays a high level of initiative, creativity, and innovation to produce results that reflect important contributions to the Corporation and/or its organizational components.

    B. Competency: Demonstrates an exceptional degree of competency within his/her position, and is frequently relied upon by others for advice, assistance, and/or judgment that reflect important contributions to the Corporation and/or its organization components.

    C. Working Relationships: Builds extremely productive working relationships with co-workers, other Divisions/Offices, or other public or private sector agencies based on mutual respect that reflect important contributions to the Corporation and/or its organizational components.

    D. Learning and Development: Takes an active part in developing personal skills and competencies and applies newly acquired skills and competencies that reflect important contributions to the Corporation and/or its organizational components. Circular 2420.1, §11-4, Exhibit "L" herein.

27. CSA awards recognize the relative contributions of individual employees in comparison with the contributions of their co-workers during a specific period of time. Accordingly, as the Circular explains, "Meeting one or more of these

criteria does not entitle employees to be nominated to receive the Corporate Success Award." *Id*.

28. On or about December 29, 2003, Martin Henning requested by e-mail that the five employees under his direct supervision, including Plaintiff, provide him with a list of their contributions for consideration of a Corporate Success Award for calendar year 2003. Affidavit of Martin Henning at paragraph 4, page 2, Exhibit "M" herein.

29. Since he had supervised Plaintiff and the other employees under his direct supervision for only three months during the CSA rating period, Martin Henning solicited and obtained the input of his predecessor, James Crum, regarding employee's accomplishments prior to October 1, 2003. *Id*, at ¶ 7; Affidavit of James Crum at paragraph 5, Exhibit "C" herein.

30. Both Martin Henning and James Crum agreed that Plaintiff did not meet the criteria to receive a CSA for calendar year 2003. *Id*.

31. Martin Henning ultimately nominated two of his five employees, other than Plaintiff, for CSA's for their accomplishments in calendar year 2003. *Id.*

32. On or about May 14, 2003, Plaintiff filed a formal EEO complaint with Defendant's "ODEO"(EEO Office), alleging that his failure to receive a CSA was the result of unlawful discrimination. Copy of Formal Complaint of Discrimination, Agency Docket No. FDICEO-040032, Exhibit "N" herein.

33. On or about March 31, 2004, Martin Henning met with Plaintiff to provide him with a "mid-year review," which was summarized in writing. Copy of "Mid-year Performance Deficiency" dated April 9, 2004. Exhibit "O" herein.

34. The "Mid-Year Performance Deficiency" document specifically addressed Plaintiff's written communication and identified specific examples of deficient documents. *Id*. at ¶ 2.

35. Plaintiff had been treated for depression and anxiety as far back as April, 1997. Report of Philip R. Appel, Ph. D., dated October 14, 2004, bearing an "Onset Date" of "4/97", Exhibit "P" herein.

36. On or about May 4, 2004, less than one month after receipt of Exhibit "O" above, Plaintiff met with Sandra Hoffman, a psychologist, for treatment of depression and anxiety. Copy of Intake Form dated May 4, 2004. Exhibit "Q" herein.

37. As of May 5, 2008, Plaintiff continues to treat with Sandra Hoffman. Deposition of Plaintiff at page 496, lines 13 through 17,. Exhibit "R" herein.

38. In early 2000, Plaintiff suffered a "Transient Ischemic Attack", a minor stroke which required approximately two months absence from work. Deposition of Plaintiff at page 263, lines 6 through 22; page 264, lines 1 through 16, Exhibit "S" herein.

39. During the approximately ninety-day period between mid-April and mid-July, 2004, Martin Henning met privately with Plaintiff on a weekly basis, when possible, to discuss Plaintiff's writing and efforts to improve it. Deposition of Plaintiff at page 478, lines 17, through 22; page 479, line 1. Exhibit "T" herein.

40. Martin Henning participated in a conversation between Plaintiff and an official from the Federal Reserve regarding the poor quality of Plaintiff's writing. Affidavit of Martin Henning at page 3, ¶ 10, Exhibit "E" herein.

