# AFFIDAVIT OF MARTIN HENNING

DISTRICT OF COLUMBIA
Date of Interview: January 25 and 26, 2005

I, Martin Henning, Central Data Repository (CDR) Project Manager, Grade CG-15, Implementation Team, Division of Insurance and Research, Federal Deposit Insurance Corporation (FDIC), make the following statement freely and voluntarily to Turna R. Lewis, who has identified herself to me as an EEO Contract Investigator for the FDIC, investigating a complaint of discrimination filed by Complainant Chowdhury, knowing that this statement is not confidential and may be shown to an interested party. I hereby solemnly swear or affirm:

1. I have been in my current position since October 2003. My immediate supervisor is Maureen Sweeney, Deputy Director, Division of Insurance and Research; my second level supervisor is Art Murton, Director, Division of Insurance and Research.

2. I had the same supervisors when the allegations occurred. Before my current position, I was the Section Chief, CG-15, Data Services Section, Division of Insurance and Research, FDIC. I was in that position for a couple of months. Before that, I was Chief, Applied Technology, Division of Supervisor and Consumer Protection, from September 2002-September 2003.

3. My race is Caucasian, national origin: United States, color: White, age: 38 (DOB: 7/1/66), religion: Protestant. I have not participated in an EEO complaint as a complainant. I have participated in the EEO process as a witness for the government, at FDIC. I provided an affidavit in connection with a complaint filed by Complainant who alleged that I discriminated against him when I did not nominate him for a 2003 Corporate Success Award.

4. I did not become aware that Complainant filed a complaint against me regarding the Corporate Success Award until July/August 2004 when I met with an investigator. I had been his supervisor since October 2003. I became aware of an agreement Complainant had with the FDIC at the end of 2003/beginning of 2004 in the context of my review of the position classifications and discussions with Andrea Woolford, who manages our human resources. She wanted to make sure that FDIC complied with the agreement.

5. The 2003 Corporate Success Award complaint, which I did not become aware of until July/August 2004, never factored into my decision to place Complainant on a Performance Improvement Plan or PIP. In fact, I did not become aware of the CSA complaint until July/August 2004, which was after I observed and began speaking with Complainant about performance problems. For instance, his mid-year review took place March 31, 2004 – a full 4 months before I knew of the CSA complaint. I had general knowledge regarding his assignment in his CDR position. Complainant's filing of his complaint did not influence me in assessing his performance. We had had several months

of activity in relation to his needed performance improvement. In answer to a question about the size of the file I kept, I told Complainant that I needed to document our interactions because of the compliant he had submitted.

6.  I replaced a previous project manager. When I joined the team, team members told me that they needed clarity about their responsibilities. I reviewed all position descriptions and created a new organization chart that outlined functional roles and responsibilities. I directly supervise 8 people. I do not know for certain the races of the employees on our team, and have not discussed with them their birthplaces. The following characteristics are based on my observation or conversations with these individuals.
Jon Wisnieski, Senior Information Systems Specialist, CG-15, white, Catholic (wife passed away and it was a Catholic service)
Sultan Chowdhury, Senior Information Systems Specialist, CG-15
Andrew Stirling, Communications Director/Analyst, CG-15, white, Mormon
Anne Beavers, Economic Assistant, CG-9, white, Protestant
Dorey Evans, Business Process Analyst, CG-14, white
Ebony Scott, Economic Assistant, CG-9, black, Protestant
Mark Montoya, Information Systems Specialist, CG-14, white
Alan Deaton, Business Process Engineer/Test Coordinator, CG-15, white
Several team members' titles changed. For example, titles with the acronym "IDM" (Institutional Data Management) were changed to "CDR" (Central Data Repository). Eboni Scott and Ann Beavers' titles did not change. Complainant's position title changed from "Senior Computer Specialist" to "Senior Information Systems Specialist" according to the human resources system. His pay plan and grade did not change.

7.  Laura Lapin and Bob Grohal also worked on the floor as part of the CDR Team. They were assigned to work with the CDR Team. Toni Holloman-Spinner, who also works with the team, posted for an EOI (Expression of Interest) to work with the CDR Team in July 2004. Toni began in August/September 2004, although she was also working with the CDR Team when I began as supervisor. Laura Lapin joined the team at the same time that I did and Bob Grohal began working with CDR in November 2003. Laura works in the Division of Information Resources Management (DIRM).

