## AFFIDAVIT

WASHINGTON

DISTRICT OF COLUMBIA

I, Mark Brenneman, race (Caucasian), national origin (American), sex (male), age (birth date: 12/14/51), and prior EEO activity (Agency Witness), knowing that this statement may be used in evidence, make the following statement freely and voluntarily to Sylvia D. Drummond, who has identified herself to me as a Contract Investigator for the Federal Deposit Insurance Corporation ("FDIC") investigating complaints of discrimination filed by Sultan M. Chowdhury, ("Complainant"). I understand that this statement is not confidential and may be shown to interested parties (those with a legal right to know). I hereby solemnly swear or affirm:

1. The Investigator has informed me that the following claim has been accepted for investigation:

    "Whether Complainant was discriminated against on the bases of race (Asian), color (Brown), national origin (Bangladesh), sex (male), age (birth date: October 24, 1955), and retaliation (prior EEO activity), when on January 23, 2004, he learned that he was not selected for one of multiple Supervisory IT Specialist positions, advertised under Vacancy Announcement Number 2003-HQ-2360, in the Division of Information Resources Management ("DIRM"), Washington, DC."

SOF - EXHIBIT H

Initials MB

2. My position title is Assistant Director, Corporate Applications Branch, DIRM, FDIC. I have held my current position since August 2003. My first level supervisor is Jerry Russomano, Deputy Director, DIRM; my second level supervisor is Michael Bartell, Chief Information Officer, DIRM.

3. I advertised the position of Supervisory IT Specialist, CG-15, under Vacancy Announcement Number 2003-HQ-2360. Applicants were screened by the Human Resources Office to determine initial qualifications. Human Resources referred thirteen (13) qualified candidates to me for consideration.

4. I asked Ralph Elosser, Assistant Director, Division of Finance, and James Barker, Senior Counsel, Legal Division, to join me and to participate in the interviews of qualified applicants because the positions support their program areas. I asked them to sit in on the interviews, to ask follow-up questions, and to provide their impressions regarding the suitability of the applicants based on the interviews.

5. I developed the interview questions, which were directly related to the KSAs for the position. Each question had benchmarks regarding the ideal response. We judged applicants according to the proximity of their responses to the benchmarks.

6. During the November and December 2003, I conducted the interviews using a new FDIC selection process initiative, the structured interview. Throughout that process, all applicants are asked the same questions, in the same order, and are given the same amount of interview time.

7. Based on my instructions, Messrs. Elosser and Barker submitted the names of their top five rated candidates based on the applicants' performance during the interviews.

I did not write down my rankings, but I should note that we were all in general agreement about the top rated applicants and Complainant was not among them.

8. In making my selection decisions, I considered the applicants' performance during the interviews as well as their experience and background, as represented in their application packages. While all applicants were qualified based on their experience, Complainant's description of some of his experience raised questions concerning whether he accurately portrayed his experience. For example, in his responses to KSAs, Complainant indicated that he had managed 50 large complex projects, but his resume does not support that claim. During the course of a year, FDIC generally runs no more than three to four such projects, all of which are managed by different people. Another questionable claim is Complainant's statement that he managed systems with over 200 million real time records in use around the clock and world-wide. The claim is suspect because United Airlines is the only place where Complainant could have gained such experience and Complainant only worked there six months, where the Complainant was responsible for training the technical staff,. This experience is not sufficient to support a claim of managing such large systems.

9. When one compares Complainant's interview performance with the selectees, it is clear that the selectees distinguished themselves from Complainant and other applicants by providing better and more specific responses to the six questions asked during the interviews. In response to the first questions regarding "breadth and depth" of experience, the three selectees gave specific techniques and mechanisms used to accomplish their projects. For example, Ms. Boardley was able to provide numerous specifics and details on her experience and was very articulate in

formulating her response. She included techniques of prioritization, negotiation, and baselining as useful for controlling scope. She cited her experiences on CTM and ETV. Ms. Ciaschi provided a very convincing response regarding her on time and on budget management of the CHRIS project and use of the SDLC in managing projects and requirements management to control scope. Ms. Padilla cited her experiences on two major projects Vision and GENESYS, both of which had interagency users. She noted the importance of architecture, security, and technical infrastructure on a large project. She emphasized the importance of balancing requirements with available time and funds and on communicating progress and issues to top management. Complainant had also worked on large projects, including IDM, LMIS, FIMS and Y2K, but did not elaborate on what key management techniques he used in successfully completing these efforts. He did note the importance of establishing good working relationships with IT and business partners. In effect, his explanations were general and less specific than the three selectees.

10. In response to question number two regarding "technical knowledge," all applicants had years of experience. The successful candidates provided responses that demonstrated their grasp of more technical and advanced issues. For example, Ms. Boardley's response evidenced a strong familiarity with all SDLC phases and deliverables as a result of her work on major projects. She specifically cited her understanding of fit/gap analysis for COTS products. Ms. Ciaschi cited many experiences with the SDLC, use of project management tools, and knowledge of SDLC deliverables. She recounted her knowledge of Visual Basic, network administration, SQL Server, and PeopleSoft tools. She noted that she had advanced

Initials [illegible]

Microsoft certification (MCSE). Ms. Padilla noted her hands-on familiarity with development technology and her enjoyment of technical challenges. She was not only familiar with the SDLC, but had supplemented it with the Rational Unified Process (RUP) and sought out opportunities to employ new technology in her job. Complainant talked about his 20 years of experience with all phases of the SDLC, but did not discuss specific aspects of how he used the SDLC. His response was at times off topic, as he addressed related experience with the development of IT Plans and coordination with security and help desk operations, which were not relevant to the question.

