## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SULTAN M. CHOWDHURY ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. 05-2368 (RMU) |
| ) | |
| SHEILA C. BAIR, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Sultan M. Chowdhury alleges that his employer, the Federal Deposit Insurance

Corporation (FDIC), discriminated against him when it denied him a supervisory position and

when his supervisor discriminated against him and then retaliated against him because he

complained about the discrimination.  In its pending motion for summary judgment, the FDIC

asserts that Chowdhury's complaint should be dismissed because he has not established a *prima*

*facie* case of discrimination or retaliation, because there was no temporal proximity, and the

treatment was not "sufficiently severe or pervasive" to create a hostile work environment.  These

contentions must be rejected because they are not in accord with the legal standards applicable to

Mr. Chowdhury's claims.

First, the Court of Appeals made it clear in *Brady v. Office of Sergeant at Arms*, 520 F.3d

490 (D.C. Cir. 2008), where, as in this case, the employer has articulated a legitimate

non-discriminatory reason for its actions, the Court "need not- and should not " decide whether a

plaintiff who suffered an adverse employment action established a *prima facie* case.  Moreover,

this reasoning has been applied to both claims of discrimination and retaliation. *Laurent v. Bureau of Rehabilitation, Inc.*, 544 F.Supp.2d 17, 22 n. 3 (D.D.C. 2008)  As such, this Court must focus on one central question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason?"  As demonstrated below, there is ample evidence that the FDIC's reasons for denying Mr. Chowdhury' selection to a supervisory position are prextextual.  As such, the FDIC's motion for summary judgment must be denied.

Second, "temporal proximity is not the only way to establish a causal connection." *Medina v. District of Columbia*, 517 F.Supp.2d 272, 28 (D.D.C. 2007) (internal quotation marks omitted).  Here, there is evidence that the responsible person admitted that he treated Chowdhury differently because he had filed an EEO complaint against him.  As such, there is no need for temporal proximity to establish a connection between the supervisor's actions and the protected activity.

Finally, Chowdhury need not show that the actions against him were severe and pervasive to establish a retaliation claim.  In *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), the Supreme Court made it clear that a plaintiff must show only that a reasonable employee would have found the challenged action materially adverse, which "means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotations omitted).  Here, Chowdhury has presented evidence of a series of actions that might, either individually or collectively, support a jury finding that they would dissuade a reasonable employee from making a complaint of discrimination.

2

For these reasons, defendant's motion for summary judgment must be denied and the disputed issues of fact in this case resolved by a jury.

## STATEMENT OF FACTS

### I.     Background.

Sultan M. Chowdhury is 53 years old. He is a Muslim, who was born in Bangladesh. Plaintiff's Exhibit ("PX") 1, Chowdhury Aff., dated 8/23/04, at 4, ¶ 8. He has a Master's Degree in Technology Management and is a Certified Public Accountant (CPA). PX 2, Chowdhury Application/Resume. He worked in a variety of positions with private companies from 1975 until he joined the FDIC in 1991. *Id.* His diverse international work experience included performing budget, analysis, and information technology (IT) functions in the banking industry, airlines industry, a large CPA firm, as well as other U.S. and international organizations. *See* PX 2 at 8-15; PX 1 at 3, ¶ 7.

### II.    Before Henning Becomes His Supervisor, Chowdhury's Career Advances and His Performance is Commended.

Mr. Chowdhury began his employment with the FDIC in June 1991, as a CG-0334-14 Senior Computer Specialist/Project Manager. PX 2 at 7. In 1999, he was promoted to CG-15. *Id.* at 6. During his career, Mr. Chowdhury worked in several divisions, including the Division of Insurance Research (DIR) and Division of Information Resources Management (DIRM). He also provided support and services to both the Division of Finance (DOF) and Legal Division. *Id.* at 3, 5-7.

Mr. Chowdhury served as a Supervisor and as a Project Manager, managing several large IT projects. PX 1 at 3, ¶ 7. For example, he managed the Legal Operations Unit in DIRM and

3

was responsible for more than 20 IT systems for the FDIC's Legal Division. *Id.* He also prepared the IT plan for and established the Legal Management Information System (LMIS), a major IT system for the Legal Division which met the comprehensive information management needs of the Legal Division for nearly a decade. PX 2 at 3; *see also* PX 1 at 3-4, ¶ 7; PX 16, Annual Performance Rating for 2001-2002 (noting, *inter alia*, that Chowdhury served as Acting Unit Chief and "did an excellent job"). He served as a major project manager for Year 2000 (Y2K) initiative within the FDIC, as well as the DOF's Financial Information Management Systems (FIMS). PX 2 at 6. As such, he managed twenty-three mission critical financial systems and was responsible for the work of more than forty staff members, including FDIC employees and contractors. *Id.* In addition, Mr. Chowdhury established and maintained an excellent working relationship with management officials of the FDIC divisions that he serviced, as well as other senior managers and peers. PX 4, Annual Performance Rating for 1998-1999; PX 5, Annual Performance Rating for 1999-2000; and PX 6, Annual Performance Rating for 2000-2001.

Before Mr. Henning became his supervisor, Mr. Chowdhury received consistently high performance ratings and commendations. *See e.g.* PX 4, Annual Performance Rating for 1998-1999 (rated "Outstanding" with score of 2.8 out of a maximum score of 3.0); PX 5, Annual Performance Rating for 1999-2000 (rated "Outstanding" with score of 2.8 out of 3.0); and PX 6, Annual Performance Rating for 2000-2001 (score of 2.8 out of 3.0); PX 16, Annual Performance Rating for 2001-2002 (rated at the highest level of "Meets Expectations" and noting that Chowdhury "did an excellent job"); PX 7, Annual Performance Rating for 2002-2003 (rated at the highest level of "Meets Expectations"). In addition, Mr. Chowdhury had received

performance and achievement awards, including a Medal from the U.S. President's Council for

Y2K.  PX 3, Chowdhury Aff., dated 1/6/05 at 2, ¶ 4.

### III.   Chowdhury Angers Brenneman By Succeeding in His EEO Claim Against Him.

In 1998, the FDIC announced two vacant Section Chief positions, and Mr. Chowdhury,

who was well-qualified for both positions, applied.  However, the selecting official, Mark

Brenneman, selected two lesser qualified non-Asians for the Section Chief positions.  Mr.

