**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
**SULTAN M. CHOWDHURY,**                     )
                                            )
       **Plaintiff,**                    )
                                            )
      **v.**                                  )     **Case No: 1:05CV02368 (RMU)**
                                            )
**SHEILA C. BAIR, CHAIRMAN,**                )
**FEDERAL DEPOSIT INSURANCE**                )
**CORPORATION,**                             )
                                            )
      **Defendant.**                    )
_____)

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**
**ON PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM**

      On March 30, 2009, the Court ordered further briefing on Defendant's motion for

summary judgment relating to Plaintiff's hostile work environment claim.  In response, on

May 4, 2009, Defendant filed its supplemental memorandum.  On May 18, 2009, Plaintiff

filed his opposition with an accompanying declaration.  Defendant now submits this reply.

**I.**     **INTRODUCTION**

      The specific facts alleged by Plaintiff, as taken from Plaintiff's own deposition

testimony and declarations, were not frequent, severe, pervasive, or abusive enough under the

very demanding standard required by this Circuit to establish a hostile work environment

claim.  Plaintiff's opposition and declaration are replete with conclusory statements and

allegations of the supposed hostile work environment ("humiliated,"[1] "berated,"

"dismissiveness," "degraded," "snide," "smirked," "angry faces," "condescending,"

_____

[1] Plaintiff uses some form of the word "humiliate" ten times in his declaration.

"offended," "would hound me," "horrified" to learn third-hand of a meeting, "impending punishment to the gallows," "rant," and "horror").

A party opposing summary judgment, however, may not rely merely on allegations or conclusory statements, but rather must present <u>specific</u> <u>facts</u> showing a genuine issue for trial. Stripped of the conclusory allegations and statements, Plaintiff's alleged <u>specific</u> <u>facts</u> fail to establish a workplace permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.

## II.   <u>ARGUMENT</u>

### A.   <u>The Demanding Legal Standard For Hostile Work Environment</u>

As phrased by this Court in a recent decision, "Plaintiff fundamentally misunderstands the nature of a hostile work environment claim," in that it is not a cause of action for ordinary tribulations of the workplace.  <u>Franklin v. Potter</u>, 600 F. Supp.2d 38, 76 (D.D.C. 2009).  This Court has also noted that the conduct complained of must be <u>extreme</u> under a <u>demanding</u> standard to amount to a change in the terms and conditions of employment.  <u>Id</u>; <u>see</u> <u>also</u> <u>Tolson v. Springer</u>, No. 07-2181, 2009 WL 1314405 at * 5 (D.D.C. May 13, 2009) (citing D.C. Circuit and District Court cases demonstrating the extreme conduct required to support a claim); Def.'s Supp. Mem. at 2 – 5 (same).

In <u>Franklin</u>, <u>Tolson</u>, and many of the other cases cited by Defendant in its Supplemental Memorandum, the courts dismissed the cases at the summary judgment stage because the plaintiff failed to establish the extreme conduct required in this Circuit to establish a hostile work environment.  When a motion for summary judgment is properly made and supported, the opposing party may not rely merely on allegations or conclusory

statements.  Mere unsubstantiated allegations create no genuine issue of fact and will not withstand summary judgment.  Rather, the opposing party must present <u>specific</u> <u>facts</u> that would enable a reasonable jury to find in its favor.  <u>Tolson</u>, 2009 WL 1314405 at * 3; <u>Brown v. Paulson</u>, 597 F. Supp.2d 67, 72 (D.D.C. 2009).  "Accepting …conclusory allegations as true…would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."  <u>Abdelkarim v. Tomlinson</u>, No. 05-1783, 2009 WL 726023 at * 3 (D.D.C. March 20, 2009), quoting <u>Greene v. Dalton</u>, 164 F.3d 671, 675 (D.C. Cir. 1999).

Here, summary judgment should be granted because Plaintiff relies heavily on conclusory statements that are insufficient to withstand summary judgment and any specific facts alleged fail to establish a hostile work environment under the required demanding standard.

**B.  Plaintiff's Alleged Specific Facts Are Neither Severe Nor Pervasive Enough Individually Or Collectively To Establish An Objectively Hostile Work Environment**

**1.  Plaintiff's "worst treatment" and other allegations fail to establish a hostile work environment**

In his May 18, 2009 declaration, Plaintiff alleges that the "<u>worst</u> <u>treatment</u> I endured were the weekly meetings with Henning that were supposedly to improve my writing."  Pl. Dec. (ECF Doc. 48-1) at 3 (emphasis added).