41. During the time that Martin Henning was his supervisor, Plaintiff was approved for more training than any other employee supervised by Mr. Henning. Affidavit of Martin Henning at page 6, ¶ 21. Exhibit "E" herein.

42. On or about August 18, 2004, Martin Henning placed Plaintiff on a "Performance Improvement Plan ("PIP"), solely related to his written communications. Copy of "Notice of Unsatisfactory Performance", dated August 18, 2004, Exhibit "U" herein.

43. On or on about August 25, 2004, Plaintiff filed a Formal EEO complaint with Defendant's "ODEO", Agency Docket No. FDICEO-040043, alleging "harassment," "[hostile] working conditions" and "reprisal," by Martin Henning, related to the "Mid-Year Performance Deficiency," Exhibit "O" herein and the "PIP," Exhibit "U" herein. Copy of EEO complaint signed August 25, 2004, Exhibit "V" herein.

44. As outlined in the "PIP" document, Exhibit "U" herein, Plaintiff received a "30 Day Written Review" from Martin Henning on or about September 22, 2004. Copy of "30 Day Written Review," Exhibit "W" herein.

45. Item 3 in Exhibit "W" herein addresses a "first draft of the Eagan Service Center Site Visit report" which Martin Henning describes as "well organized with a clear purpose statement, logical flow and hierarchy, concise and clear recommendations, and contained well supported conclusions. "Exhibit "W", page 1, ¶ 3.

46. As outlined in the "PIP" document, Exhibit "U" herein, Plaintiff received a "60 Day Written Review" from Martin Henning on or about November 4, 2004. Copy of "60 Day Written Review," Exhibit "X" herein.

47. Item 3 in Exhibit "X" herein addresses the "Eagan Service Center Site Visit report" described in Fact No. 51 above, pointing out that the document was

6

"originally authored by FDIC information security examiner Tom Tuzinski," not Plaintiff.  Exhibit "X", at page 1, ¶ 3.

48. On or about November 9, 2004, Plaintiff presented Martin Henning with a letter from Dr. Taiwo Okusami, requesting that Plaintiff be excused from work through December 9, 2004.  Copy of letter from Dr. Taiwo Okusami dated November 9, 2004. Exhibit "Y" herein.

49. Plaintiff provided Defendant with three subsequent letters from Dr. Taiwo Okusami dated December 7, 2004, December 29, 2004 and January 25, 2005, requesting that Plaintiff be excused from work through December 31, 2004, January 31, 2005 and February 25, 2005, respectively.  Copies of letter from Dr. Taiwo Okusami, Exhibits "Y-1", "Y-2" and "Y-3" herein.

50. On or about February 24, 2005, Plaintiff provided Defendant with a letter dated February 24, 2005 from Sandra J. Hoffman, Ed.D, advising that Plaintiff was "applying for medical disability retirement" and that he was "unable to perform the functions of the job place." Copy of letter from Sandra J. Hoffman, Ed.D. Exhibit "Z" herein.

51. On or about March 28, 2005, Plaintiff executed his "Application for Immediate Retirement," under the "Federal Employee Retirement System".  Copy of Application for Immediate Retirement," dated March 28, 2005. Exhibit "AA" herein.

52. In the "Addendum" to Exhibit "AA" herein, the only specific mention of Plaintiff's supervisors and/or co-workers is contained in response to "Question 5", which asks, "Describe how your disease(s) or injury (ies) interferes with performance of your duties, attendance, or your conduct". A portion of Plaintiff's response thereto states.  "Also, my emotional impairments often renders me unable to function with even minimal stress and has led me to the belief that my supervisors and team members do not support me, they are conspiring against me and they want to harm me." Exhibit "AA", Addendum therein at ¶ 5.

53. When questioned about the comments quoted in Fact No. 52, above, Plaintiff stated that his co-workers were not conspiring against him.  Deposition of Plaintiff at page 346, lines 7 through 21.  Exhibit "BB" herein.