8.  Complainant is the only employee I supervised who received written notice of his mid-year performance deficiencies. Complainant is the only employee I supervised who was placed on a PIP.

9.  The CDR team does not have a manual that specifies writing guidelines. I did not require any particular writing style or format. Multiple styles can be effective in communicating to an audience. I talked to Complainant about some of the characteristics of effective written communication. For example, when the intended audience reads effective written communication, they understand what is being communicated. The intended audience is not confused about the written material. I also talked to him about using purpose statements in his writing. There are different types of written work product produced on our project. Examples included press releases, and "use cases"

(which follow a specific structure). Our team members did not create "use cases," but reviewed them for content. Complainant was responsible for drafting risk management plans, disaster recovery plans, business continuity plans. No specific format was required for these documents.

10. Complainant's writing was ineffective in communicating with his audience. In some cases, I was a member of the intended audience. Examples of his ineffective written communication include the risk management plan that was written in December, 2003 through January 2004. Mary West, Federal Reserve Steering Committee Chair, specifically commented to Complainant that she did not understand the plan's risk definitions. She continued to express this problem even after Complainant made several revisions. I was also part of that audience. Another example of Complainant's ineffective written communication was the Business Continuity Plan which provides guidance on how to continue the business in the event of a disaster. I reviewed the document with an interagency group in approximately the June-August, 2004 timeframe. Complainant received feedback from the group that the plan was unclear. Gary Christensen, Office of the Comptroller of the Currency National Bank Examiner, and Tom Selle, the former FDIC manager of the Call Reporting Section, were among those who made specific recommendations for improvement. Tom served as a technical monitor who reviewed the contractor's work. There was consensus among the group that even after a couple of revisions the plan was not adequate. One of the problems they noted is that the document did not convey a clear sequence of activities in the event of a disaster. They suggested that the document needed to be succinct and sequential, laying out steps to be taken in the event of a disaster. I agreed with the feedback. There were other examples. To my knowledge, the Complainant was the first person to prepare the Business Continuity Plan. I do not know if he was the first person to prepare the risk management plan but I know that he was solely responsible for revising it to address comments received from its audience.

10.a The policy at FDIC is that we provide regular feedback to employees so that they know all the time how they are doing, both good and bad. I understand that this policy helps ensure that employees are not surprised at the end of the year by their performance evaluation. Regarding the June 15, 2004 communication I had with Complainant in a one on one meeting, I wanted to make sure that he was aware that his performance was deficient, but did not want to threaten him. Complainant told me several days later that he felt that my comment was threatening. I told him that it was not intended to be a threat but that I wanted him to know my assessment of his performance as quickly as possible so that he would have time to address the issue before his end of the year performance review. I give constructive criticism and positive affirmation to all the employees I supervise. That was the context of the communication. I did not intend any threat.

11. Other employees prepare original written communication. For example Andrew Stirling writes press releases and project status reports. Ann Beavers does not do a lot of original writing. Eboni Scott will be writing a test plan. Jon Wisnieski has written technical approaches to business problems, with supporting documents. Bob Grohal writes position papers. Alan Deaton writes test plans that document test steps and

identify success criterion. Mark Montoya does not do as much narrative writing, but might have produced some position papers. Dorey Evans has done more graphical representations of ideas than narrative writing. She did write a functional requirements document. My approach to evaluating employee's writing has not included being prescriptive.

12.     I may have placed the Mid-Year Performance Deficiency face-up in his chair. I do understand the sensitive nature of performance documents and my practice is at least to protect their contents by delivering them to the employee personally, by placing them face-down in an employee's chair, or by placing them in the employee's chair in an envelope. I don't remember specifically if I placed the Mid-Year Performance Deficiency memo face down or not. If he came into his office and found it face-up, then someone else may have turned the document face-up. Regarding the PIP, my intention was certainly not to leave it on the copier and I do not remember doing so. I apologized when Complainant stated that I had left a copy on the copier.