11. Complainant and the selectees appear to be pretty much in the same ballpark with respect to questions three and four. In response to question five, "supervisory skills," two of the selectees once again provided stronger responses. Ms. Boardley responded that she had dealt with mis-matches of staff and skills and dealt with such imbalances by providing cross-training. She noted she had been able to manage workloads despite recent staff reductions and used project plans as a primary tool to gauge work progress. She noted that continuity and consistency were key components of managing people and that she focused her staff's attention on project scope, plans, and budgets. Ms. Padilla responded that she assessed the workload and matched roles and responsibilities to the strengths and aspirations of her team members. She noted the importance of open and honest communication when staff did not meet expectations and in taking a personal interest in her team's work. She also noted the importance of encouraging and motivating staff. Complainant gave an adequate response and stated that he was very experienced, had an open-door policy, and was

fair with his staff. In general, the responses of the two selectees showed a more hands-on approach, particularly dealing with less than perfect staffing situations. The response of Ms. Ciaschi was not considered to be superior to Mr. Chowdhury on this question.

12. All the selectees gave better responses than Complainant to the last question regarding "working under pressure." Ms. Boardley responded with a concrete example involving the October 2002 FDIC buyout and her group's ability to work in a crisis mode and work with the National Finance Center (NFC) to deal with new data required on short notice by the buyout program. She also noted a stressful situation in the implementation of ETV. Her systematic approach was to communicate with the client and within DIRM, to establish a schedule, and to coordinate and organize the work. Ms. Ciaschi responded with two examples, CHRIS and NFE. She cited a creative approach to dealing with a stressful situation where software was not working as expected and testing time was short. She managed the problem working with a contractor to isolate and fix the problem, so testing could resume. She also noted the importance of team building and communication in dealing with stressful situations. Ms. Padilla responded with examples from her work on the ViSION project, where the team was under pressure for 2 years. Her approach involved bringing alternatives and recommendations to management when dealing with problems and issues, rather than just informing them of the problem. She also noted the importance of good communication and in controlling one's own personal stress so it did not transfer to team members. Mr. Chowdhury cited being under pressure most of his career and noted the long hours he worked on the Y2K project. He noted

the importance of setting an example and to recognize the needs of other project team members in stressful work situations. Complainant's response was okay, but the selectees gave more tangible examples. Each selectee referenced specific examples where they solved stress-related problems, where Mr. Chowdhury talked in more general terms. Their specific examples provided greater confidence of their ability to deal with stress and to lead teams that were under stress.

13. I did not discriminate against Complainant as alleged. My selection decisions were based on the foregoing factors. Overall, based on my assessment of the interviews and applications, Complainant was not the best candidate for the position.

14. For the past two years, I have not made selections other than the ones at issue in this complaint.

15. I was generally aware of Complainant's race/national origin, sex, age, and prior EEO activity, but those factors played no role whatsoever in my selection decision. I knew Complainant and had participated with him in an Asian Heritage exhibit during the Agency's celebration of Asian Heritage Week. I knew a little about Complainant's prior EEO complaint because I had a limited involvement in the settlement of that complaint. I understand that Complainant believes that I should know something of his abilities because he once worked in DIRM. I had no direct knowledge of Complainant's abilities and job performance when he worked in DIRM. I did not work directly with Complainant when he worked in DIRM, nor was I in his chain of command.

_M. B_____
Signature

Initials _MB_

Signed and sworn to before me
On this  17  day of  August 2004
At      1:51 pm

_Dorain D Fulton_
Neutral witness, notary or investigator

## PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to the Federal Deposit Insurance Corporation activities, or to others for uses as published in the Federal Register.

### EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____  _____
Signature of Interviewer         Signature of Affiant

7/19/04                          Arlington, Virginia
_____  _____
Date                             Place



**Federal Deposit Insurance Corporation**
3501 N. Fairfax Drive (Room 801-1231), Arlington, VA 22226-3500    Office of Diversity and Economic Opportunity

---

## NOTICE OF RIGHTS OF WITNESSES
## IN
## EEO INVESTIGATIONS

Pursuant to the provisions at 29 C.F.R. §1614.108, federal agencies are required to investigate all aspects of discrimination complaints. The investigation shall include a thorough review of the circumstances under which the alleged discrimination occurred, and the treatment of members of the complainant's protected group(s) as compared with the treatment of other employees in the organizational segment in which the complaint arose.

All employees having any knowledge of the matter complained of are required to cooperate with the investigator who is conducting the investigation. The investigator is authorized to administer oaths and require that statements of witnesses be reduced to an affidavit. The witness must swear to or affirm to the truth of the statements before the investigator or a third party, without a pledge of confidentiality. The investigator is also authorized to obtain copies of relevant employment records, policy statements, and regulations.

As a witness, you have the following rights:

1. To be provided a Notice of Authorization that identifies the investigator and explains the investigator's authority and responsibility in the conducting the investigation.

2. To have a representative present at any meeting/discussion with the investigator. The representative can advise you on how to respond to the investigator, but cannot respond for you.

3. To receive sufficient information concerning the claim(s) and basis(es) of the complaint and circumstances under which the complaint arose in order for you to accurately respond to the questions posed by the investigator.

4. To be provided access to documents you previously prepared or had access to, if they are necessary for you to review in order to respond to questions posed by the investigator.

5. To review your affidavit and make corrections or other changes <u>prior to</u> signing the affidavit.

I HAVE READ AND UNDERSTAND MY RIGHTS AS A WITNESS IN EEO INVESTIGATIONS.

WITNESS: _____    DATE: 7/14/04