Chowdhury, therefore, filed an EEO complaint challenging Brenneman's selection as unlawfully

based on his race, religion, national origin, and reprisal.  PX 9, Brenneman Dep. at 41-47; *see*

*also* PX 8, EEO Counselor's Report FDICEO-980195 (identifying Brenneman as not selecting

Chowdhury for vacancies in 1998).  These complaints were settled in approximately December

2002.  PX 3 at 15, ¶ 47.  Mr. Brenneman signed the settlement agreement on behalf of the

Agency.  PX 41, Chowdhury Dep. at 220.

### IV.   Brenneman Denies Chowdhury a Supervisory IT Specialist Position Despite His Superior Qualifications.

In September 2003, the FDIC advertised three vacancies for Supervisory IT Specialists,

CG-15, in the Corporate Applications Branch, Application Systems Management Office,

Division of Information Resources Management (DIRM).  PX 39, Vacancy Announcement 2003-

HQ-2360.  Two of the three positions identified in the announcement were specifically intended

to support the Legal Division and the Division of Finance.  PX 9, Brenneman Dep. at 34-35.

Brenneman, who had been the responsible management official in Mr. Chowdhury's earlier

complaint, was the selecting official for these positions.[1]  PX 40, Merit Promotion Roster at 1.

---

[1]When he rejected Chowdhury's application, Brenneman was well aware that Chowdhury
had filed EEO complaints of discrimination based on his refusal to promote Chowdhury.  PX 9,

Mr. Chowdhury, having ably performed IT duties in the FDIC since 1991 and demonstrated extensive IT, budget, cost analysis, and resource management experience both in the FDIC and in the private sector for 16 years, applied for the vacant positions. *See* PX 2 at 2-13, Chowdhury Application/Resume.  His diverse international work experience included performing budget analysis and information technology (IT) functions in the banking industry, airlines industry, a large CPA firm, as well as other U.S. and international organizations. *See* PX 2; PX 1 at 3, ¶ 7.  In addition, Mr. Chowdhury had worked in DIRM while Brenneman was an executive manager in DIRM.  PX 41, Chowdhury Dep. at 216; PX 9, Brenneman Dep. at 84.

Because Chowdhury was already a CG-15, based on his grade, assignments, and qualifications, he was eligible for a lateral transfer to any of the advertised positions, without further competition. *See* PX 40, Merit Promotion Roster at 2; PX 9, Brenneman Dep. at 36.  Yet, Mr. Chowdhury was not selected for any of the three vacancies.  Rather, three younger, non-Asian, non-Muslim, employees with less experience were selected. *See* PX 9, Brenneman Dep. at 101-102; *see also* PX 51, ROI for FDICEO-040025/040032 at 15 (noting that none of the three selectees are Asian or Muslim, that all are younger than Chowdhury, and that none had engaged in prior EEO activity).  At his deposition, Brenneman acknowledged that Chowdhury had substantially more IT experience and supervision in IT, both with FDIC and in the private sector, than any of the selectees.  PX 9, Brenneman Dep. at 49-50.  Brenneman also admitted that Chowdhury was the only candidate who had previously done work with both the Legal and Finance Divisions. *Id.* at 53, 56 (Chowdhury managed IT projects that serviced both the Legal and Finance Divisions).  Further, Brenneman admitted that, unlike the selectees, Chowdhury had

Brenneman Dep. at 48-49.

two Master's Degrees: one in IT, and was a CPA. *Id*. at 61-62. In fact, Brenneman admitted that one of the selectees had not even been a supervisor in FDIC. *Id*. at 160; *but see id*. at 49 (testifying that Chowdhury "had substantial [supervisory] experience" in IT positions).

## V.   Brenneman Provides Questionable Reasons For His Rejection of Chowdhury's Application.

In his sworn statement, Brenneman claimed that one of the reasons he did not select Chowdhury was because he did not "accurately portray his experience." PX 52, Brenneman Aff., dated 8/17/04 at ¶ 8. At his deposition, Brenneman provided varying explanations regarding when he began to question the accuracy of Chowdhury's application. First, he testified that he thought about it during the interview, but "didn't think it was the place to question his credibility in the interviews." PX 9 at 80. Then he testified, "I don't recall why I didn't go into this specifically during the interview." *Id*. at 83. Finally, he claimed that he did not have the specific concerns mentioned in the affidavit at the time of the interview. *Id*. at 85-86. He testified, "This specific set that I put down here were something that came to me when I was preparing the affidavit." *Id*. at 85. Mr. Brenneman failed to raise these alleged concerns with Mr. Chowdhury or the other panel members – even though he acknowledges that any of these three people would know better whether Chowdhury accurately portrayed his experience and might have provided an explanation for the perceived inaccuracy. *Id*. at 84, 86-87.

Brenneman also claimed that Chowdhury's responses during his interview were less specific and not as good as the selectees' responses. PX 52 at ¶ 9. Yet, his contemporaneous notes reveal that he made the most number of notes regarding Chowdhury's answers and, for one of the answers by Mr. Chowdhury, Brenneman's note says "very specific." PX 53, Brenneman

Interview Notes (Chowdhury); PX 9 at 118-19 (testifying that his note regarding Mr. Chowdhury's answer says "very specific").

## VI.   Henning's Hostile Treatment of Chowdhury.

In October 2003, Martin Henning became Mr. Chowdhury's supervisor.  PX 43, Henning Dep. at 23-24.  From the very beginning, Mr. Henning displayed anger towards Mr. Chowdhury. During their first meeting, Mr. Henning, without any prefacing comments or context, told Chowdhury that he "had fired people before" and that he "knew [Chowdhury's] background." PX 41, Chowdhury Dep. at 104-106; PX 44, Henning Aff., dated 2/7/05, at 1, ¶ 4 (within a short time of becoming Chowdhury's supervisor, Henning learned that Chowdhury had filed an EEO claim and the Agency settled the case).  When Chowdhury asked how Henning knew his background, Henning said that "he could not tell [him] the source."  PX 3 at 2, ¶ 3.  Henning later clarified his meaning.  On March 31, 2004, Mr. Henning told Mr. Chowdhury that he was being rigid in scrutinizing his work because he had filed an EEO complaint.  *Id.* at 8, ¶ 21.