By way of background, when Henning first became Plaintiff's supervisor in October 2003, several people raised concerns with Henning regarding the quality of Plaintiff's writing. In March 2004, Henning met with Plaintiff for a mid-year review to discuss deficiencies with Plaintiff's written communications.  In April 2004, Henning signed Plaintiff's mid-year

review memorandum that discussed these deficiencies.  Consequently, beginning in April

2004, Henning met with Plaintiff on a weekly basis, when possible, to discuss Plaintiff's

writing and efforts to improve it.  <u>See</u> Def.'s Reply (ECF Doc. 40) at 15 – 16.  Henning noted

these regular meetings in his April 9, 2004 memo to Plaintiff where Henning suggested ways

to improve the deficiencies:

> As we discussed, the quality of your writing is something that you can improve
> with specific actions and appropriate attention.  And I am committed to helping
> you in that process.  Please let me know how I can help in addition to the
> actions above and <u>regular meetings</u> to discuss your progress.

PX 18 (ECF Doc. 36) (emphasis added).

It is in this context where Henning met with Plaintiff to improve his written

communication skills that Plaintiff endured this "worst treatment."

In his May 18, 2009 declaration, Plaintiff alleges that Henning was "grunting" at him;

"berated" him; would "rant" at him; would "point his finger;" "clench his teeth," and "make

angry faces."  Pl. Dec. (ECF Doc. 48-1) at 3.  Berating and ranting are conclusory statements.

Pointing a finger, clenching teeth, and making an angry face may be impolite or possibly

rude, but not abusive.  Moreover, the <u>specific facts</u> alleged by Plaintiff fail to support his

conclusions.  Plaintiff provides two examples of specific facts in his declaration to support his

allegations of berating or ranting.  First, Henning allegedly stated: "ooooh, this is terrible, No,

Sultan, this makes no sense."  <u>Id</u>.  Second, Henning allegedly stated: "you are a grade 15, like

me."  <u>Id</u>.  As a matter of law, these alleged comments cannot sustain a hostile work

environment.

During his deposition, Plaintiff characterized these discussions where Henning worked

with Plaintiff to improve his writing as "torture."  Plaintiff alleged that Henning would "grit

his teeth" and would "show his fingers" and this was "torturous;" it was "torturous" to have

his work critiqued for 60 minutes; and Henning "would raise his voice in a controlled

manner." Def.'s Reply, Att. B (Pl. Dep.) (ECF Doc. 40-2) at 252-3, 256, 259, and 271.

> Q        …You told me that he criticized your work and that he pointed his finger and
>          that his face got red sometimes and that you had to be in his office to go over
>          your work.  Other than those things – okay, and he clenched his teeth
>          sometimes according to you.  What other things did he do that were torture?
> A        I think those are significant torture.[2]
> Q        Okay.  Is there anything else?
> A        I don't recall now.

Def. Stmt., Ex. TT (Pl. Dep.) (ECF Doc. 32-79) at 490.

Whether characterized by Plaintiff in a conclusory fashion as berating, ranting, or

torture, the specific facts alleged by Plaintiff fail to support his conclusions.  Given that

Plaintiff claims that these meetings were the "worst treatment" he endured, Plaintiff must

concede that his remaining allegations were less severe and pervasive.  Further, given that

Plaintiff's "worst treatment" allegation fails to establish his claim, Plaintiff's remaining less

severe allegations must likewise fail.

Reviewing Plaintiff's May 18, 2009 declaration for specific facts rather than

conclusory allegations, Plaintiff's other examples also fail to support his claim.  On one

occasion Henning called him into his office, closed the door (so the discussion was not in a

---

[2] A hostile work environment claim has an objective and a subjective component.  An objective reasonable person must find the environment hostile and abusive and the victim must subjectively perceive the environment to be abusive.  See Harris, 510 U.S. 17 at 21-22.  Here, no objective reasonable person could find the environment to be "torture."  Moreover, Plaintiff's subjective reaction that talking to his supervisor about his work product amounts to "torture" fails to establish an abusive environment.  See Franklin, 600 F. Supp.2d at 78 (defendant cannot be responsible for plaintiff's subjective belief of persecution); Smith v. Jackson, 539 F. Supp.2d 116, 138 n 21 (D.D.C. 2008) (plaintiff's subjective reaction to his work environment, rather than the environment itself, would not transform a non-hostile work environment into an abusive one).