54. Plaintiff was approved by "OPM" for "Disability Retirement" on or about July 29, 2005.  Copy of SF-50 reflecting Plaintiff's status as "Retirement Disability." Box 5-B, Exhibit "CC" herein.

55. At or about mid-2005, Plaintiff was approved for "Social Security Disability Retirement." Copy of letter from Social Security Administration to Plaintiff. Exhibit "DD" herein.

7

56. On or about January 20, 2006, Plaintiff was notified by "The Hartford" that he had been approved for "Long Term Disability" benefits under the "Mental Limitation". Copy of letter from "The Hartford" dated January 20, 2006, to Plaintiff, Exhibit "EE" herein.

57. At or about November 18, 2004, Plaintiff applied for benefits with the U.S. Department of Labor for "workers compensation". Copy of application with U.S. Department of Labor by Plaintiff, Exhibit "FF" herein.

58. Following his "stroke" in 2000-01, Plaintiff experienced continuing health problems, including, but not limited to, hypertension. Deposition of Plaintiff at page 408, lines 2 through 22; page 409, lines 1 through 10, Exhibit "GG" herein.

59. In support of Plaintiff's applications for disability retirement, his treating psychiatrist, Martin Book, D.O., prepared a cumulative report dated June 13, 2005. Copy of "Psychiatric Report" by Martin Book, D.O. Exhibit "HH" herein.

60. In the "Summary" portion of Exhibit "HH," Dr. Book states: "...during the past several years, [Plaintiff] has experienced the onset and intensification of a debilitating set of symptoms, including unremitting pain, fatigue, cognitive difficulties, anxiety and depression, which have driven him to the point where he is unable to perform the critical elements of his current job." Exhibit "HH" in "Summary" section.

61. In the "Summary" portion of Exhibit "HH", Dr. Book states: "[Plaintiff's] failure to respond to repeated medical and psychiatric treatment intervention suggests that his condition is progressive and that further worsening may well be expected." Exhibit "HH" in "Summary" section.

62. The report prepared by Phillip R. Appel, Ph.D., Exhibit "P" herein, states the following: "Because of [Plaintiff's] condition, he is more sensitized to react to supervisory criticism and dislike." Exhibit "P", at page 2.

63. Plaintiff's primary care physician, Dr. Vinu Gauti, M.D., referred him to the offices of Dr. David Satinsky in March 2006, for a neurological evaluation, Deposition of Dr. David Satinsky, M.D., at page 12, lines 12 through 22; page 13, lines 1 through 18, Exhibit "II" herein.

64. At the request of his neurologist, Dr. David Satinsky, M.D., Plaintiff was referred to Dr. Syd Brown, Ph.D., a licensed psychologist, for a "neuropsychological examination." Deposition of Dr. David Satinsky, M.D., at pages 41, lines 11 through 22; page 42, ;ines 1 through 16, Exhibit "JJ" herein.

65. Dr. Syd Brown, Ph.D., tested Plaintiff over two days. May 25, 2007 and June 1, 2007, and issued a report of his findings on or about June 16, 2007. Copy of "Neuropsychological evaluation," Exhibit "KK" herein.

8

66. The report prepared by Dr. Syd Brown, Exhibit "KK" herein, quotes Plaintiff as follows: "[Plaintiff} had "a "minor stroke" in 2000 after the Y2K project was completed, and was in the hospital for ten days, "that was the beginning of my downfall." [Plaintiff] suffered from depression, stress, anxiety, insomnia and fibromyalgia, "I was having a rotten life." Id, at page 2, bullet no. 2.

67. Under the heading "Cognitive Functioning" in Exhibit "KK" herein, Dr. Syd Brown makes the following observations regarding Plaintiff:

- "Compared to his peer, Mr. Chowdhury may experience some difficulty in holding information to perform a specific task. Difficulties with working memory may make the processing of complex information more time-consuming for him, drain his mental energies more quickly as compared to other adults his age, and perhaps result in more frequent errors on a variety of learning tasks.
- Processing visual material without making errors is a significant deficit.
- Processing speed in general is a significant weakness, as Mr. Chowdhury had difficulty on all timed tasks on the WAIS-III."