13.     I don't have notes of a meeting with Complainant in October 2003 with me. It is probable that I met with Complainant in October, but I don't remember telling him that I fired people and did not have an opinion of his work at that point in time. Before becoming the CDR Project Manager, I was asked to take over a KPMG contract and met with Complainant. But that would have been before October 2003. I knew of his background because I was on a ranking panel that evaluated applicants where Complainant was one of the applicants. In that context I read his resume. I understand that participation on ranking panels is confidential. I don't ever remember talking about firing people with Complainant. I have only had to do that one time in the late 80s, early 90s in Southern California because the company I was working for was suffering financially. I don't remember if that came up in a conversation with Complainant. But, if it did, it was not meant in a threatening manner, but was probably just conversational.

14.     I assigned different functional team leaders based on the areas of the project that needed specific attention. For example, Laura Lapin was the oversight manager and also was responsible for finances. She worked for the IT division and handled technical issues and interactions, and security. I tried to align team members with work based on their skills and abilities. The team leaders did not do performance evaluations; I was still the formal supervisor and this arrangement was communicated to the entire team in several team meetings.

15.     All CG-15, white employees on the CDR Implementation Team reported functionally to me, and all eight employees mentioned in paragraph six reported to me formally. Complainant was a team leader before I came on the project, focusing on data input. He had completed that work by the time I started. I determined that the most appropriate work for him next was to keep track of the finances (including budget analysis), oversee risk management, lead a Section 508 team, and lead the security team. I thought that security assignment would capitalize on his IT background and talked to Complainant about these assignments. Complainant was not happy with the entire arrangement and specifically mentioned that he did not want to work with Laura Lapin. I

asked him why and he indicated that she did not have a good reputation for treating people well. Complainant was a functional leader on 508 compliance and in that role, he led an interagency team. I spoke with team members to ensure that the revised position descriptions and functional responsibilities were acceptable to them. I did not receive any negative feedback from Complainant regarding the position description. I know that he was not excited about the accounting function, but he was the only CPA on the team. As with all team members, Complainant's roles and responsibilities were conveyed in writing to the rest of the team, including that he would be managing the finances and leading 508 compliance.

16. Complainant has good technical qualifications. He understands accounting and Section 508. His technical competence met expectations. His problems are with written communication.

17. In an internal meeting, I may have stated that Alan Deaton would be assuming the financial management responsibilities. Complainant had made comments about being overloaded, and Alan was new to the team and needed assignments. I doubt that I would have said anything significant at an interagency meeting, the other agencies don't care who manages our agency finances. But I try to be very clear about who is responsible for team functions. I don't recall whether I told him of the duties Alan Deaton would have before Complainant went on vacation.

17.a. Complainant was not excluded from the project management meetings. Meetings are posted on a web site that has a calendar and information about the project. All team members, including Complainant, had access to that calendar. Sometimes meetings are announced by sending an E-mail invitation; sometimes they are simply posted on the web site calendar. I don't know how long Complainant was listed as part of any specific group on the web site. He presented material at several project management meetings. There was no intention or attempt to exclude him from meetings he needed to attend. It would not be in my best interest to exclude him, even with the performance problems. The steering committee has membership; Complainant is not a member. I come at the behest of Mary West, the Chair. Complainant would come only when asked to come and brief the committee, which he did on occasion.

18. I spoke with Jim Crum, Complainant's previous supervisor, in a telephone conversation about the Corporate Success Award in relation to the team that he had supervised for the majority of 2003. I reviewed the 2002-2003 performance evaluations (October –September) when I wrote employee's 2004 performance evaluations. Complainant had been rated as "meets expectations" in his previous performance evaluations.

19. Complainant presented a Security Test and Evaluation (ST&E) written recommendation to the CDR Steering Committee. They eventually concurred with his recommendation. He had to present it twice because they didn't understand the first time the context for the recommendation and the decision to be made. I suggested that Complainant use the Business Writers Handbook as a reference for written

communication. I received the book as part of a writing course that I took at the FDIC. It is considered a preeminent reference book. I would not generally require a grade 15 employee to follow a writing template for each of their written products. I am not generally prescriptive. There are some FDIC documents that can be prepared using templates, for example, an official Report of Examination. But, that was generally not the case for CDR written work products. I told Complainant that I came to FDIC as an examiner and that I had received constructive feedback on my writing skills and shared my materials from a FDIC writing course I took with him as guidance. I used personal examples because I wanted to create an effective working relationship as we addressed his deficiency.

20. Regarding Complainant's assertion that I told him that he lacked "professionalism" for his comments to UNISYS, a contractor, I do not recall the conversation, nor the specific instance. Generally, I am not critical of efforts to obtain specific delivery dates from the contractor.