Mr. Henning also took exception to Mr. Chowdhury's other "background": his religion and national origin.  Mr. Chowdhury was both the only Muslim and the only Asian in CDR.  For this, Henning took steps to isolate him.  During conversations and discussions with the CDR team, Henning would comment that "we [the CDR team] are Christian family."  PX 41, Chowdhury Dep. at 121.  In addition, Mr. Henning made a point of keeping a Bible on his work desk, visible to Chowdhury and his other subordinates.  Henning organized regular lunch hour meetings for the Christians in the office to study the Bible in an FDIC conference room.  PX 41, Chowdhury Dep. at 117-119; PX 43, Henning Dep. at 339-341.

Before Mr. Henning became his supervisor, Mr. Chowdhury served as the team leader of

8

approximately fifteen professionals, including individuals assigned to FDIC, the Federal Reserve

Board, and the Office of the Comptroller Currency.  PX 41, Chowdhury Dep. at 100.  Shortly

after becoming Chowdhury's supervisor, Henning ordered Chowdhury to report to Laura Lapin,

although like Chowdhury, she was a CG-15.  PX 43, Henning Dep. at 106-108, 113; PX 41,

Chowdhury Dep. at 142 (Henning told Chowdhury to report to her and process his leave slips

through her).  Every other CG-15 member of the CDR team reported directly to Henning.  PX 43,

Henning Dep. at 106-108, 113; *see also* PX 11, Organization Chart for CDR Team.  Although

Mr. Chowdhury had organized the team and had been commended for his initiatives and progress

made by that team, Mr. Henning instead assigned him to assist Ms. Lapin with contract OM-

related tasks – an assignment that no one on the CDR team wanted to do.  PX 3 at 2, ¶ 4.  Mr.

Henning assigned Mr. Chowdhury to assist Lapin by prepare the contract expanding statements,

which essentially meant that Mr. Chowdhury had to collect and add contract invoices.  PX 41 at

137-38; *see also id.* at 140 (testifying that his assignment was to collect data from within FDIC

for an oversight manager).  Typically, grade 7 and 8 employees perform this task.  *Id.* at 138.

A few weeks after this reassignment, Henning changed Mr. Chowdhury's job title from

"Project Manager" to "Senior Information Systems Specialist."  PX 3 at 2-3, ¶ 5; PX 11,

Organization Chart for CDR Team.  Since December 2002, Mr. Chowdhury had been assigned as

a Project Manager.  PX 1 at 2, ¶ 2; *see also* PX 41, Chowdhury Dep. at 31-32 (testifying that he

transferred to CDR as a Project Manager).

Henning also humiliated Chowdhury in front of his co-workers.  On April 8, 2004,

Henning held a meeting with Chowdhury, Laura Lapin and Susan Koepp.  PX 3 at 5, ¶ 14.

Henning said that the based upon requirements established by the Federal Information Security

Management Act (FISMA), Chowdhury had to become the Certification and Accreditation

(C&A) agent for the CDR Team. *Id.* Henning then asked, in front of the other meeting

attendees, what Chowdhury thought his salary raise should be for the year. *Id.* Mr. Henning

announced that Chowdhury would get a "0%" raise, which within the culture of the FDIC means

that an employee has failed and his job is on the line. *Id.*

## VII.   Henning Denies Chowdhury a Performance Award, Despite his Accomplishments.

During calendar year 2003, Mr. Chowdhury's accomplishments as a Project Manager

included: saving the FDIC over $100,000 by requiring a contractor to provide deliverables that

were established in the contract and avoiding issuance of additional task orders at further costs to

FDIC; forming an interagency team to ensure compliance with statutory requirements; and

ensuring necessary contract modifications to protect FDIC interests. *See* PX 15, Chowdhury

CSA Input.  Based on these accomplishments, Chowdhury was eligible for a cash award under

the FDIC's Corporate Success Award (CSA) Program.  PX 12, E-mail from Henning, dated

12/29/03.  However, Mr. Henning refused to nominate Chowdhury for a Corporate Success

Award.  Instead, Henning nominated two white employees, both of whom had not produced any

savings for the FDIC, but who were not Muslim or Asian, and had not engaged in prior EEO

activity. *See* PX 13, Montoya CSA Packet (including notification of approval of CSA); PX 14,

Wisnieski CSA Packet (nominated but not approved for CSA).  Only Chowdhury demonstrated a

*tangible* monetary savings - $100,000 - for the FDIC.  *Compare* PX 13 and PX 14 *with* PX 15

(only Chowdhury's accomplishments demonstrate a significant monetary savings to FDIC).

## VIII.   Henning Sabotages Chowdhury's Applications For Details and Rotational Positions.

In late 2003, Mr. Chowdhury applied to participate in the FDIC Internal Job Rotations

Program (IJRP).  The IJRP was a leadership development program that provided training classes and rotational assignments for employees.  PX 47, Zack Dep. at 21, 25-26, 28.  Chowdhury's application for participation in IJRP was fully supported by Mr. James E. Crum, who had been his supervisor since he was assigned to the CDR team.  PX 50, 12/11/03 Memorandum (also noting that Chowdhury "is highly capable, and requires minimum supervision in accomplishing his tasks").  In late December 2003, Chowdhury was notified that he had been selected to participate in the program.  *Id.* at 3-4.  However, Mr. Henning prevented Chowdhury from receiving any detail/rotational assignment by spoiling his application each time that he applied.

In early 2004, Mr. Chowdhury applied for an IJRP detail assignment with the FDIC Corporate University, as an assistant to the Dean of the Corporate University's School of Insurance, Fred Carns.  PX 3 at 10-11, ¶ 33; *see also* PX 49, IJRP Document Listing Special Assistant Position.  After Chowdhury interviewed for the position, Henning told Carns that Chowdhury had performance issues and could not take the detail assignment.  PX 17, Carns Dep. at 44-51.  Therefore, Carns did not select Chowdhury for the detail position.  PX 48, Non-Selection Form, dated 2/23/04.

In June 2004, Chowdhury requested Henning's approval and support for a detail to the Cost Management Program of DOF.  Mr. Henning refused to respond to Chowdhury's e-mail. PX 3 at 11, ¶ 34.  Then, after the closing date for the detail, Henning told Chowdhury that he had contacted the selecting official and told him not to select Mr. Chowdhury.  *Id.*

Finally, in October 2004, Henning told Chowdhury that he had blocked an IJRP detail to the Office of Diversity and Economic Opportunity (ODEO) within the last two months, and that

he had blocked Chowdhury serving as a mentor in the FDIC Corporate Mentoring Program.[2] *Id.*

at 11, ¶ 35.  Indeed, Mr. Henning told Chowdhury that he had been denying potential detail and

IJRP opportunities for Mr. Chowdhury since the beginning of 2004.  *Id.* at 10, ¶ 32.