public place) and:  "He raised his voice, and said, 'You're not professional. Why did you ask the contractor for a date.'"  Pl. Dec. at 2.  On one occasion in a meeting where Plaintiff was in the middle of explaining something, Henning "abruptly called the meeting to an end" and this "humiliated" Plaintiff.  Id.  On one occasion, he was "horrified to learn third-hand" about a meeting he thought he should attend.  Id.  Plaintiff also cites unspecific criticism of his work and cites other meetings he was not invited to attend.  Id. at 1.[3]

All of these incidents merely involve the daily interactions between a subordinate and his supervisor and at most constitute common workplace grievances that fail to constitute the extreme, abusive conduct necessary to change the terms and conditions of employment to establish a hostile work environment.

This Court has consistently held that there is no hostile work environment where a plaintiff's case is based upon a supervisor's criticisms of a subordinate's work.  Common workplace grievances are not the type of extreme conduct necessary to establish a claim. Franklin v. Potter, 600 F. Supp.2d 38, 76 (D.D.C. 2009).  This Court has emphasized this demanding standard in the context of workplace disputes between supervisors and subordinates:

> However, the fact that an employee and his immediate supervisor repeatedly "butted heads," that the supervisor "frequently yelled at him during discussions about his work," and that the supervisor "threatened him" with job-related consequences for his refusals to meet workplace expectations does not demonstrate a hostile work environment pervaded by discrimination or retaliation. *Smith, 539 F.Supp.2d at 138-139* ("[A]n 'intense' manager does not a hostile work environment make."); *Singh v. U.S. House of Reps., Comm. on Ways & Means, 300 F.Supp.2d 48, 56 (D.D.C.2004)* ("Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of

---

[3] Since Plaintiff's May 18, 2009 declaration mostly repeats allegations raised in prior filings that were addressed in Defendant's Supplemental Memorandum, Defendant's responses need not be repeated here.

disapproval) are the kinds of normal strains that can occur in any office setting ...."); *see also* *Baloch, 550 F.3d at 1201* (finding that "totality of circumstances" did not show hostile work environment despite plaintiff's "several verbal clashes with his supervisor in the workplace").

Id. at 77.

In Pearsall v. Holder, No. 07-0108, 2009 WL 1133364 at * 8 (D.D.C. April 28, 2009), this Court dismissed a hostile work environment claim based on allegations that the plaintiff was assigned substandard office space; denied training; denied telecommute opportunities; excluded from meetings; and "generally underutilized his skills and experience." The allegations failed to establish a hostile work environment and were simply the ordinary tribulations of the workplace. Id.

In Smith v. Jackson, 539 F. Supp.2d 116, 138 (D.D.C. 2008), this Court granted summary judgment where an "intense" supervisor called the plaintiff into his office numerous times a day, repeatedly called him on the phone, constantly sent him emails, changed his CWS, charged him with AWOL, physically blocked his path when he sought to leave his office, "frequently yelled" at him during discussions about his work, and "butted heads" with him over a contract.

In Hussain v. Gutierrez, 593 F. Supp.2d 1, 7 (D.D.C. 2008), this Court granted summary judgment where the plaintiff alleged that her job responsibilities were continually changed and downgraded, she was not treated like a professional, was asked to do tasks below her job title, asked to sit in a reception area, and told how to organize her desk. The Court held that such complaints over job responsibilities and office arrangement were simply ordinary tribulations of the workplace insufficient to support a claim. Id.

In <u>Bryant v. Leavitt</u>, 475 F. Supp.2d 15 (D.D.C. 2007), this Court dismissed a hostile

work environment claim and stated:

> Here, Plaintiff has offered evidence that he was subject to harassment when
> [supervisor] Coy reprimanded and criticized him, made unwelcome comments
> about his age, and singled him out for close scrutiny by management.  These
> discrete acts of alleged discrimination and retaliation simply do not rise to the
> level of severity and pervasiveness necessary to maintain a hostile work
> environment claim.

<u>Id.</u> at 28; <u>see</u> <u>also</u> <u>Singh v. U.S. House of Representatives</u>, 300 F. Supp.2d 48, 56 (D.D.C.

2004) ("criticisms of a subordinate's work and expressions of disapproval (even loud

expressions of disapproval) are normal strains that can occur in any office setting");  <u>Richard</u>

<u>v. Bell Atlantic Corp.</u>, 209 F. Supp.2d 23, 35 (D.D.C. 2002) ("rude comments, unjust

criticism, and stressful working conditions"); <u>Everson v. Medlantic Healthcare Group</u>, 414 F.