Exhibit "KK" herein, at page 3, last three "bullet points" on the page.

68. Under the heading "Attentional Functions" in Exhibit "KK" herein, Dr. Syd Brown makes the following observations regarding Plaintiff:
"Mr. Chowdhury's attentional functioning is severely compromised"

Exhibit "KK" herein, at page 4, final "bullet point" in the section Attentional Function".

69. Under the heading "Executive Functions" in Exhibit "KK" herein, Dr. Syd Brown makes the following observations regarding Plaintiff::

- Ability to control impulsive responding: extremely weak (stroop).
- Ability to respond flexibly under pressure: extremely weak (Trail-Making).
- Ability to utilize feedback to establish, maintain, and shift response set: very weak, with preservation interfering with problem-solving (WCST.)
- Verbal fluency, ability to access lexicon of words and generate word lists based on phonemic cues: extremely weak (COWAT phonemic cues).
- Confrontational naming: extremely weak (Boston Naming Test-Second Ed).
- Mr. Chowdhury's executive functions are severely compromised.

Exhibit "KK" herein, at page 4, under the heading "Executive Functions."

70. Under the heading "Organizational Functions" in Exhibit "KK" herein, Dr. Syd Brown makes the following observations regarding Plaintiff::

9

- "Organization of verbal information when an organizational schema is implicit but not explicitly stated: weak (CVLT-II).
- Organization of visual information: weak (ROCFT).
- Semantic processing: extremely weak (COWAT semantic cues).
- Mr. Chowdhury's organizational functioning is compromised."

Exhibit "KK" herein, at page 5, under the heading "Organizational Functions."

71. Under the heading "Learning" in Exhibit "KK" herein, Dr. Syd Brown makes the following observations regarding Plaintiff::

- "Learning and recall were significantly lower than expected based on his educational level (M.S. in Computer Science) and occupational achievements per his self-report.
- Immediate memory for visual stimuli and overall immediate memory scores on the WMS-III, are significantly lower than predicted by his WAIS-III full scale IQ."

Exhibit "KK" herein, at page 5, first two "bullet points" under the heading "Learning."

72. Under the heading "Emotional Functioning" in Exhibit "KK" herein, Dr. Syd Brown makes the following observations regarding Plaintiff::

- "He presents a mixed pattern of symptoms is which somatic reactivity under stress is a primary difficulty. The mixed pattern includes a picture of physical problems, which may be vague and have appeared after a period of stress, and may not be traceable to actual organic changes. He also displays a reduced level of psychological functioning.
- Mr. Chowdhury may have a hysteroid adjustment to life and may experience periods of exacerbated symptom development under stress.
- His thinking is likely to be characterized by obessiveness and indecision.
- Mr. Chowdhury's MMPI-II profile suggests that he is somewhat passive-dependent and demanding in interpersonal relationships, perhaps attempting to control others by complaining of physical symptoms."

Exhibit "KK" herein, at page 6, "bullet points" 2, 3, 6 and 7, respectively, under the heading "Emotional Functioning."

73. Under the heading "Impressions" in Exhibit "KK" herein, Dr. Syd Brown makes the following observations regarding Plaintiff::

- Cognitive Disorder, NOS (DSM-IV 294.9): As manifested by

    \*   attentional functions and executive functions are severely compromised

10

      \*     the presence of perseveration on several tasks
      \*     organizational functions are compromised
      \*     learning and memory for verbal information is somewhat impaired
      \*     learning and memory for visual information is significantly impaired
      \*     It is not likely that this level of cognitive impairment would be the result of his depression or his medication.

- Specific brain areas of concern: test results are consistent with compromised brain particular the hippocampus.
- Differential diagnoses re cognitive functioning: Dementia of the Alzheimer's Type vs. Vascular Dementia (formerly Multi-Infarct Dementia).
- Major Depression, Single Episode, Moderate (DSM-IV 296.32)
- Generalized Anxiety Disorder (DSM-IV 300.02

Exhibit "KK" herein, at page 6, under the heading "Impressions."