21. Regarding the meeting of October 12, 2004, I did tell Complainant that based on my assessment of his performance, I had denied his request for the Mentoring Program. I told Fred Carns, in relation to Complainant's application to be involved in another off-project assignment, that Complainant was currently on a PIP and that we were working on his writing skills. Regarding the Cost Management Program detail, I may have spoken with Betty Rudolph about Complainant's application for the position, I don't recall at this time. When FDIC employees contacted me regarding Complainant's application for a new internal assignment, I tried to answer their questions about his performance as accurately and sensitively as possible. I typically ask staff during performance reviews where they want to be in three or five years with the intent of supporting them in their professional goals. If Complainant's writing had improved, I would have supported his efforts for other work assignments after evaluating the impact a re-assignment would have on our project. My tendency was to let him apply for new assignments in hope that the writing problem would be cleared up by the time of the selection process. I don't recall denying Complainant's request for training in security Certification and Accreditation. I approved several applications for training that Complainant attended in 2004. Complainant was approved for more training than anyone else under my supervision. As part of his training, he was also approved for, and attended, two courses on business writing skills.

22. I probably told Laura Lapin about Complainant's attendance at a business writing workshop, since Laura is his team leader and would need to know where to locate him. His whereabouts needed to be accounted for when he was out of the office. I did not talk to our team at all about Complainant's performance, other than Laura, because she was his team leader.

23. The ESC site report was an assignment I gave to Complainant as part of his PIP. I initially wrote up the PIP to include Complainant's writing a Security Plan report. I talked to Complainant before finalizing the PIP because I wanted to ensure the assignments were reasonable to him and didn't create new work for him. Complainant

told me that he would not be the original author of the Security Plan report. We agreed to choose something Complainant was responsible for authoring and Complainant chose the Eagan Service Center (ESC) site visit report as a better written work product to use in evaluating his written communication performance. I operated under the assumption that the ESC report was his original work. I reviewed the first draft and gave positive feedback. Later, I became aware that the first draft had been written by Tom Tuzinski and that Complainant had revised the draft. I contacted Tom to find out his role on the first draft of the ESC report and he told me that he (Tom) wrote it. Tom wanted to know why I had questions and I was very careful to protect Complainant's privacy. I reviewed the first draft and the final draft and could see that Tom had written the first draft. I asked Complainant who wrote the first draft and he confirmed that Tom had written the first draft. I spoke with Complainant and told him that I could not consider the report a good representation of his original authorship, even though he made revisions and finalized, because he did not write the report.

24. I have not treated Complainant differently based on any of the bases he alleged. I have bent over backwards to work with him. I have worked with people of all races, origins, and religions and treated all fairly. I have a Bible on my desk (although it is not labeled as such) but do not talk about religion unless someone broaches the topic. I have a reputation for fairness at the FDIC. I generally don't talk about religion with my staff unless they raise the topic. I never spoke about religion with Complainant and do not know his religion. As an example, I have never spoken with Mark Montoya about his religion. Mark received a 2003 Corporate Success Award and his religion played no role in my decision.

I have given constructive criticism to other team members at the CG-15 level and I have received constructive criticism from them and others.

Documents provided: FDIC CDR Implementation Team Organization Chart

I have read the above statement consisting of seven pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

_Martin Henning_
Signature

_2/7/05_
Date

Subscribed and sworn to before Jon Wisnieski
at Washington, DC
on the 7th day of February 2005

_[signature]_
Signature of Witness

SUPPLEMENTAL AFFIDAVIT

WASHINGTON
DISTRICT OF COLOMBIA

I, Martin Henning (Caucasian, United States, White, DOB: July 1, 1966, Protestant, and prior EEO activity as an Agency witness), Central Data Repository (CDR) Project Manager, Implementation Team, Division of Insurance and Research, Federal Deposit Insurance Corporation, Washington, DC, hereby make the following statement as a supplement to my affidavit, dated February 7, 2005. I understand that this statement is not confidential and may be shown to any interested party with a legal need-to-know.