## IX.   Although He Had Sabotaged All of Chowdhury's Detail and Rotational Job Opportunities, Henning Falsely Announces that Chowdhury Would be Leaving CDR.

While Chowdhury was on approved leaved, Henning announced to the entire CDR

Steering Committee that he had hired a replacement for Chowdhury and that Chowdhury was

leaving CDR.  *See* PX 41, Chowdhury Dep. at 146-47; PX 46, Wisnieski Dep. at 43-47

(describing the meeting and Henning's announcement); PX 10, Lapin Dep. at 61-62 (recalling a

meeting where Henning stated that Chowdhury would be replaced and that he was going on to a

new job). Chowdhury was surprised at this news, as he had been unable to find a detail or

rotational assignment and had not taken another job either within or out of FDIC.  PX 3 at 3, ¶ 8.

Then, in February 2004, Henning hired Alan Deaton, a white male, to replace Chowdhury.  PX

41, Chowdhury Dep. at 150; PX 43, Henning Dep. at 118.  That summer, Henning also added

Andrew Sterling to the CDR team and gave him assigned Chowdhury's risk management duties.

PX 42, Chowdhury Rebuttal Affidavits, at 6 of 11, ¶ 6; PX 10, Lapin Dep. at 57-58.

## X.   Henning Criticizes Chowdhury For Work That He Had Earlier Approved.

During the first half of the 2003-2004 rating period, Mr. Henning had received and

approved Mr. Chowdhury's documents without providing any negative feedback.  Yet, on March

31, 2004, Mr. Henning told Mr. Chowdhury that his written communications were deficient –

---

[2]Mr. Chowdhury had served successfully as a mentor in the FDIC mentor program for two terms and served with distinction in a previous detail with ODEO.  PX 3 at 11, ¶ 35.

using some of the same documents that he had approved as justification. PX 41, Chowdhury

Dep. at 235; PX 43, Henning Dep. at 294-295; PX 3 at 5, ¶ 13.  No one other than Henning

criticized Chowdhury's written work products.  PX 45, Sweeney Dep. at 50-51, 58-63.  When

Mr. Chowdhury asked Mr. Henning why he was suddenly finding fault with his writing, Mr.

Henning explained that he was being rigid in scrutinizing Chowdhury's written communications

because Chowdhury had filed an EEO complaint against him.  PX 3 at 8, ¶ 21.  Mr. Henning then

assured Chowdhury that their current conversation was very "informal," and was not going

"anywhere."  PX 41, Chowdhury Dep. at 234.

Then, on April 9, 2004, Mr. Henning gave Chowdhury a performance deficiency

memorandum.  PX 18.  This time, Henning based his assertion that Mr. Chowdhury's work was

deficient on documents that had been written and approved by other FDIC managers.  PX 3 at 6,

¶ 16.  For instance, the CDR Risk Management Plan (CDR RMP), prepared by Chowdhury, had

been approved by Henning's predecessor, James E. Crum, before it was then provided to the

CDR team and Henning for final review.  *See* PX 3 at 6, ¶ 16; *see also* PX 19, FFIEC Central

Deposit Repository Risk Management Plan, dated 1/8/04;[3] PX 10, Lapin Dep. at 58 (no changes

to RMP after Andrew Sterling replaced Chowdhury).  Crum considered Mr. Chowdhury's work

on the CDR RMP to be "of excellent quality."  *See* PX 7 at 2 ("Sultan worked . . . to develop

solid risk management plans meeting FDIC requirements.  His work in this area has been self-

directed and of excellent quality.").

Henning also asserted that Chowdhury's work on the Sensitivity Assessment

---

[3]The same document that was reviewed in January 2004 was uploaded onto the FDIC
intranet and served as FDIC policy as of April 29, 2004.  *See* PX 19 (cover page for plan
including Chowdhury's handwritten note).

Questionnaire (SAQ) was deficient even though he himself had approved the document on April 6, 2004, just three days before he issued the 4/9/04 mid-year performance deficiency memorandum. *Compare* PX 20 at 10 (Henning signature indicating "review and concurrence with data provided in this questionnaire" as of 4/6/04) *with* PX 21 (reflecting Henning criticism as of 4/27/04). The SAQ had also been approved by the senior executive representatives of the various agencies concerned. PX 20, Sensitivity Assessment Questionnaire (cover letter showing approvals had to be secured prior to signatures by executive representatives between April 8-15, 2004).

Although Mr. Chowdhury was aware of no real problems with his written communications, he made every effort to satisfy Mr. Henning. He agreed to meet with Mr. Henning to review his written work.[4] PX 3 at 7, ¶ 18. He also completed a course on "How to Sharpen Your Business Writing Skills," at the American Management Association in May 2004. *Id.*

## XI.   Henning Puts Chowdhury on a Performance Improvement Plan and Threatens To Terminate Him.

In an e-mail, dated July 28, 2004, Chowdhury asked Henning to be relieved of the 4/9/04 memorandum requirements, particularly since he had completed the writing course, the 90-day period had ended on July 9, 2004, and Henning had provided no meaningful additional feedback. PX 25, E-mail, dated 7/28/04, from Chowdhury to Henning; *see also* PX 3 at 7, ¶ 20. Henning responded on July 30, when he called Chowdhury into his office. PX 3 at 7, ¶ 20. Henning was

---

[4]It was during one of their meetings to discuss written communications that Henning admitted that he was rigidly scrutinizing Chowdhury's written work because he had filed a complaint against him. PX 3 at 8, ¶ 21.

visibly agitated and while he was shaking a paper copy of the 7/28/04 e-mail in Chowdhury's face, Henning blurted out, "I will give you a PIP," *id.*, and told Chowdhury that he could be terminated if the requirements of the PIP were not satisfied. *Id.* at 7-8, ¶ 20.