Supp.2d 77, 86 (D.D.C. 2006) ("reprimands and unpleasant bosses").

Here, Plaintiff's allegations mostly concern meetings with his supervisor to discuss

ways to improve his written work product, comments made by the supervisor to his

subordinate during those meetings about his work product, a decision made by a supervisor on

when to end a meeting, and decisions by a supervisor on which of his subordinates should

attend various meetings (essentially an allocation of resources issue).  Other claims noted by

the Court in its Memorandum Opinion included Plaintiff's claim that he was the only CDR

employee to report to a team leader other than Henning, that Henning assigned him work that

an assistant would normally handle, and that Henning frustrated Plaintiff's attempt to move to

another division.  Again, at most these constitute common workplace grievances over

reporting lines, team leader designations, work assignments, and detail assignments that fail to

constitute the extreme, abusive conduct necessary to establish a hostile work environment.

These are all everyday issues that every private and federal sector supervisor and subordinate may encounter on a daily basis.  As reflected in the above decisions, these allegations simply constitute ordinary workplace grievances that fail to establish a hostile work environment.

### 2.    Plaintiff admitted that any remarks Henning may have made about being a Christian were non-threatening

Plaintiff's most recent opposition brief and declaration rely heavily on Plaintiff's allegation that Henning referred to the work unit as a "Christian family."  But Plaintiff has mischaracterized Henning's alleged statements and the record evidence from Plaintiff's own deposition testimony does not support his allegation.

Plaintiff's May 18, 2009 declaration alleges: "It was soon after Henning became my supervisor in October 2003, that he called our unit, which he headed, a 'Christian family.'" Pl. Dec. at 1.  Similarly, Plaintiff's original opposition brief characterized Plaintiff's testimony as follows:

> During conversations and discussions with the CDR team, Henning would comment that "we [the CDR team] are Christian family." PX 41, Chowdhury Dep. at 121.

Opp'n filed Sept. 19, 2008 (ECF Doc. 36) at 8 (bracketed phrase in original).  To be clear, as shown below, the bracketed phrase [the CDR team], does not appear anywhere in Plaintiff's deposition testimony.

Plaintiff's mischaracterization of the facts is shown by what Plaintiff actually said at his deposition.  Plaintiff testified:

> Q      You say in paragraph eight that Mr. Henning made his religious difference known to you.  Did he do anything other than having a bible on his desk that made his religious difference known to you?

| A | It was made known that he is a religious person or religious Christian and he came late on Friday mornings because he goes to church.[4] |
| Q | Who made it known? |
| A | He made it known. |
| Q | How did he do that? |
| A | In conversations.  <u>We are Christian family or something of that nature</u>. |
| Q | He said that to you. |
| A | Yes in conversations and he – we knew it because we could not schedule early Friday morning meetings with him because <u>he would be at church with his family</u>. |

Def.'s reply, Att. B (Pl. Dep.) (ECF Doc. 40-2) at 120-121 (emphasis added).

This is far different from Plaintiff's characterization that Henning referred to the <u>CDR team</u> or the <u>office</u> or the <u>unit</u> as a Christian family.  Plaintiff's <u>actual</u> testimony fails to support any allegation that Henning referred to the work team or unit as a Christian family. At most, Henning simply indicated that he attended church services Friday mornings with his own family.

In fact, Plaintiff also testified that:

| Q | So he went to church on his own time outside of work? |
| A | I don't know that. |
| Q | Well, did he hold religious services at work? |
| A | I don't know that. |
| Q | Well I am asking you, do you know if he did? |
| A | I don't know that.[5] |
| Q | Okay.  So, did you at any time feel threatened by Mr. Henning being a Christian? |
| A | No.  I don't feel threatened because of his religion. |
| Q | And for the record, what is your religion? |
| A | I'm a Muslim. |
| Q | Did Mr. Henning ever make any comments to you about being Muslim? |
| A | No. |
| Q | Did Mr. Henning ever make any comments about Muslims generally in your presence? |
| A | Not that I recall. |

---

[4] Note that Plaintiff did not mention Bible study meetings, discussed below at 12.

[5] Note that Plaintiff did not mention Bible study meetings.

Def.'s Stmt. at Ex. SS (Pl. Dep.) (ECF Doc. 32-78) at 121-22.