74. Under the heading "Impressions" section of Exhibit "KK" herein, Dr. Syd Brown makes a "Differential Diagnosis" related to Plaintiff's cognitive functioning of Dementia of the Alzheimer Type vs. Vascular Dementia. Id at "bullet point" number 3.

75. Plaintiff's neurologist Dr. David Satinsky, M.D. does not believe that Plaintiff suffers from "vascular dementia" Deposition of Dr. David Satinsky at page 48, lines 16 through 22, Exhibit "LL" herein.

76. Plaintiff's neurologist Dr. David Satinsky, M.D. has no reason to disbelieve Dr. Brown's differential diagnosis that Plaintiff suffers from Alzheimer Disease. Deposition of Dr. David Satinsky at page 49 lines 1 through 11, Exhibit "MM" herein.

77. Plaintiff's neurologist Dr. David Satinsky, M.D. believes that Plaintiff is "cognitively impaired", possibly due to Alzheimer Disease. Deposition of Dr. David Satinsky at page 51, lines through 22, Exhibit "NN" herein.

78. Plaintiff's neurologist Dr. David Satinsky, M.D. is of the medical opinion that Plaintiff cognitive impairments, identified by Dr. Syd Brown, occurred over a period of years prior to the neuropsychological tests reflected in "Exhibit "KK". Deposition of Dr. David Satinsky at page 80, line 6 through 14, Exhibit "OO" herein.

79. Plaintiff's neurologist Dr. David Satinsky, M.D., advised Plaintiff to undergo a "PET" scan to determine whether the diagnosis of Alzheimer's disease was accurate, but Plaintiff did not undergo such test. Deposition of Plaintiff at page 469, lines 1 through 13, Exhibit "PP" herein.

80. Plaintiff did not work at the FDIC after November 9, 2004, which date was prior to the expiration of his "Performance Improvement Plan", Exhibit "T" herein. Deposition of Plaintiff at page 327 lines 4 through 15, and pages 329, lines 5 through 22 and page 330, lines 1 through 14. Exhibit "QQ" herein.

81. Martin Henning never said anything to Plaintiff concerning Plaintiff being from Bangladesh, being Muslin, being of dark complexion, or being over the age of 40. Deposition of Plaintiff at page 163, lines 1 through 20. Exhibit "RR" herein.

82. Plaintiff never felt bothered, offended or threatened by the bible on Martin Henning's desk or the fact that Martin Henning was a Christian. Deposition of Plaintiff at page 120, lines 3 through 22, page 121, lines 1 through 22, and page 122, line 1. Exhibit "SS" herein.

83. Plaintiff's alleged "torture" at the hands of Martin Henning was comprised of Henning's criticism of Plaintiff writing skills, pointing his finger at Plaintiff, becoming red-faced, clenching his teeth at times and requiring Plaintiff to meet with Henning to review Plaintiff's work product. Deposition of Plaintiff at page 490, lines 2 through 13. Exhibit "TT" herein.

84. The Corporate Success Award was a discretionary award based on performance. Deposition of Plaintiff at page 165, lines 10-19. Exhibit "UU" herein.

85. Martin Henning never made any comments to Plaintiff about his religion or about Muslims in general. Deposition of Plaintiff at page 122, lines 5-11. Exhibit "SS" herein, *supra*.

July 21, 2008         Respectfully submitted,

/s/_____
Tina A. Lamoreaux, Counsel
District of Columbia Bar No: 375762
Federal Deposit Insurance Corporation
Legal Division
3501 Fairfax Drive, Room VS – D6138
Arlington, VA 22226
P: (703) 562-2304 F: (703) 562-2468

/s/_____
Victor E. George, Counsel
California Bar No: 89595
Federal Deposit Insurance Corporation
Legal Division,
3501 Fairfax Drive, Room VS – E6004
Arlington, VA 22226
P: (703) 562-2395 F: (703) 562-2468

Attorneys for Defendant