I hereby state:

On February 7, 2005, I signed an Affidavit regarding my response to the following allegations:

**FDICEO-040043**

> Whether Complainant was discriminated and subjected to harassment (non-sexual) on the bases of race (Asian), color (Brown), national origin (Bangladesh), religion (Muslim), retaliation (prior EEO activity), and age (DOB: October 24, 1955), when:
>
> 1. on April 13, 2004, Martin Henning, Central Data Repository ("CDR") Project Manager, Division of Insurance and Research, issued to Complainant a "Mid-year Performance Deficiency" memorandum dated April 9, 2004, that stated Complainant was not meeting expectations for his position and grade level;
>
> 2. on June 15, 2004, Complainant felt threatened when Mr. Henning remarked that "he (Henning) wanted to make sure that Complainant was not surprised at his Performance Management Plan ("PMP") evaluation";
>
> 3. subsequently, on August 18, 2004, Mr. Henning issued Complainant a "Notice of Unsatisfactory Performance – Performance Improvement Plan ("PIP")" that placed Complainant on a 90-day PIP to improve his writing deficiencies; and,
>
> 4. in a meeting, on October 12, 2004, Mr. Henning informed Complainant that because of his performance since the beginning

MH

of 2004, he was denied potential career opportunities in other FDIC Divisions and Offices. Complainant alleges he was denied career opportunities available through the FDIC Internal Job Rotation Program ("IJRP"), Expression of Interest ("EOI") Program, and the FDIC Mentoring Program.

1. I have been requested to provide clarification of a statement that Complainant made in his Affidavit dated January 6, 2005. Complainant alleges in his affidavit on page 8, paragraph 21, that "In one of our meetings in regard to the written communication, I inquired of Mr. Henning why he had been so rigid with me, to which he stated that I filed an EEO complaint against him for non-award of the Corporate Success Award (CSA)."

   Did you make the above comment to Complainant in a meeting or at anytime? Please explain.

2. <u>Response</u>:

   No, I didn't make the statement above at any time.

Page 2 of 3                                                         Initials MH

I have read the above statement, consisting of __3__ pages and I affirm under penalty of perjury that it is true and correct. I understand that the information I have given is not confidential and may be shown to parties with a legal need-to-know.

Executed on __4/22/05__                                    __Martin Henning__
                                                           Signature of person giving statement


__[signature]__
Signature of person witnessing above signature

__Auriel Jon Wisniaski__
Printed or typed name of person witnessing above signature


Page __3__ of __3__                                        Initials __MH__

**FDIC**

**Federal Deposit Insurance Corporation**
3501 N. Fairfax Drive (Room 801-1231), Arlington, VA 22226-3500

Office of Diversity and Economic Opportunity

---

NOTICE OF RIGHTS OF WITNESSES
IN
EEO INVESTIGATIONS

Pursuant to the provisions at 29 C.F.R. §1614.108, federal agencies are required to investigate all aspects of discrimination complaints. The investigation shall include a thorough review of the circumstances under which the alleged discrimination occurred, and the treatment of members of the complainant's protected group(s) as compared with the treatment of other employees in the organizational segment in which the complaint arose.

All employees having any knowledge of the matter complained of are required to cooperate with the investigator who is conducting the investigation. The investigator is authorized to administer oaths and require that statements of witnesses be reduced to an affidavit. The witness must swear to or affirm to the truth of the statements before the investigator or a third party, without a pledge of confidentiality. The investigator is also authorized to obtain copies of relevant employment records, policy statements, and regulations.

As a witness, you have the following rights:

1. To be provided a Notice of Authorization that identifies the investigator and explains the investigator's authority and responsibility in the conducting the investigation.

2. To have a representative present at any meeting/discussion with the investigator. The representative can advise you on how to respond to the investigator, but cannot respond for you.

3. To receive sufficient information concerning the claim(s) and basis(es) of the complaint and circumstances under which the complaint arose in order for you to accurately respond to the questions posed by the investigator.

4. To be provided access to documents you previously prepared or had access to, if they are necessary for you to review in order to respond to questions posed by the investigator.

5. To review your affidavit and make corrections or other changes <u>prior to</u> signing the affidavit.

I HAVE READ AND UNDERSTAND MY RIGHTS AS A WITNESS IN EEO INVESTIGATIONS.

WITNESS: _Martin Jennings_  DATE: _1/25/05_

# PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, or to others for uses as published in the Federal Register.

### EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____    _____
Signature of Interviewer            Signature of Affiant

1/25/05                             Washington, D.C.
_____    _____
Date                                Place