On August 18, 2004, less than two weeks from the end of then-current performance rating period, Mr. Henning left the memorandum putting him on a PIP on Mr. Chowdhury's desk chair, face-up for anyone to view. PX 26, PIP Memorandum; PX 3 at 8, ¶ 24. Later that same day, Chowdhury went to the CDR copy room and found a copy of the PIP memorandum on the copy machine. *Id.* at 8, ¶ 25. Mr. Chowdhury was humiliated and felt violated. *Id.*

On August 30, 2004, Mr. Chowdhury responded to the 8/18/04 PIP memorandum. PX 27. Chowdhury pointed out that several documents referred to in the PIP memorandum had been successfully completed during the period December 2003-April 2004. *See* PX 27; *see also* Section X., *supra*. With regard to the remaining alleged deficiencies, several were still in the draft stages and should not have served as a basis for placing Chowdhury on a PIP. PX 27

## XII.   During the PIP Period, Mr. Henning Harasses Chowdhury Over His Written Work Products.

During the PIP period, Mr. Henning routinely reviewed Mr. Chowdhury's written work, approving certain parts of a document and making comments on others, but then he would make arbitrary revisions on successive versions of the same language he had approved. For example, Mr. Chowdhury was responsible to develop a CDR Business Contingency Plan, a draft copy of which was provided to multiple agencies and FDIC personnel on August 11, 2004.[5] *See* PX 23,

---

[5]It is important to note that Mr. Henning was blaming Mr. Chowdhury for written products that included input and language from several other agencies. *See* PX 22 (cover e-mail, dated 8/11/04 from Chowdhury, addressed to FDIC, Federal Reserve Bank, and Office of the Comptroller of the Currency employees). Indeed, Henning's comments and questions are

CDR Business Contingency Plan, dated 8/8/04. Therefore, Mr. Chowdhury was required for each version of this document to coordinate the language, content, format, and order of information to satisfy all agencies and organizations that had input into the product. In his written comments throughout the document, Mr. Henning addresses issues and questions to Mr. Chowdhury and other individuals for action. *See generally* PX 23 (plan cover page reflecting "Action Items" for "G.C., S.C. [Sultan Chowdhury], Martin [Henning], Tom Selle, and J.T."). When looking at second draft version, dated 10/11/04, Henning notes that "this document needs significant improvement before it will be acceptable" even though Henning's extensive revisions had already been incorporated in August 2004. *See* PX 24, 2nd Draft CDR Business Contingency Plan, dated 10/11/04. Henning's serial revisions of his own work in succeeding versions of the draft plan cannot be Sultan Chowdhury's fault.

A comparison of the two draft versions demonstrates that Henning finds fault with the second version, even though he had approved identical language in the first draft. *Compare* PX 23 at 9 of 46 (paragraph C.1. "The CMC will . . ." with no comment from Henning) *with* PX 24 at 4 (paragraph B.1. "The CMC will . . ." where Henning crosses out "CMC" and replaces with "PM"); *compare also* PX 23 at 9 of 46 (paragraph C.3.a. "**Call Peak Period -** Correction to the failure or potential failure . . ." with no comment from Henning) *with* PX 24 at 4 (paragraph B.3.a. "**Call Peak Period -** Correction to the failure or potential failure . . ." with an arrow drawn above "correction to the failure" and a question mark referring to "potential failure") (bold in

---

addressed to both FDIC employees (other than Mr. Chowdhury) and non-FDIC personnel. PX 23 (Cover of Business Contingency Plan contains Henning's handwritten notes reflecting - "T.S" (Tom Selle, FDIC employee); "J.T." (Jack Talbert, FDIC employee); and "G.C." (Gary Christianson of the Office of the Comptroller of the Currency).

originals); and *compare also* PX 23 at 11 of 46 (paragraph "**G. CDR Recovery Operation**" with approval by Henning at subparagraph (4)) *with* PX 24 at 8 (paragraph "**E. CDR Recovery Operation** with multiple revisions and questions on the entire page).

One of the written products that Chowdhury provided to Henning during the PIP period was a draft report from a site visit of a team that Chowdhury led during a temporary duty (TDY) trip in late June 2004. One of the team members, Tom Tuzinski, an FDIC employee not assigned to the CDR Team prepared a draft report and provided it to Chowdhury. PX 28, Initial Draft Site Visit Report. However, Chowdhury, in turn, reformatted, reorganized, made additions, and rewrote the report before he turned it in to Henning in mid-September 2004. PX 29, 2nd Draft Site Visit Report, dated 9/12/04. Mr. Henning's comments about the draft report were favorable. *See* PX 29 (Henning written notes on e-mail that forwarded draft report to him). Approximately one week later, on September 22, 2004, Mr. Henning provided a 30-day review memorandum regarding Chowdhury's progress during the PIP period that was generally favorable, particularly as it related to the site visit report. PX 32, 30-Day Written Review, dated 9/22/04.

Within less than two weeks after Mr. Henning's review of the initial draft report, Chowdhury provided another draft site visit report to Henning. PX 30, 3rd Draft Site Visit Report, dated 9/28/04. There were very few remarks or comments made by Henning during his review of the second draft. PX 30 (a total of nine notations made by Henning). Indeed, Mr. Henning provided oral feedback to Chowdhury more than two weeks after he had received that draft report. PX 30 (cover page of draft report reflecting "verbal feedback" to Chowdhury on 10/19/04).

At the same time that he provided oral feedback to Chowdhury about the September 28,

2004 draft report, Henning asked Tom Tuzinski who authored the original draft site visit report. *See* PX 30 (Henning's handwritten note on first page regarding contact with Tuzinski).  While Mr. Henning claimed that he took this action because Mr. Chowdhury was supposed to produce an example of a written product where he was the original author, Henning never communicated this "expectation" to Chowdhury, either in the April 9, 2004 (Mid-Year Performance Deficiency) or August 18, 2004 (PIP) memoranda.  PX 41, Chowdhury Dep. at 305-307 (Chowdhury testifying that the first time Henning mentioned "original authorship" requirement was in a November 4, 2004 memorandum from Henning to Chowdhury); PX 31, E-mail string between Henning and Chowdhury, 10/29-11/1/04.  Chowdhury became extremely anxious as it appeared that Henning was preparing yet another attack on his performance.  PX 41, Chowdhury Dep. at 329 (during the November 4/5, 2004, meeting, Henning pushed Chowdhury to the end), at 432 (because of Henning's nitpicking, Chowdhury was "constantly feeling threatened or extra-aware what the hell he's going to say next time").