Far from saying that Henning called the office a "Christian family" and used that to isolate Plaintiff, Plaintiff conceded that he was not threatened by Henning's religion and Henning never made any comments about Plaintiff being Muslim.  No objective observer could find that a supervisor's statement suggesting that <u>he himself or his family</u> were Christian was threatening – a fact Plaintiff conceded.

The only other arguable evidence of a religious hostile work environment is Plaintiff's allegation that Henning kept a Bible at his desk and sometimes held Bible meetings during lunch hour in a conference room or in his office.  The Bible was produced at Henning's deposition, however, where it was confirmed that the Bible had no writing on its cover, its spine, or the back cover, and had no gilding on its pages.  It was simply a plain covered, leather-bound book.  Def.'s reply filed Oct. 30, 2008 at Att. D (Henning Dep.) (ECF Doc. 40-4) at 331, 349.

Plaintiff conceded that the Bible did not bother him, he did not find it offensive, and Henning never referred to it when speaking to him.

> Q   Did you ever say anything to Mr. Henning about it?
> A   No.
> Q   Did it bother you?
> A   Not in particular.
> Q   Was it offensive to you?
> A   No.
> Q   Did Mr. Henning ever refer to it in speaking with you?
> A   No.[6]

Def.'s reply filed Oct. 30, 2008 at Att. B (Pl. Dep.) (ECF Doc. 40-2) at 120.

---

[6] Note that Plaintiff again did not mention any problem with Bible study meetings.

Although Plaintiff alleges in his declaration that Henning would talk to "CDR staff in the hallway and in casual meetings" about Bible meetings (see Pl. Dec. at 1), Plaintiff cannot ignore his own deposition testimony that he was not threatened by Henning's religion, the Bible did not bother him, it was not offensive, Henning never referred to it when speaking to him, and Henning never made any comments about his being Muslim.

Interestingly, as noted in footnotes 4-6 above, when questioned at his deposition (taken over the course of three separate days) about the "Christian family," Bible, and other religious discrimination allegations, Plaintiff never mentioned the Bible studies at all. During the course of this litigation, Plaintiff earlier submitted three sworn declarations or affidavits. None mention the Bible studies at all. See PX 1 (Plaintiff's Aug. 23, 2004 Affidavit) (ECF Doc. 36-3); PX 3 (Plaintiff's Jan. 6, 2005 Affidavit) (ECF Doc. 36-5); PX 42 (Plaintiff's March 9, 2005 Rebuttal to Martin Henning Affidavit) (ECF Doc. 36-44).

In any event, Plaintiff's allegations relating to the Bible fail to support his claim. Keeping an unmarked Bible in a private office and sometimes holding Bible studies in the office during non-work hours fail to support a hostile work environment. Indeed, in 1997, The White House issued Guidelines on Religious Exercise and Religious Expression in the Federal Workplace that specifically noted that federal employees may keep a Bible on their private desk and may gather on their own time for prayer and "Bible study" in conference rooms. See Ex. A to this reply at 4, 14, and 16 (1997 WL 475412). "Such a gathering does not constitute religious harassment even if other employees with different views on how to pray might feel excluded or ask that the group be disbanded." Id. at 14-15.

The "Christian family" and Bible allegations are the only allegations that possibly support a religious hostile work environment. A review of Plaintiff's actual deposition

testimony, and not Plaintiff's characterization of that testimony, however, fails to establish a

religious hostile work environment.  Taken individually, together, or even in concert with the

rest of Plaintiff's allegations, they fail to establish the severe, pervasive, and abusive work

environment necessary to support a hostile work environment.

**III.**    **CONCLUSION**

Plaintiff has failed to establish that he was forced to suffer discriminatory intimidation,

ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of his

employment and create an abusive working environment.  Moreover, Plaintiff has failed to

establish the type of "extreme" conduct necessary in this Circuit to support a hostile work

environment claim and his allegations surely do not demonstrate a work environment that was

pervaded by discrimination.

For the reasons set forth above and in its Supplemental Memorandum, Defendant

respectfully requests this Court enter summary judgment on Defendant's behalf as to

Plaintiff's hostile work environment claim.

May 26, 2009                                Respectfully submitted,

                                            _/s/_ Thomas J. Sarisky_____
                                            Thomas J. Sarisky, Counsel
                                            FDIC Legal Division
                                            DC Bar No. 442607
                                            3501 Fairfax Drive, Room VS-D6116
                                            Arlington, VA  22226
                                            703-562- 2618 (office)
                                            703-562-2482 (fax)