In a series of e-mails between October 29 and November 1, 2004, Henning asked Chowdhury who authored the site visit report and what role Chowdhury played in that process. PX 31.  Mr. Chowdhury replied that he and Tom Tuzinski were the primary authors, and that the draft reports that Henning saw were prepared by Chowdhury.  PX 31.  In fact, a comparison of the draft report that Tom Tuzinski provided to Mr. Chowdhury with the draft that Chowdhury gave to Henning reveals that Chowdhury had reorganized and rewritten the report, as well as adding several appendices.  *Compare* PX 28 *with* PX 29.

## XIII.  Henning Forces Chowdhury to Leave the FDIC.

By November 2004, Henning's campaign of harassment and his refusal to allow

Chowdhury to go on a detail or rotational assignment had taken its toll on Mr. Chowdhury.  He began to experience symptoms of depression and anxiety: recurring headaches, heightened blood pressure, migraines, and he had feelings of disillusionment as Mr. Henning intensified the pressure by making him continuously redo his written work.  PX 3 at 9, ¶ 28.  In May 2004, Chowdhury contacted the FDIC Employee Assistance Program (EAP) office about the anxiety that he was experiencing.  *Id.*  The EAP Counselor recommended that Chowdhury seek professional counseling and treatment.  *Id.*  In addition, he sought assistance from the FDIC Nurse's Office several times due to stress-related symptoms.  *Id.*  At the recommendation of his treating health care professionals, Mr. Chowdhury sought medical leave from work.  *See* PX 34, Letters from Dr. Hoffman and Dr. Taiwo Okusami, dated November-December 2004 (advising that Mr. Chowdhury be placed on medical leave and be reassigned from his current position and supervisor).  Mr. Chowdhury remained on extended sick leave and was placed on leave without pay (LWOP) status when he had exhausted his accrued sick and annual leave.

On May 4, 2004, Mr. Chowdhury began weekly psychotherapy sessions with Dr. Sandra J. Hoffman, a Clinical Psychologist.  *See* PX 33, Dr. Hoffman's Psychological Report, dated 4/4/05.  Dr. Hoffman's diagnoses of Mr. Chowdhury included "Major Depression (DSM IV: 296.32) and Generalized Anxiety Disorders (DSM IV: 300.02) in the wake of extremely stressful work and psychological abuse by his boss."  *Id.* at 1. Despite the therapy sessions with Dr. Hoffman, Mr. Chowdhury's depression and severe anxiety increased.  *Id.* at 2-3.  In March 2005, Mr. Chowdhury began therapy sessions with Dr. Martin J. Book, a psychiatrist.  PX 35, Dr. Book's Psychiatric Report, dated 6/13/05.  Dr. Book determined that Mr. Chowdhury suffered multi axial psychiatric diagnosis, including Major Depression, Single Episode, Moderate

(296.32), Generalized Anxiety Disorder (300.02), and Post Traumatic Stress Symptoms. *Id.* at 4.

Dr. Book opined that Mr. Chowdhury's condition was caused by issues in the workplace and

with his supervisor. *Id.*

After undergoing psychological and psychiatric treatment for nearly one year, Mr.

Chowdhury submitted an application for disability retirement to OPM. *See* PX 36, Chowdhury

Disability Retirement Application. In their respective reports, Dr. Hoffman and Dr. Book opined

that Mr. Chowdhury's depression and anxiety prevented him from being able to return to the

FDIC. Mr. Chowdhury's application for Federal Disability Retirement was approved on June 30,

2005. PX 37. He began receiving Social Security Disability benefits in May 2005. PX 38.

## ARGUMENT

### I.    Standard of Review.

Summary judgment is proper only against "a party who fails to make a showing sufficient

to establish the existence of any element essential to that party's case, and on which that party

will bear the burden of proof at trial" Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S.

317, 321 (1986). This Court must view the evidence in the light most favorable to the non-

moving party and drawing all reasonable inferences accordingly. *Salazar v. Washington*

*Metropolitan Transit Authority*, 401 F.3d 504, 507 (D.C. Cir. 2005) (*citing Dunaway v. Int'l Bhd.*

*of Teamsters*, 310 F.3d 758, 761 (D.C. Cir. 2002)).

To make the determination on a motion for summary judgment, this Court must evaluate

all of the evidence. *Celotex*, 477 U.S. at 323. In *Anderson v. Liberty Lobby, Inc.*, the Supreme

Court makes clear that disputes over facts, which might affect the outcome of the suit under the

governing law, will preclude the entry of summary judgment. 477 U.S. 242, 248 (1986); *see*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (explaining that where the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, the motion for summary judgment cannot be granted). Indeed, the evidence presented must always be construed in favor of the party opposing the motion for summary judgment, and it is that party who is also to be accorded the benefit of all favorable inferences that can be drawn from the record evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Washington Post Co. v. United States Dep't of Health and Human Srvs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). Thus, the party that moved for summary judgment must demonstrate that there is an absence of evidence to support the nonmoving party's case *Celotex,* 477 U.S. at 323. If, and only if, the moving party meets this burden, the burden passes to the nonmoving party to establish the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id.* Where the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, the grant of summary judgment must be reversed. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

The D.C. Circuit Court has directed that courts view summary judgment in Title VII cases with special caution because discriminatory intent and proof of disparate treatment are difficult to establish. *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 879 (D.C. Cir. 1997). Accordingly, if any reasonable fact-finder could infer discrimination based on the evidence submitted, then summary judgment in a Title VII case is inappropriate. *See Anderson,* 477 U.S. at 248 (Summary judgment cannot be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."). Therefore, the trial court's focus must be whether a genuine issue exists as to whether the defendant intentionally discriminated against the plaintiff.

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993); *Barbour v. Merrill*, 48 F.3d 1270, 1276 (D.C. Cir. 1995).

## II.   The Focus of The Court's Inquiry Should Be on Motive and Pretext Rather Than on Whether Chowdhury Has Established A Prima Facie Case.

Defendant devotes a significant portion of its brief to arguing that Chowdhury has not made out a prima facie case of discrimination or retaliation.  Yet, "[a]s Supreme Court precedents establish, the prima-facie-case aspect of *McDonnell Douglas* is irrelevant when an employer has asserted a legitimate, non-discriminatory reason for its decision." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008); *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff.") (internal quotation marks omitted); *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) ("[T]he prima facie case is a largely unnecessary sideshow.").  Indeed, the D.C. Circuit has specifically held that "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not-*and should not*-decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas." Brady*, 520 F.3d at 494 (emphasis in original); *see also Gaujacq v. Electricite de France Intern. North America, Inc.*, __ F. Supp. 2d __, __, 2008 WL 3864038 (D.D.C.) ("As in disparate-treatment cases, in retaliation cases where the employer has offered a legitimate, non-discriminatory reason for an employment decision, the first step in the

22

McDonnell Douglas paradigm drops out and the sole inquiry is whether the plaintiff produced

sufficient evidence for a reasonable jury to find that the employer's asserted [non-retaliatory]

reason was not the actual reason."); *Pardo-Kronemann v. Jackson*, 541 F.Supp.2d 210, 215

(D.D.C. 2008) (applying same principle in retaliation case); *Laurent v. Bureau of Rehabilitation,*

*Inc.*, 544 F.Supp.2d 17, 22 & n.3 (D.D.C. 2008) (same).

As such, the plaintiff may "survive summary judgment" by "show[ing] that a reasonable

jury could conclude from all of the evidence that the adverse employment decision was made for

a discriminatory [or retaliatory] reason." *Id.* (*quoting Lathram v. Snow* , 336 F.3d 1085, 1088

(D.C.Cir. 2003)). "Usually, proffering 'evidence from which a jury could find that [the

employer's's stated reasons]. . .were pretextual. . .will be enough to get a plaintiff's claim to a

jury.'" *George v. Leavitt* , 407 F.3d 405 (D.C. Cir. 2005).  As the Supreme Court held in *Reeves,*

"[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the

explanation that the employer is dissembling to cover up a discriminatory purpose," particularly

since "the employer is in the best position to put forth the actual reason for its decision." 530 U.S.

at 147; *see also Salazar v. Washington Metropolitan Transit Authority*, 401 F.3d 504, 511 (D.C.

Cir. 2005) (finding questions about whether the employer provided fairly administered promotion

selection process, and whether the failure to promote on grounds that successful candidate was

more qualified precluded summary).

### III.    A Jury Trial Is Required To Determine Whether Brenneman Denied Chowdhury A Promotion Because of His Religion, Nationality or Protected Activity.

According to Brenneman, the main reason that he selected three younger, female, non-

Asian, non-Muslim applicants who had not engaged in protected activity and who had less

experience than Chowdhury was that "Complainant's description of some of his experience raised questions concerning whether he accurately portrayed his experience." PX 52 (Brenneman Aff.). However, Chowdhury has presented evidence from which a trier of fact could reject this reason, as well as the other proffered reasons and conclude that Brenneman is dissembling to cover up his discriminatory and retaliatory purpose.

The Fourth Circuit and several others have held that "a fact finder could infer from the late appearance of [an employer's] justification that it is a post-hoc rationale, not a legitimate explanation for [the discriminatory action]." *EEOC v. Sears Roebuck and Co.*, 243 F.3d 846, 853 (4th Cir. 2001); *see also Czekalski v. Peters*, 475 F.3d 360, 367 (D.C. Cir. 2007) (holding that "subsequent clarifications [of an articulated reason] represented nothing more than back-pedaling"); *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 284 (3rd Cir. 2001) ("the ever-changing nature of the proffered reasons can be considered as detracting from their legitimacy."); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir.1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext."); *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir.1994) (holding that a reasonable juror could infer that the shifting and inconsistent explanations given by the employer at trial were pretextual, developed over time to counter the evidence suggesting discrimination). Here, it was not until seven months after he made the decision, and long after Chowdhury filed his EEO complaint, that Brenneman first alleged that he doubted Chowdhury's portrayal of his experience. PX 52 at ¶ 8 (Brenneman Aff., dated 7/19/04); PX 40 (Merit Promotion Roster showing selections made on 12/19/03); PX 9 at 85 (testifying that he did not have the specific concerns mentioned in his affidavit until he began preparing the affidavit).

The late appearance of Brenneman's credibility doubts alone is sufficient to cast doubt on Brenneman's veracity in offering this and his other explanations. *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 813 (10th Cir. 2000) ("Courts should be disquieted ... by an employer who 'fully' articulates its reasons for the first time months after the decision was made."). Yet, Brenneman also contradicted himself at his deposition. First, he testified that he did not question Chowdhury about the accuracy of his representations during the interview because he "didn't think it was the place to question his credibility in the interviews." PX 9 at 80. Then he testified, "I don't recall why I didn't go into this specifically during the interview." PX 9 at 83. Finally, he admitted that he did not question Chowdhury about his veracity because he did not have the concerns at the time of the interview. *Id.* at 85-86. While a reasonable jury could draw a number of inferences from his conflicting testimony, given Mr. Brenneman's utter failure to raise these alleged concerns with anyone prior to this case, one likely conclusion is that Brenneman came up with these allegations after the fact as a way of trying to justify selecting three less qualified individuals over Mr. Chowdhury.

A jury could also conclude that Brenneman lied when he testified that he did not select Chowdhury because his interview responses were less specific than the selectees' responses. PX 55 at ¶ 9. Although Brenneman disputes the plain meaning of his contemporaneous notes, a jury could find that when he wrote "very specific" in the place he recorded Chowdhury's interview responses, he meant that Chowdhury was "very specific" in his answer – especially given his questionable testimony about when his concerns over Chowdhury's credibility. PX 56, Brenneman Interview Notes (Chowdhury).

25

IV.     **Chowdhury's Hostile Work Environment Claim Should Go To A Jury.**

When the workplace is, "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment,' Title VII is violated." *Singletary*, 351 F.3d at 526 (*quoting Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986); *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005). "[A] discriminatory abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Singletary*, 351 F.3d at 526. "Whether the harassment was sufficiently severe or pervasive to create a hostile work environment is "quintessentially a question of fact" for the jury." *Smith v. First Union Nat. Bank*, 202 F.3d 234, 243 (4th Cir. 2000); *see also Estes v. Georgetown University*, 231 F. Supp. 2d 279, 282 (D.D.C. 2002) (finding that it was, "for the jury to decide whom to believe on the question of whether the evidence taken as a whole crossed the line between mere vulgarity...and offensive conduct that was sufficiently severe or pervasive to alter conditions of employment").

There is ample evidence from which a jury could infer that Henning directed his hostility at Chowdhury for an unlawful reason. Henning admitted that he scrutinized Chowdhury's work so rigidly because he had filed an EEO complaint against him. PX 3 at 8, ¶ 21. In addition, a reasonable jury could infer that Henning targeted Chowdhury because of his racial and ethnic "background." PX 41 at 104-106. Certainly, his efforts to convert the office into a "Christian family" isolated Chowdhury as the only Muslim in the office. PX 41 at 121. Furthermore, Henning singled Chowdhury out at the only CG-15 who reported to another CG-15 instead of

Henning himself. PX 43 at 106-108. Henning also assigned Chowdhury to work as the CG-15's assistant and made a point of telling Chowdhury that he had to do it because no one else wanted to. PX 3 at 2, ¶ 4. Henning also humiliated Chowdhury in front of his coworkers by announcing his departure and belittled him by telling everyone that Chowdhury would receive no raise that year. PX 3 at 5, ¶ 14; PX 41 at 146-47; PX 46, Wisnieski Dep. at 43-47; PX 10, Lapin Dep. at 61-62 . There is no evidence that Henning treated any other employee outside of Chowdhury's protected class in such a hostile manner.

There can also be no doubt that there are material issues of fact regarding whether Henning's harassment was sufficiently severe to violate Title VII. The isolation, humiliation, and looming threat of termination ultimately rendered Chowdhury unable to do his job; the harassment led to depression and anxiety that caused Mr. Chowdhury to retire on disability. *See Harris,* 510 U.S. at 370-71 ("Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being."). Furthermore, the harassment was as pervasive as harassment can be: Henning unfairly criticized every piece of work that Chowdhury produced even after he had approved it. Henning also put Chowdhury under a permanent threat of termination.

## V.   Chowdhury's Retaliation Claims Survive Summary Judgment Under the Standard Enunciated in *Burlington Northern.*

Summary judgment must be denied on Chowdhury's retaliation claim because Henning admitted his retaliatory motive and because Chowdhury has adduced sufficient evidence that the actions Henning took against him "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White,* 548

U.S. 53 (2006).  The cases decided under this standard support a finding that the following

retaliatory actions taken against Chowdhury warrant the protection of Title VII's anti-retaliation

provision:

1. Henning removed Chowdhury from his role as team leader, his title was changed from Project Manager to Senior Information Systems Specialist, and he was assigned the clerical task of collecting and adding data for another CG-15 – a task typically performed by CG-7's and CG-8's. *See Burlington Northern*, 548 U.S. 71-72 (finding that reassignment was materially adverse, in part, because reassigned duties were less prestigious and less desirable); *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (finding change in duties adverse where duties performed were lower graded);[6] *Robinson v. Winter*, 457 F.Supp.2d 32, 34 (D.D.C. 2006) (finding "assignment to menial tasks" to be adverse employment action under *Burlington Northern*); *Chaple v. Johnson*, 453 F.Supp.2d 63, 71-72 (D.D.C. 2006) (finding genuine issue regarding material adverse action where employee testified that "his duties were reduced, the position was no longer highly visible and career enhancing, and its tasks were insufficient to support a GS-14 grade.").

2. Henning unfairly put Chowdhury on a Performance Improvement Plan and warned that him that he could be terminated. *See Velikonja v. Gonzales*, 466 F.3d 122, 124 (D.C.Cir. 2006) (holding that the "prospect" of an investigation resulting from the employer's false accusations could dissuade a reasonable employee from making or supporting a charge of discrimination); *Roberts v. Roadway Express*, 149 F.3d 1098, 1104 (10th Cir. 1998) (holding that issuing written reprimands are materially adverse because written reprimands made termination more likely); *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090 (10th Cir. 2007) (threats to oppose unemployment application and steps taken towards that end are sufficient under *Burlington Northern* standard).

---

[6]Most courts addressing the issue, even before the Supreme Court decided *Burlington*, agree that a diminution in duties constitutes an adverse action. *See, e.g., Green v. Admin. of the Tulane Educ. Fund*, 284 F.3d 642, 651, 654-55 (5th Cir. 2002) (holding that removal of duties constituted an adverse action and noting that "the Supreme Court did not state that loss of economic benefit was required in all cases"); *Dahm v. Glynn*, 60 F.3d 253, 257 (7th Cir. 1994) ("[A] dramatic downward shift in skill level required to perform job responsibilities can rise to the level of an adverse employment action"); *Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 799 (10th Cir. 1993) (If an employee "is required to utilize a lesser degree of skill than his previous assignment," then he has suffered a demotion) *abrogated on other grounds, Buchanan v. Sherrill*, 51 F.3d 227, 229 (10th Cir. 1995).

3.   Henning precluded Chowdhury from several career-enhancing details and rotational assignments. *See Velikonja,* 466 F.3d at 124 (holding that preclusion from career enhancing opportunities was materially adverse).

4.   Henning humiliated Chowdhury in front of his coworkers when he falsely announced to the group that he was leaving and again when Henning publicly stated that Chowdhury would get a 0% raise for taking on a new role. *See Pegues v. Mineta,* 2006 WL 2434936 at *7 (D.D.C.) (degrading and humiliating behavior satisfied the *Burlington* standard).

5.   Henning unfairly scrutinized Chowdhury's work by criticizing work he had already approved and admitted that he did so because Chowdhury complained of discrimination. *See Rattigan v. Gonzales,* 503 F.Supp.2d 56, 76 (D.D.C. 2007) (excessive monitoring and investigation may dissuade a reasonable worker from making charge of discrimination).

6.   Henning denied Chowdhury a $5,000 Performance Award. *See Weber v. Battista,* 494 F.3d 179, 184 (D.C. Cir. 2007) (loss of performance award could well dissuade a reasonable worker from complaining of discrimination).

While a reasonable jury might find that any one of these actions would be sufficient to dissuade someone from complaining of discrimination, "the sheer number of actions taken against Plaintiff weigh in his favor." *Pegues,* 2006 WL 2434936 at *7. Accordingly, summary judgment must be denied on Chowdhury's claims of retaliation.

Respectfully submitted,


                                        /s/
                                        David H. Shapiro, D.C. Bar # 961326
                                        James E. Simpson, D.C. Bar # 482870
                                        Swick & Shapiro, P.C.
                                        1225 Eye Street, N.W.
                                        Suite 1290
                                        Washington, DC  20005
                                        (202) 842-0300
                                        Fax (202) 842-1418

                                        Attorneys for Plaintiff